IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION

| | | |
|---|---|---|
| MELVIN DAVIS, | ) | |
| | ) | |
| Petitioner, | ) | |
| | ) | |
| v. | ) | CASE NO. 2:10-cv-00262-WKW-JTA |
| | ) | [WO] |
| JEFFERSON DUNN, *Commissioner*, | ) | |
| *Alabama Department of Corrections*, | ) | |
| | ) | |
| Respondent. | ) | |

## MEMORANDUM OPINION AND ORDER

## I.  INTRODUCTION

Petitioner Melvin Davis ("Davis"), incarcerated at the William C. Holman Correctional Facility in Atmore, Alabama, filed this federal habeas corpus petition pursuant to 28 U.S.C. § 2254, challenging his 1996 convictions for capital murder and resulting death sentence in the Circuit Court of Montgomery County, Alabama.[1]  The petition is fully briefed and ripe for review.  Upon thorough consideration of the briefs and the entire record, and for the reasons set forth below, Davis is not entitled to habeas relief, and his petition is due to be denied.

---

[1]    When filed, this case was assigned to another district judge.  (Doc. 1).  On November 25, 2014, it was reassigned to the undersigned district judge.  (Doc. 37).

**Table of Contents**

I. INTRODUCTION ........................................................................................................................... 1

II. JURISDICTION AND VENUE ................................................................................................... 4

III. BACKGROUND .......................................................................................................................... 4

    A.    Guilt Phase of Davis's Trial ............................................................................................ 4

    B.    Penalty Phase of Davis's Trial ...................................................................................... 35

    C.    Judicial Sentencing Hearing .......................................................................................... 38

    D.    Resolution of Davis's Co-Defendants' Cases ............................................................... 40

IV. POST-TRIAL PROCEEDINGS AND PROCEDURAL HISTORY ...................................... 41

    A.    Direct Appeal .................................................................................................................. 41

    B.    Rule 32 Proceedings ....................................................................................................... 44

V. STANDARDS OF REVIEW ....................................................................................................... 57

    A.    Exhaustion and Procedural Default ............................................................................. 57

    B.    AEDPA Review of State Court Decisions ..................................................................... 61

VI. DISCUSSION .............................................................................................................................. 65

    A.    Davis's Claims of Ineffective Assistance of Trial Counsel at the Guilt Phase (Doc. 1 at ¶¶ 34–75) ..................... 66

        1.    Davis's subclaim that trial counsel failed to locate, interview, and present alibi witnesses who possessed exculpatory information (doc. 1 at ¶¶ 36–41) ........................................................................................... 68

        2.    Davis's subclaim that trial counsel failed to begin any trial preparation until five days before trial and did not meet with Davis enough (doc. 1 at ¶¶ 42–46) ........................................................................................... 79

        3.    Davis's subclaim that trial counsel failed to conduct an independent investigation of the facts or to investigate alternative theories of the crime (doc. 1 at ¶¶ 47–56) ...................................................................... 86

        4.    Davis's subclaim that trial counsel failed to cross-examine or challenge the credibility of Jointer, Smith, Boswell, Jr., and Dunn (doc. 1 at ¶¶ 57–64) ................................................................................................. 100

        5.    Davis's subclaim that trial counsel failed to consult or retain experts (doc. 1 at ¶¶ 65–74) .......................... 113

        6.    Davis's subclaim that trial counsel failed to adequately prepare to cross-examine the State's expert witnesses (doc. 1 at ¶ 75) ................................................................................................................................................. 121

    B.    Davis's Claims of Ineffective Assistance of Trial Counsel at the Penalty Phase (Doc. 1 at ¶¶ 76–117)............. 122

        1.    Davis's subclaim that trial counsel failed to investigate mitigation evidence of Davis's dysfunctional childhood and bleak life history (doc. 1 at ¶¶ 80–94) ............................................................................................. 124

        2.    Davis's subclaim that trial counsel failed to investigate mitigation evidence of Davis's good character in the community (doc. 1 at ¶¶ 95–105) ................................................................................................................... 124

        3.    Davis's subclaim that trial counsel failed to offer expert testimony about his mental health for mitigation purposes (doc. 1 at ¶¶ 106–09) .................................................................................................................... 143

        4.    Davis's subclaim that trial counsel failed to use readily available expert "social history" testimony in mitigation (doc. 1 at ¶¶ 110–12) ............................................................................................................................ 146

        5.    Davis's subclaim that trial counsel failed to adequately prepare for his judicial sentencing hearing before the judge (doc. 1 at ¶¶ 113–17) ................................................................................................................................. 150

    C.    Davis's Claim that the Prosecution Violated *Brady* in Various Ways (Doc. 1 at ¶¶ 118–25)............................. 157

    D.    Davis's Claim that the Rule 32 Court's Verbatim Adoption of the Proposed Order Submitted by the State Violated his Right to Due Process (Doc. 1 at ¶¶ 126–33) .................................................................................... 169

    E.    Davis's Claim that the Denial of His Motions for a Continuance Deprived Him of His Rights to Due Process, a Fair Trial, and Effective Assistance of Counsel (Doc. 1 at ¶¶ 134–38) .......................................................... 172

F.      Davis's Claim that Prosecutorial Misconduct Deprived Him of His Rights to Due Process, a Fair Trial, and a Reliable Sentence (Doc. 1 at ¶¶ 139–56) ................................................................. 172

G.      Davis's Claim that His Absence During Part of his Trial Frustrated the Fairness of the Proceedings and Violated His Rights Under the Fifth, Sixth, Eighth, and Fourteenth Amendments (Doc. 1 at ¶¶ 157–58) .................... 181

H.      Davis's Claim that the Trial Court's Admission of Certain Evidence and Testimony Violated His Rights to Due Process, Confrontation, and a Fair Trial (Doc. 1 at ¶¶ 159–61) .................................................................. 183

I.      Davis's Claim that the Trial Court Prevented Him from Presenting a Defense in Violation of His Rights to Confrontation, Due Process, and a Fair Trial (Doc. 1 at ¶¶ 162–63) ................................................. 188

J.      Davis's Claim that the Trial Court's Failure to Excuse Seven Potential Jurors for Cause Deprived Him of His Rights to Due Process, a Fair Trial, and a Reliable Sentence (Doc. 1 at ¶¶ 164–66) .................... 192

K.      Davis's Claim that the Trial Court's Removal of One Potential Juror for Cause Deprived Him of His Rights to Due Process, a Fair Trial, and a Reliable Sentence (Doc. 1 at ¶¶ 167–68) ........................................ 193

L.      Davis's Claim that Alabama's Capital Sentencing Scheme Violated His Right to a Trial by Jury (Doc. 1 at ¶¶ 169–70) .......................................................................................................................... 195

M.      Davis's Claim that the Trial Court's Failure to Disqualify the Prosecutor or Take Other Remedial Action to Cure the Taint of Prosecutorial Misconduct Violated Davis's Right to a Fair Trial (Doc. 1 at ¶¶ 171–73) ................. 197

N.      Davis's Claim that Misconduct by Jurors Deprived Him of His Rights to be Tried by an Impartial Jury, to Due Process, and to a Reliable Sentence (Doc. 1 at ¶¶ 174–78) .......................................................... 199

O.      Davis's Claim that the Trial Court's Failure to Instruct the Jury on the Lesser Included Offense of Intentional Murder Rendered His Conviction and Sentence Unreliable in Violation of his Eighth and Fourteenth Amendment Rights (Doc. 1 at ¶¶ 179–83) .......................................................................................... 202

P.      Davis's Claim that the Prosecution Violated *Batson* (Doc. 1 at ¶¶ 184–85) ............................................. 205

Q.      Davis's Claim that the Trial Court Misapplied an Aggravating Factor at Sentencing and as a Result His Sentence Violates His Rights Under the Sixth, Eighth, and Fourteenth Amendments (Doc. 1 at ¶¶ 186–88) ............... 206

R.      Davis's Claim that the Trial Court Considered Improper Evidence in Determining Aggravating Factors and Disregarded a Valid Mitigating Factor and as a Result His Sentence Violates His Rights Under the Sixth, Eighth, and Fourteenth Amendments (Doc. 1 at ¶¶ 189–93) ............................................................................ 208

S.      Davis's Claim that the Trial Court Deprived Him of His Fifth, Sixth, Eighth, and Fourteenth Amendment Rights by Allowing the State to Present Hearsay Testimony (Doc. 1 at ¶ 194) .......................................... 212

T.      Davis's Claim that the Trial Court's Jury Instructions Deprived Him of his Fifth, Sixth, Eighth and Fourteenth Amendment Rights (Doc. 1 at ¶¶ 195–200) .................................................................................. 213

U.      Davis's Claim that His Sentences for Conspiracy to Commit Murder and Attempted Murder Violated *Apprendi* (Doc. 1 at ¶¶ 201–03) ......................................................................................................... 218

V.      Davis's Claim that the State's Introduction of Crime Scene and Autopsy Photographs Denied Him the Right to a Fair Trial (Doc. 1 at ¶¶ 204–08) ............................................................................................... 220

W.      Davis's Claim that the State Failed to Meet Its Burden of Proving All Elements of the Capital Murder Offenses in Violation of His Rights to Due Process and a Fair Trial (Doc. 1 at ¶¶ 209–10) .......................................... 227

Y.      Davis's Claims of Ineffective Assistance of Appellate Counsel (Doc. 1 at ¶¶ 211–15) ........................................ 231

VII. CERTIFICATE OF APPEALABILITY .................................................................................................. 235

VIII. CONCLUSION .......................................................................................................................... 236

## II.  JURISDICTION AND VENUE

Jurisdiction and venue over Davis's petition for writ of habeas corpus are proper under 28 U.S.C. § 2241(d) because he was convicted and sentenced in state court in Montgomery County, Alabama, which is within the Middle District of Alabama.

## III.  BACKGROUND

### A.    Guilt Phase of Davis's Trial

The Alabama Court of Criminal Appeals ("ACCA"), in its opinion on direct appeal, quoted the trial court's description of the facts of the crimes as follows:

> Timothy Ray was twenty-seven years old at the time of his death. He was shot seven times, execution style, at point-blank range. John Bradley was sixty-seven years old at the time of his death and was shot three times, execution style, at point-blank range. Eugene Smith was fifty years old when he was shot execution style in the head. Miraculously, he survived and testified at trial. Charlie Boswell, Jr., was the target of the murders as he was the informant in a drug case that was pending against Davis and his brother, Princeton Davis. Boswell, Jr., was not at the home when the shootings occurred. The roots of this case stem from an earlier drug sale case against Davis. In 1995 and 1996, Davis sold marijuana, along with his brother Princeton Davis, from his family's apartment in Gibbs Village. The Montgomery Police Department learned of these drug sales and sent an informant, Charlie Boswell, Jr., to make controlled buys. Boswell made several buys from Princeton Davis and one buy from Davis. Based upon these buys, Davis and his brother were arrested and charged with distribution of marijuana. They were subsequently indicted on the offenses. The drug case involving Melvin Davis is case CC–96–1183; the case involving Princeton Davis is CC–96–1304/05/06.

During the pendency of this case, Davis learned of the identity of the informant, Boswell, from his lawyer.  Davis determined that the way to eliminate the case was to eliminate the informant.  Approximately three weeks before the murders, Davis met with Marcus Dunn and codefendants, Derrick Singleton and Antonio Jointer, at the house on Caffey Dr., where Davis had moved his drug operation.  At this meeting Davis discussed several ways in which to silence the informant.  It was decided that Boswell, Jr., would be killed.  Boswell, Jr., lived, at times, with his father at 3325 Loveless Curve, which was around the corner from where Davis was selling drugs.  Singleton scouted the house and on one occasion drove by it with Dunn to show him where the informant lived.

On Thanksgiving night, November 29, 1996, Davis met with Singleton and Jointer to go to the Top Flight Disco.  The three drove to the club in Singleton's Chevrolet Nova.  They stayed in the club until closing, which was approximately 2:00 a.m.  They then left the club in the same automobile, with Davis driving, Jointer in the front passenger seat, and Singleton in the rear passenger seat.  They traveled down High St. to Decatur St. and then turned right on Fairview Ave.  Jointer believed that they were taking him to his home which was on Rosa Parks Ave.  Instead, at the traffic light at Fairview and Interstate 65, Davis produced a .45 caliber pistol and Singleton produced a .38 caliber pistol, stating, "It's time."  Jointer knew that they meant it was time to kill the informant.  Jointer was unarmed.  Davis then drove to Caffey Dr. and then turned onto Loveless Curve, stopping down the street from the house.  They then approached the house.  Davis banged on the door at 3325 Loveless Curve until the home owner, Charlie Boswell, Sr., came to it.  Davis then stated that he was there to see "Lewis."  Boswell replied that Lewis did not live there but, inquired if he meant "Eugene," who was Eugene Smith, Mr. Boswell's close friend and roommate.  Davis stated that he did, and Mr. Boswell let all three men inside the house.  Present in the house with Mr. Boswell were Timothy Ray, who was asleep on a love seat by the front door in the living room, John Bradley, who was asleep on a couch in the living room, and Eugene Smith, who was in the bedroom at the back of the house.  Davis and Singleton went to the door of Mr. Smith's bedroom and Davis asked, "Is that him?"[FN 1]  Singleton replied in the affirmative.  At trial, Mr. Smith positively identified Davis as one of the men standing at his door.  At that point, as Mr. Smith described it, the other one walked to him,

placed the gun to his ear and fired.  Miraculously, he survived but was seriously wounded.  Jointer, who was standing in the hallway, heard the shot and was numb with fear.  Davis, Singleton, and Jointer then fled the house.  As they were leaving, Davis and Singleton coldly and methodically pumped numerous rounds into Timothy Ray and John Bradley.  Mr. Ray was shot seven times at point-blank range with a .45 caliber pistol and a .38 caliber pistol while Mr. Bradley was shot three times at point-blank range with .45 caliber and .38 caliber pistols.  .45 caliber shell casings were found in Eugene Smith's bedroom and in the living room near the bodies of Mr. Smith and Mr. Ray.  .38 caliber and .45 caliber slugs were also found in the house and were recovered from the bodies of the victims.  Timothy Ray and John Bradley were shot for no reason except they were in the path of the defendants as they fled.  Davis told Jointer that if he ever told anyone about the shootings, he would kill him.

> [FN 1] The record indicates that codefendant Singleton asked the appellant "Is that him?"  The appellant replied affirmatively.  The record clearly indicates that the trial court understood this, even though it mistakenly stated those facts in its written findings of fact.

> After the shootings, Davis drove to the Waffle House [restaurant] on West South Blvd. with Singleton and Jointer where they met Davis's girlfriend, Kaneshia Taylor.  Davis and Singleton sat with Taylor and ordered food while Jointer sat by himself at another booth.

> For approximately one year this case went unsolved until Dunn, who was facing drug charges, came forward with the information concerning the conspiracy to kill Charlie Boswell, Jr., initiated by, and to the benefit of, Davis.  This statement led the police to Jointer who gave a statement implicating Davis and Singleton in the shootings.  Davis, upon being questioned by police, denied any involvement in the shootings but admitted to being with Jointer and Singleton that night.

*Davis v. State*, 804 So. 2d 1153, 1155–56 (Ala. Crim. App. 2000) (quotation marks omitted).

On January 9, 1998, a Montgomery County, Alabama, grand jury indicted Davis, along with his co-defendants Antonio Jointer ("Jointer") and Derrick Singleton ("Singleton"), on one count of attempted murder in violation of Alabama Code § 13A-4-2 (1975); one count of conspiracy to commit murder in violation of Ala. Code § 13A-4-3; two counts of capital murder committed during the course of a burglary in violation of Ala. Code § 13A-5-40(a)(4); and one count of capital murder of two or more persons in violation of Ala. Code § 13A-5-40(a)(10). (Doc. 15-1 at 10–15).[2]

Davis's trial began on August 24, 1998, in the Montgomery County Circuit Court ("the trial court") and lasted four days. Court-appointed lawyers Paul Copeland ("Copeland") and David Belser ("Belser") represented Davis. Assistant District Attorney ("DA") Randy McNeill prosecuted the case. Because it is relevant to Davis's claims, the Court has summarized some of the trial evidence and some of the trial court's evidentiary and procedural rulings.

The State's first witness was Corporal Michael Drummond ("Cpl. Drummond") of the Montgomery Police Department ("MPD")'s Narcotics Bureau. (Doc. 15-4 at 124–87). Cpl. Drummond testified he knew Davis by his nickname "Red," and he used Charles Boswell, Jr. ("Boswell, Jr."), as a confidential informant

---

[2]    References to page numbers are to those generated by the Court's CM/ECF electronic filing system.

("CI") to buy marijuana from Davis and his brother Princeton on April 4, 1996, at Davis's residence in the Gibbs Village housing project in Montgomery. (*Id*. at 127–30). Cpl. Drummond had also used Boswell, Jr. to buy marijuana from Princeton Davis twice before at Gibbs Village. (*Id*.). In fact, Cpl. Drummond had used Boswell, Jr. as a CI in approximately 50 cases, and he knew that Boswell, Jr.'s father was an individual named Charles Boswell, Sr. ("Boswell, Sr."). (*Id*. at 128).

The controlled buy on April 4, 1996, resulted in arrests and indictments for both Davis and Princeton as co-defendants on charges of distribution of a controlled substance. (*Id*. at 133). Princeton went to trial in February 1997. (*Id*. at 135–36). Cpl. Drummond was present at and testified at Princeton's trial. Boswell, Jr. also testified at Princeton's trial, but Cpl. Drummond had trouble persuading Boswell Jr. to testify because Boswell, Jr. was "scared." (*Id.* at 136).

Davis's trial was originally set for July 1996 but was continued four or five times. (*Id.* at 133). Cpl. Drummond gave Boswell Jr.'s name to the lawyer who was representing Davis in his case prior to his scheduled trial. (*Id.* at 177). Davis's trial was reset for January 1997, and then for March 1997, but Cpl. Drummond eventually had to ask the DA to *nolle prosse* Davis's case because he had lost contact with Boswell, Jr. who was supposed to testify against Davis. (*Id.* at 137). Cpl. Drummond explained that without Boswell, Jr.'s testimony, he could not make out a case against Davis. (*Id.*).

At that point in Cpl. Drummond's testimony, the prosecution sought to admit the following court documents from Davis's drug distribution case: 1) a Case Action Summary report giving a timeline of Davis's case; 2) a notice dated November 19, 1996, which stated that Davis's trial would be set for January 1997; and 3) the DA's motion to *nolle prosse* that was granted by the court. (*Id.* at 138). Davis's counsel objected that the documents were irrelevant to Davis's capital murder case, prejudicial because they suggested that Davis had some sort of extensive involvement with the court system, and cumulative to the testimony that Cpl. Drummond had already given. (*Id.* at 138–39). The prosecution responded that the notice dated November 19, 1996, which set Davis's trial for January 1997, was particularly relevant to Davis's capital murder case because it showed that Davis had received notice merely days before the murders took place of when his trial would be. (*Id.* at 139–40). The trial court overruled the defense's objection and admitted the court documents. (*Id.* at 140).

On cross-examination, Cpl. Drummond admitted that there were other individuals in the Gibbs Village community who might have known that Boswell, Jr. was working as a CI. (*Id.* at 155). Davis's counsel asked him if Boswell, Jr. had ever told him that he had been threatened by either a man named Steven McLemore ("McLemore") or a man named Jerome Henderson ("Henderson"), known as "Black." (*Id.* at 156). Cpl. Drummond replied that Boswell, Jr. had not told him

that. (*Id.*). Cpl. Drummond did state that Boswell, Jr. had once told him that he had been threatened by a man named John McClenney ("McClenney"), known as "Johnny Red." (*Id.* at 157).

At that point in Cpl. Drummond's testimony, Davis's counsel asked for a hearing outside of the presence of the jury and, at that hearing, asked the trial court to declare a mistrial because the prosecution had not provided defense counsel with the information that McClenney had threatened Boswell, Jr. (*Id.* at 159). Davis's counsel argued that the information was exculpatory to Davis because it suggested that an individual other than Davis had a motive to kill Boswell, Jr., especially in light of the similarities between Davis's nickname of "Red" and McClenney's nickname of "Johnny Red." (*Id.* at 158–64). The trial court advised the parties to speak with Boswell, Jr. about the threat before the trial continued. (*Id.* at 163). At that point, Davis's counsel stated that he had just realized that Davis had not been present for the in-chambers hearing, stating, "Just for the record, I just realized our client had been taken back to the back for the colloquy." (*Id*. at 164). After a short recess, the in-chambers hearing continued, and Davis's counsel advised the court that they had just spoken with Boswell, Jr., and he had told them that McClenney had once threatened to shoot him. (*Id.* at 165). The prosecution responded that they were not aware of McClenney's threat and that Davis's defense counsel could call both Boswell, Jr. and Cpl. Drummond to testify about the alleged threat. (*Id.* at 166).

The trial court noted that the information was exculpatory to Davis, but the court denied Davis's counsel's motion for a mistrial because the court did not believe that the prosecution had withheld the information. (*Id.* at 167).

When cross-examination of Cpl. Drummond continued, he stated that although he was not involved in the investigation of the murders that occurred at 3325 Loveless Curve on November 29, 1996, several days after the murders Boswell, Jr. called him, stating that someone had come to his father's house and killed some people. (*Id.* at 177). Cpl. Drummond recalled that Boswell, Jr. was "terrified" and was worried that someone had tried to kill him due to his work as a CI. (*Id.*). Cpl. Drummond recalled that he put Boswell, Jr. up in a hotel for a time. (*Id.*).

Boswell, Jr. was the prosecution's next witness, and he testified about working for Cpl. Drummond as a CI and making controlled drug buys from Davis and Princeton in April 1996. (*Id.* at 187–202, doc. 15-5 at 3–28). Boswell, Jr. stated that he testified at Princeton's trial in February 1997, and he stated that he was supposed to testify at Davis's trial, but the case was dismissed because he "left town" and was "scared." (Doc. 15-4 at 195). Boswell, Jr. also stated that he lived with his father at his house located at 3325 Loveless Curve sometimes, and that others stayed there too sometimes, including a man named John Bradley. (*Id.* at 197–98). He said that when McClenney threatened him, he didn't take it seriously, and that the threat

11

occurred almost two years before the murders occurred in November 1996.  (*Id*. at 198).

During a lunch recess, the following exchange occurred among the prosecutor, Davis, and the court:

| | |
|---|---|
| Mr. McNeill: | Judge, one thing also I want to make sure the Record is clear.  We did have a hearing on the Motion for Mistrial outside the presence of the defendant.  I wanted to make sure we have come back and rehashed the motion.  I want to make sure the Record is clear that defense counsel and the defendant waived his presence at that discussion, and we have.  We would ask him. |
| The Court: | Mr. Davis, you are aware an argument for a Motion for Mistrial has been made; is that correct? |
| The Defendant: | Yes. |
| The Court: | Earlier I think they had taken you back to the cell when the first argument was made, but it has been reargued in your presence, is that correct? |
| The Defendant: | Yes, sir. |
| The Court: | Do you waive your presence during the first time that you were out of the courtroom? |
| The Defendant: | Yes. |

(Doc. 15-5 at 15–16).

Boswell, Sr. was the prosecution's third witness, and he described the shootings that occurred at his home on the night of November 29, 1996, as follows. (*Id.* at 28–67).  His house had two bedrooms, which were occupied by him and

Eugene Smith ("Smith"), but Timothy Ray ("Ray") and John Bradley ("Bradley") were sleeping on the couches in the living room that night. (*Id*. at 29–30). Three Black males knocked on his door at around 2:00 a.m., and after he realized that no one else in the house was going to open the door, he walked out of his bedroom and opened the door and asked who they wanted to see. (*Id.* at 30–36). One of the men might have said "Louis," but he said that no "Louis" lived there. (*Id.* at 35). Then, Boswell, Sr. asked if they wanted to see Eugene, and they responded yes. (*Id*.). After he let them in, he walked back to his bedroom, and they walked towards Smith's bedroom. (*Id*.). Because it was dark, he only saw one of the three men well, and he said that he was skinny and looked to be about 19 to 20 years old. (*Id*. at 58). He then heard several shots, he loaded his pistol, and he ran back out to the living room. (*Id.* at 35–39). When he reentered the living room, he saw that the front door was open, the three men were gone, Bradley and Ray were still lying on the couches in the living room where they had been asleep before the shootings, and they appeared to be dead. (*Id.* at 38–39). He also saw that Smith was moving around and badly hurt, so he called the paramedics and the police. (*Id*. at 37–39). On cross-examination, Boswell, Sr. acknowledged that he oftentimes would let people into his house to see Smith. (*Id*. at 40). He recalled going to the police department after the murders and being shown a photo lineup, but he did not recall who, if anyone,

he picked out of the lineup as one of the three men who were in his house that night. (*Id*. at 56).

Smith was the prosecution's next witness, and he testified about the shootings and later identified Davis as being with the man who shot him, as follows. (*Id.* at 68–97). On the night of the shootings, Smith was inside his bedroom at Boswell, Sr.'s house and heard knocking on the door sometime between 1:00 and 3:00 a.m. (*Id.* at 70–72). He turned on his bedroom light, and he heard Boswell, Sr. say that he was going to get his gun. (*Id.* at 72). Boswell, Sr. opened the door, and he heard him say, "don't nobody live here but Eugene." (*Id.* at 73). A man who he later identified as Davis, and another Black man who was taller than Davis, walked inside the house and up to Smith as Smith stood in the doorway of his room. (*Id.* at 72–74). The taller man asked Davis if Smith was "one of them." (*Id.* at 74). Smith said, "one of who?", but Davis said "yes", and the taller man then held a .45 caliber weapon to Smith's ear and shot Smith in the head. (*Id.* at 74–77).

On cross-examination, Davis's counsel asked Smith when he first identified Davis as being one of the men who were in the house on the night of the shootings, and Smith responded that the first time he did so was on the first day of the trial, just the day before, when the lawyers were selecting the jury and he "saw Melvin Davis and said that's one of the guys that came in my room." (*Id.* at 79). Smith explained that he was able to identify Davis because on the night of the shootings, Davis

"walked right past me" and he "got a good look at him." (*Id.*). Smith was then asked if he remembered being shown a photo lineup at the DA's office on the Sunday before trial began in which he picked out a photo of Davis. (*Id.* at 80). Smith responded, "Oh, yeah." (*Id.* at 80–81).

The prosecution's final witnesses for the day were the following. Corporal Mack Higgins ("Cpl. Higgins") of the MPD testified about responding to a dispatch call shortly after 2:00 a.m. to 3325 Loveless Curve on the night of the shootings. (*Id.* at 98–120). He recalled that an elderly Black man opened the door, and he described finding, in the living room, two men who had been shot and killed and, in the bedroom, a third man who had been seriously injured and who was bleeding profusely and holding his head. (*Id.* at 99–106). Leroy Davis, a medic with the Montgomery Fire Department, testified about supervising the initial treatment of Smith. (*Id.* at 121–28). Huey Thornton, an evidence technician with the MPD, testified about the crime scene and the evidence that was collected, including two fingerprints that could not be matched to anyone. (*Id.* at 128–44, 149–62). Through these witnesses' testimony, a crime scene video and crime scene photos were admitted, over repeated objections by Davis's counsel.

When the trial recessed for the day, Davis's counsel advised the trial court, outside the presence of the jury, that the prosecution had made him aware that on the Sunday before the trial began, when the prosecution was meeting with Smith in the

DA's office to prepare for Smith's testimony, the prosecutor had shown Smith a photo lineup that included a photo of Davis. (*Id.* at 145–46). According to the prosecutor, Smith initially identified Davis as one of the men who shot him, but an hour later, when he was shown the photo lineup again, Smith acted like he could not remember being shown the photo lineup and appeared to be confused. (*Id.*). Davis's counsel argued that the jury should know about this information because it was exculpatory to Davis, but that in lieu of attempting to call the prosecutor as a witness to describe this occurrence, he and the prosecutor had agreed to a written stipulation describing what happened and agreed that they could present it to the jury during the defense's case-in-chief. (*Id.* at 146–47). The trial court agreed, and the court later read the following stipulation to the jury:

> On August 23, 1998, Eugene Smith met with Randy McNeill to discuss trial testimony. Present at the meeting was his sister, Mary Glover. Mr. McNeill knew that he had not previously been shown a lineup of the defendant, including the defendant, Melvin Davis. So, therefore, Mr. McNeill asked him if he thought he could identify the man who shot him if he was shown a lineup. He stated he could.

> Mr. McNeill then produced a photo lineup containing the defendant's picture, which has been introduced as evidence, and I believe it is marked as Defendant's Exhibit 4. Mr. McNeill did not prompt him to suggest to him the identity of the defendant. Mr. Smith studied the lineup for less than ten seconds and then emphatically stated that number four, who was in fact, Mr. Davis, was the person that stood at the door and was the man—and was with the man who shot him. Mr. McNeill then asked him if he was certain, in which he stated that this was the defendant. And

Mr. Smith reiterated that the defendant did not shoot him but was present when he was shot.

Approximately fifteen minutes later, Mr. Smith was again shown the lineup by [an investigator in the district attorney's office] and was asked if he could identify the person who shot him. Mr. Smith seemed confused and acted as if he had not previously been shown the lineup and stated that he recognized number six and number two who were in the photo lineup.

Mr. McNeill did not question him any further because he seemed confused.

(Doc. 15-7 at 40–42).

The following day, MPD Detective Derrick Cunningham ("Det. Cunningham") testified about his investigation into the murders and his eventual arrest of Davis, stating the following. (Doc. 15-5 at 162–202; doc. 15-6 at 3–22). He was called to the crime scene at about 3:00 a.m. on November 29, 1996, and he became the initial case agent in the investigation. (Doc. 15-5 at 164). Some days after the murders, Boswell, Jr. informed him that he was scared for his life because he thought that he was the intended target in the hit at his father's house due to his work as a CI for the MPD, but that the hit men killed the wrong people instead. (*Id.* at 186). After that, anyone who may have had any dealings with Boswell, Jr. in his drug sales were considered potential suspects. (*Id.* at 193).

He said that MPD conducted numerous photo and live lineups with Smith and Boswell, Sr., but no one was ever positively identified as the shooter. (Doc. 15-6 at 18). Boswell, Sr. actually identified McLemore as the shooter in two photo lineups,

but he later changed his mind.  (Doc. 15-5 at 199).   Smith often gave Det. Cunningham names of individuals who he suspected might have been involved in the shootings, but he often changed his mind as well.  (Doc. 15-5 at 172–75; *see id.* at 175 ("[I]f he saw a picture in the newspaper, he would give a name and say, ya'll need to check him, too, or something.  He used to call just about every other day saying that he saw somebody on TV that looked like the guy.")).  For example, at first Smith told officers that one of the shooters looked like Barry Broadnax, who was the brother of a man with whom he used to work named Timothy Broadnax. (*Id.* at 174).  Officers conducted a live lineup for Smith, which included Barry Broadnax.  (*Id.*).  Smith at first identified Barry Broadnax as one of the shooters but then changed his mind.  (*Id.* at 174, 197).

In early 1997, MPD turned over the investigation to Detective Guy Naquin ("Det. Naquin"), but Det. Cunningham assisted him when he was needed.  (Doc. 15-6 at 11).  As the investigation wore on, the City of Montgomery and the State of Alabama offered a $10,000 reward for information leading to arrests in the investigation.  (Doc. 15-5 at 176).

In October 1997, MPD received information that led it to Davis, Jointer, and Singleton as suspects in the murders, and Det. Cunningham then assisted Det. Naquin in arresting and interviewing Davis.  (*Id.* at 175–76).  From his work as a police officer in the area, Det. Cunningham already knew Davis as "Red" prior to

the murders.  (Doc. 15-6 at 4, 12).  Warrants were issued for Davis, Jointer, and Singleton, and shortly thereafter, Det. Cunningham called Davis's mother in hopes of speaking with Davis.  (*Id*. at 6).  Davis's mother relayed a message to Davis, and Davis contacted Det. Cunningham and agreed to be transported to MPD headquarters.  (*Id*. at 7).  Det. Cunningham picked Davis up from the front porch of a residence on Bragg Street in Montgomery, and Davis did not resist arrest.  (*Id.* at 8–10).  Other officers picked up Davis's girlfriend, Kaneshia Taylor ("Taylor"), and transported her to MPD headquarters to be interviewed, although she was not arrested.  (*Id*. at 15).  Det. Cunningham drove Davis to MPD headquarters, and while in the car, Det. Cunningham told Davis that he had warrants for his arrest for capital murder and attempted murder and that he needed to be interviewed by Det. Naquin.  (*Id*. at 10).  Davis asked what the warrants were about, and Det. Cunningham told him that he needed to talk with Det. Naquin about it.  (*Id*. at 11).

Once at MPD headquarters, Det. Cunningham and Det. Naquin read Davis his constitutional rights and began talking with him in an unrecorded interview.  (*Id*. at 14).  Davis told them that he knew that Boswell, Jr. was a CI and that he had testified against his brother Princeton at his trial in February of that year.  (*Id.*).  Davis told them that on the evening of the murders, he was at the Top Flight Club with Jointer, Singleton, his girlfriend Kaneshia Taylor, and others.  (*Id*. at 19).  Davis said that after they left the club, they went directly to the Waffle House to eat, and then they

went home. (*Id.* at 20). Det. Cunningham later sat in the interview room while Davis had a conversation with his mother. (*Id.* at 21).

Taylor was the prosecution's next witness, and she testified about the night of the shootings, as follows. (*Id*. at 23–44). Taylor and her friends Sonya Walker ("Walker") and Melinda Clayton ("Clayton") planned to meet Davis, Jointer, and Singleton at the Top Flight Club. (*Id*. at 24–25). Taylor, Walker, and Clayton rode together to the Top Flight Club, separately from the three men, and arrived at around 11:30 p.m. (*Id*. at 26). The three women saw Davis, Singleton, and Jointer outside the club as they were parking their car, but there was a long line to get into the club, and so the three women never entered the club and instead proceeded to the 747 Club. (*Id.* at 29–30, 39). The three women stayed at the 747 Club until it closed at around 1:30 or 2:00 a.m. and then drove back to the Top Flight Club because they were going to meet Davis, Singleton, and Jointer there so that they could all ride together to the Waffle House restaurant to eat. (*Id*. at 30). However, when the three women arrived back at the Top Flight Club, some people were shooting guns in the parking lot, so they never saw Davis, Singleton, and Jointer and instead just decided to drive to the Waffle House without the men. (*Id*. at 31, 42). When they arrived at the Waffle House about 15 minutes later, the men were not there, so they waited in the parking lot for them to arrive for five to ten minutes. (*Id*. at 31–32). Once Davis, Singleton, and Jointer arrived, Taylor went inside with them, but the other two

women left to go home.  (*Id*. at 32).  Taylor sat at a table with Davis and Singleton, but Jointer sat at a separate table, and he didn't eat.  (*Id.*).  When asked if Davis would have been telling the truth or lying when he told police that he was with her at the Top Flight Club the entire night, Taylor responded that he would have been lying because she was not at the Top Flight Club.  (*Id*. at 34–35).

Marcus Dunn ("Dunn") then testified as follows.  (*Id.* at 45–74).  Dunn was friends with Davis, Singleton, Jointer, and Princeton Davis, and he dealt drugs with Davis.  (*Id*. at 46–47).  Davis continued to sell drugs from various residences after he was arrested for distribution of a controlled substance in April 1996.  (*Id*.).  Approximately one to two weeks before the murders took place, Dunn was with Davis, Singleton, and Jointer at Singleton's grandmother's house.  (*Id*. at 50–53).  Davis told the other men that he had found out through his lawyer in his drug distribution case that Boswell, Jr. was the CI to whom he and Princeton had sold drugs.  (*Id.* at 50).  Davis told the other men that he "would do whatever it took" to prevent Boswell, Jr. from testifying in court against his brother Princeton at his upcoming drug distribution trial. (*Id*. at 51).  Some days later, Singleton drove Dunn by 3325 Loveless Curve and told him that Boswell, Jr. lived there.  (*Id*. at 53).  During that time, there was an evening when the group had discussed "doing it," but it was raining and cold, so the group decided to wait.  (*Id*. at 53–54). On Thanksgiving night, 1996, sometime between 8:00 p.m. and midnight, Davis paged

him with a code that Dunn knew to be a code to call Davis back. Dunn did not call Davis back because he was taking care of his child and he "knew what that page meant." (*Id*. at 54, 65–67). Dunn said that he did not learn about the shootings until sometime after Princeton's trial in February 1997, when he was with Davis. Davis told Dunn that since Boswell, Jr. had testified at Princeton's trial, "they must have hit the wrong house." (*Id.* at 55).

On cross-examination, Dunn acknowledged that at some point after the murders occurred, he was in court on his own possession of marijuana case when police pulled him out of the courtroom and questioned him about the Loveless Curve shootings. (*Id*. at 57). He stated that he told police about the conversation that occurred among him, Davis, Singleton, and Jointer, several weeks prior to the murders, wherein Davis indicated that he wanted to stop Boswell, Jr. from testifying against Princeton. (*Id*.). When asked whether his possession of marijuana case was going to be dismissed in exchange for his cooperation in the investigation against Davis, Dunn said no. (*Id*. at 58). When asked why Singleton drove Dunn by Boswell, Sr.'s house before the murders, Dunn said that Singleton showed him the house where Boswell, Jr. supposedly lived because "all four of us was supposed to be part of it," meaning himself, Jointer, Singleton, and Davis. (*Id*. at 67). Davis's defense counsel then asked Dunn if Dunn was charged with conspiracy to commit murder, and Dunn said no. (*Id*.). Defense counsel then asked if Dunn was charged

with criminal conspiracy.  (*Id.* at 68).  Before Dunn could answer, the prosecution

objected to the question, arguing that it put the jury under a false impression.  (*Id.*).

The trial court sustained the objection.  (*Id.*).  Dunn was asked if he would be the

person receiving the $10,000 reward for leading MPD to arrests in the case, and he

said that he would be if he applied for it.  (*Id.* at 72).  On redirect, Dunn was asked

if he ever saw Davis and Singleton in the possession of any firearms, and he said

that he had, and that they had a .45, .38s, .25s, and a shotgun.  (*Id.*).

Jointer then testified as follows.  (*Id.* at 78–136).  Jointer was not offered a

deal in exchange for his testimony.  (*Id.* at 79).  Davis sold drugs with Dunn and

Singleton.  (*Id.* at 82).  Three or four weeks prior to the murders, Jointer was with

Davis, Singleton, and Dunn, and Davis said that he wanted to go to Boswell, Jr.'s

house and "tie him up and kill him."  (*Id.* at 86–87).  Jointer told Davis that he wanted

nothing to do with it, and Jointer didn't see Davis again until Thanksgiving night,

when Davis picked him up at his mother's house to go to the Top Flight Club.  (*Id.*

at 88–89).  They stayed at the club until it closed that night, and he was intoxicated.

(*Id.* at 93–94).  When they were leaving, they were delayed in the parking lot because

some people were shooting guns, and the police would not let anyone leave.  (*Id.* at

94–95).  After they were cleared to leave, he thought that Davis and Singleton were

taking him home, but Davis pulled out "some type automatic" weapon and Singleton

pulled out "[s]ome type of revolver" and said, "it is time."  (*Id.* at 96–97).  He was

scared, and he blacked out. (*Id*. at 98). Davis and Singleton argued about which house it was, and eventually they parked a bit down the street from 3325 Loveless Curve. (*Id*. at 99). They put a gun to Jointer's back and forced him to go with them into the house. (*Id*. at 100). Once they were let inside, they walked into the living room, but Jointer did not see anyone on the couches. (*Id*. at 104). Davis and Singleton then made Jointer stand against a wall while they approached the back bedroom. (*Id*. at 105). Jointer saw a light come on in the back bedroom; he heard them speaking with a man; Davis asked Singleton "was that him;" and then multiple shots rang out. (*Id*. at 106). Singleton pushed Jointer toward the front door, and he was standing directly in front of the front door when multiple shots rang out again. (*Id.* at 107). He saw someone raise up from the couch. (*Id.*). After Davis and Singleton shot the men, they forced Jointer with them out of the house, and once they were back in the car, Davis told Jointer that if he ever told anyone, he would kill him. (*Id.* at 108). They then drove to the Waffle House. (*Id*. at 108–09). Jointer did not call the police in the eleventh-month period between November 1996 and when he was ultimately arrested in October 1997 because he was afraid of Davis. (*Id.* at 109–10). When Jointer did give a statement, at first, he denied being in the house that night "because I knew that he would think that it was me if the police picked him up." (*Id*. at 110).

On cross-examination, Jointer acknowledged that he had been charged with capital murder just like Davis and Singleton had, but he again stated that he did not have a deal with the prosecution for his testimony.  (*Id*. at 111).  Davis's defense counsel asked Jointer if he was claiming that he was not guilty of capital murder, and Jointer replied that he was not guilty of capital murder.  (*Id*.).  Defense counsel then asked: "Are you going to plead to it?"  (*Id*. at 112).  The prosecution objected, and the court sustained the objection, ruling that the question was argumentative.  (*Id*.).  Defense counsel then stated: "Your two good friends were going to take you out and take you over to this house and just sort of put all the dead bodies in one place, kill you along with the informant, right?"  (*Id*. at 129).  The prosecution again objected that the question was argumentative, and the court sustained the objection.  (*Id*.).  Jointer admitted that even though he was afraid of Davis, he saw Davis again about two weeks later, and he continued to see him five or six times after that and before their eventual arrests.  (*Id*. at 135).  Specifically, he said that he saw Davis when he went to Singleton's house to purchase clothes from Singleton.  (*Id*.).

Det. Naquin then testified as follows.  (*Id*. at 136–67).  He took over the investigation from Det. Cunningham in January 1997.  (*Id*. at 137).  A man named Jerome Henderson was a suspect for a time due to an interview that the MPD had conducted with Yulonda Belser ("Belser"), who said that she overheard Jerome Henderson and Damon Washington talking about the murders.  (*Id*. at 153–54, 157–

58).  Belser told the MPD that she overheard them "discussing . . . that they should have just shot this person at Loveless Curve in the leg, and why did he kill him?" (*Id*. at 155).  However, Det. Naquin later found out that Belser lied to him about what she heard.  (*Id*. at 154).  Det. Naquin also investigated the facts that the victim Timothy Ray was involved in drug dealing and that a man named Steven McLemore had threatened to kill Ray sometime prior to the murders.  (*Id*. at 157).

Det. Naquin did not have enough evidence to charge anyone until September 1997, when Dunn's lawyer in his pending drug possession case contacted the MPD, stating that Dunn had information about the murders.  (*Id*. at 139).  Dunn gave a statement to the DA, which led to Davis, Singleton, and Jointer's arrests.  (*Id*. at 140).  After Det. Cunningham arrested Davis in October 1997, Det. Naquin interviewed him at MPD headquarters.  (*Id.*).  After Davis was read his constitutional rights, Davis told Det. Naquin that on the night of the shootings, he went to the Top Flight Club with Singleton, Jointer, and Taylor until the club closed, at which time they proceeded directly to the Waffle House to eat.  (*Id*. at 142).  Davis said he had nothing to do with the murders.  (*Id*. at 151).  Davis's account of the evening did not match Taylor's, who had also given a statement at the same time.  (*Id*. at 143).

Det. Naquin also took two statements from Jointer upon his arrest.  (*Id*. at 149).  In the first statement, Jointer told him that he jumped out of the car before Davis and Singleton arrived at Loveless Curve on the night of the shootings, and he

said that he had nothing to do with the murders. (*Id*.). In his second statement, however, Jointer admitted to being at the crime scene and said things that only someone who was there would know. (*Id*. at 150).

Det. Naquin also arrested Singleton, but Singleton made no statement. (*Id*. at 149). Singleton initially laughed when Det. Naquin told him why he was under arrest, but after Det. Naquin told him that he had also spoken to Dunn and Jointer, "[Singleton's] head dipped, and he slumped down in the chair, and he said he knew what I was talking about then." (*Id*. at 151). Det. Naquin did not know if Dunn was receiving a $10,000 reward for his help in leading the MPD to Jointer, Singleton, and Davis. (*Id*. at 153).

The State's final witnesses were Joe Saloom, who worked with the Department of Forensic Sciences and testified as an expert in the fields of tools, firearms identification, and markings (*id.* at 169–85), and Gregory Wanger, the state medical examiner who performed the autopsies on the victims and testified as an expert in the field of forensic pathology (*id*. at 185–202; doc. 15-7 at 3). Mr. Saloom described the various bullets recovered from the two victims. Dr. Wanger explained that Ray, who was 23 years old, died of seven gunshot wounds to the head, chest, back, abdomen, and right thigh (doc. 15-6 at 187), and that Bradley, who was 63 years old, died of three gunshot wounds to the head and upper back (*id*. at 197). Autopsy photos were admitted during this testimony over the defense's objection.

At the close of the prosecution's case, several matters were taken up outside the presence of the jury. Davis's counsel moved for a judgment of acquittal on the ground that the prosecution had not proven its case beyond a reasonable doubt because no physical evidence tied Davis to the crimes and there were credibility issues with the eyewitnesses who connected Davis to the murders. (Doc. 15-7 at 6–23). Davis's counsel also moved to strike the counts of the Indictment charging murder committed during a burglary on the ground that the prosecution had not proven that a burglary occurred because the prosecution failed to prove a "breaking and entering" and the conspiracy-to-commit-murder count on the ground that it was cumulative to the capital murder charges. (*Id.* at 23–26, 28–29). After hearing argument, the trial court denied the motions.

Then, Davis's counsel moved for a mistrial based on new evidence that they said they had just received about Jerome Henderson. (*Id.* at 29–33). Davis's counsel explained to the court that after Cpl. Drummond had testified that Boswell, Jr. told him that he was threatened by a man named John McClenney, Davis's counsel had received permission from the court to request MPD records pertaining to other individuals who bought drugs from Boswell, Jr. as a CI. Davis's counsel further explained that one of those files was on Henderson and that it indicated that he also bought drugs from Boswell, Jr. as a CI on the same day that Davis did. The file further showed that that controlled buy resulted in charges being brought against

Henderson, but that his trial, which was set for October 1996, was also *nolle prossed* because the MPD could not locate Boswell, Jr. to testify against him. Davis's counsel asked for a mistrial based on the ground that they could not locate Henderson and did not have time to investigate whether Henderson had a motive to kill Boswell, Jr. Davis's defense counsel also advised the court that, as Det. Naquin had testified, Yulonda Belser reported to police that she overheard Henderson say that he shot Timothy Ray in the head. Davis's defense counsel said that they had been trying unsuccessfully to locate Belser to investigate this as well.

In response, the prosecution stated that they had provided to Davis's counsel all of the information about Henderson and Belser long before trial, and Davis's counsel could have subpoenaed them to testify. (*Id*. at 34). The prosecution also argued that the fact that Boswell, Jr. bought drugs from Henderson as a CI was not exculpatory to Davis because Henderson's drug case was *nolle prossed* before the murders occurred, which undermined any motive that Henderson might have had to silence Boswell, Jr. The prosecution also pointed out that Henderson was a suspect in the murders at one point because of his connection to Ray, not due to any connection with Boswell, Jr. (*Id*. at 34–36). The court denied Davis's counsel's motion for a mistrial. (*Id*. at 36).

Davis's only witness was Cpl. Drummond, called for the purpose of cross-examining him about the records that Davis's counsel had obtained about other

individuals who had bought drugs from Boswell, Jr. as a CI. (*Id.* at 43–56). Cpl. Drummond testified as follows. On April 4, 1996, the same day that he used Boswell, Jr. to buy marijuana from Davis, he also used Boswell, Jr. to buy drugs from Henderson. (*Id.* at 47-48). Henderson was also charged with distribution of a controlled substance, and his case was set for trial on October 22, 1996. However, it was also *nolle prossed* because the MPD could not locate Boswell, Jr. to testify against Henderson. (*Id.* at 48-49, 53). This was before the murders took place on November 29, 1996. (*Id*. at 49). Unlike with Davis, Cpl. Drummond never provided the name of Boswell, Jr. to Henderson's lawyer as the CI from whom Henderson had bought drugs. (*Id.* at 54).

In closing argument, the State summarized the evidence and argued that Davis planned to murder Boswell, Jr. in order to prevent him from testifying against his brother, but that he killed the wrong people instead. (*Id*. at 61–74). Davis's counsel argued that there was reasonable doubt as to whether Davis committed the crimes for several reasons, including that Boswell, Jr. twice identified McLemore, not Davis, as the shooter in photo lineups, although he later changed his mind; Boswell, Sr. was not a reliable witness because he could not remember participating in a live lineup; Boswell, Sr. and Smith were inconsistent as to how many men came into the house that evening; Smith identified Timothy Broadnax, not Davis, as a suspect, although he later equivocated on that; Smith was never shown a photo lineup of

Davis until the Sunday before the trial began, when Smith already knew that he would be testifying against Davis at his trial; Smith recalled that whoever was at the door that night said they were looking for "Eugene"; no physical evidence linked Davis to the crimes; although two fingerprints were found at the scene, they were never matched to anyone; Det. Naquin recalled that Belser told him that she overheard Henderson say that he shot Ray; Henderson had a motive to kill Boswell, Jr. because he bought drugs from him as a CI on the same day that Davis did; McClenny had also threatened to shoot Boswell, Jr. at some point in the past, so he also had a motive; Dunn's testimony shouldn't be believed because he was the person who first led police to Davis and likely had a deal with the State to dismiss his drug possession charge in exchange for his testimony; Jointer's testimony shouldn't be believed because it was unreasonable to think that Singleton and Davis would threaten to kill their best friend if he didn't go along with the shootings; and Jointer's testimony that he was afraid of Davis shouldn't be believed because Jointer continued to associate with Davis after the murders. (*Id.* at 75–103). In rebuttal, the State pointed out, among other things, that the other suspects in the case were cleared because the MPD did not have enough evidence against them and that Davis was the only one with a motive to kill Boswell, Jr. (*Id.* at 103–14).

The trial court then gave the jury its instructions, and the jury took a lunch break before beginning to deliberate. During that lunch break while the jury was out

of the courthouse, court staff found a manila folder inside the jury deliberation room that was marked "1105-A." (*Id*. at 150). The folder contained a Narcotics and Intelligence Bureau report on Davis and his brother Princeton that had been issued by the MPD. (*Id*.). Outside the presence of the jury, the following colloquy occurred:

Mr. Copeland:    What is being discussed here is a file. I think it is Montgomery Police File 1105-A. It is a Narcotics and Intelligence Bureau Report, and it has to do with Melvin Davis and Princeton Davis, and I believe this is Melvin Davis's narcotics file that they maintain as they gather intelligence on various and sorted [sic] narcotics offenses.

Its presence in the jury room—let me rush to say the State had nothing to do with this file being here, and as far as I am concerned, I have spoken to Randy and Susan and we have looked at their table. It didn't come off theirs. It certainly didn't come off the defense's table. But since it is the Narcotics and Intelligence Bureau file, its presence in the jury room, if discovered by the jurors, this has not been admitted into evidence nor even referred to, and its presence in the jury room could substantially undermine the integrity of the deliberations of the jurors inasmuch as this provides focus of Melvin Davis's involvement with the drug trade.

So if it turns out that any juror saw this, we will be moving for a mistrial.

The Court:    And I'll deal with that if that does happen. Let me see that. I guess if we are going to put this on the Record, I want to make sure we do put on the Record there is nothing to suggest at this point in time—in fact, the jury was not in the jury room

when we found it.  They had not started their deliberations when we found it.  They had gone to lunch.  So I am not sure how it got in there.  So now I am going to take what I think is the appropriate action and ask the jurors if any of them happened to see it anytime prior to the time they went to lunch.

Mr. McNeill:       Judge, and read the contents of the file.

Ms. Redmond:    My understanding from the Court staff it was found closed on the table.

The Court:         It was found closed on the table.  Anyway, let's find out what they say.

(The following occurred in the presence and hearing of the jury:)

The Court:         Ladies and gentlemen, first let me apologize for interrupting your deliberations.  I trust that you had a good lunch today.

                         I had a question that I needed to ask you.  This file that I am holding up we happened to find in the deliberation room before you began your deliberations, but after you had left to go to lunch.  I hold it up so that you can take a look at it.  Did any of you happen to see this file that was sitting in the deliberation room?

Juror:               We saw it sitting there.

Juror:               I was the last one to come in, and I saw it.

The Court:         Several people saw it sitting there?  Did anybody happen to open it and look at it?  Everybody is nodding negative they didn't open it up, so I assume nobody read whatever is in this file, that we don't know if it had anything to do with this trial or not, but I am assuming that everybody said no they

haven't read it.  I want to make sure.  Thank you. You can continue your deliberations.

(The jury was excused to deliberate.)

(The following occurred outside the presence and hearing of the jury:)

Ms. Redmond:    State is satisfied, Judge.

Mr. Copeland:    Judge, the defendant is far from satisfied.  This file was previously referred to as the Montgomery Police Department file, and access to that file would be to the very limited number of people.  I know for a fact and would be happy for the DA's office to testify we have never requested the file and therefore never gained possession of it.  Now all of a sudden we find a law enforcement file involving my client sitting in a jury room, and through your Honor's diligent instructions and their diligently following them, it wasn't opened, but a number of them saw it.  So all of a sudden there are things being brought into the jury room that could affect the outcome of this trial, and I wish to express my deepest concern.  I don't know that it rises to the level of mistrial since nobody looked at the contents, but I renew my motion for mistrial, inasmuch as somebody put that file there.

The Court:    Let me see it one more time, please, sir.

Mr. Copeland:    I need to add this for the Record.  For the Record, we had requested by subpoena last week and have on the Record discussed several times this week a number of files that involved Narcotics.  This was not one of them.

The Court:    Well, just so we can make sure the Record is clear, as I look at this, there is nothing on the outside of this file anywhere to indicate this has anything to do with this trial whatsoever.  In fact, it is a plain

34

> manila folder with some numbers at the end, 1105-A, nothing to indicate a Police Department intelligence file, this defendant [sic]. In fact, it looks just like a plain manila folder. That is crystal clear. To the best of our knowledge, nobody has opened it and looked at it. So Motion for Mistrial is denied.

(*Id.* at 150–56).

After deliberating for another hour, the jury returned its verdict, convicting Davis on all counts in the Indictment. (*Id.* at 156–57; doc. 15-1 at 158–62).

## B.    Penalty Phase of Davis's Trial

The same day, the trial court conducted the penalty phase before the jury. (Doc. 15-7 at 158–204; doc. 15-8 at 3–66). Davis's counsel initially asked that the penalty phase be postponed for two reasons: they planned to call Davis's mother to testify, but she was distraught, and they planned to call a psychiatrist, Dr. William Freeman ("Dr. Freeman"), to testify, but they could not locate him. (Doc. 15-7 at 165–71). Davis's counsel explained to the trial court that they had sought and received extraordinary expenses for the appointment of Dr. Freeman to explore Davis's mental status at the time of the offense and possible mitigation defenses at the penalty phase, but that counsel had not yet received a report from Dr. Freeman's evaluation of Davis. (*Id*. at 166–67). The State opposed a continuance. (*Id*. at 169–70). The trial court denied defense counsel's request to postpone the penalty phase and urged Davis's counsel to attempt to contact Dr. Freeman. (*Id*. at 173).

The prosecution recommended a sentence of death to the jury due to the existence of three aggravating circumstances under Alabama law: Davis committed the murders during a burglary, Ala. Code § 13A-5-49(4); the murders were committed while Davis was under a sentence of imprisonment, *id.* § 13A-5-49(1); and Davis committed the murders to attempt to disrupt or hinder the lawful exercise of a governmental function because he committed the murders to attempt to silence a witness, *i.e.*, Boswell, Jr., *id.* § 13A-5-49(7). (*Id.* at 159, 175–77). To support the second aggravator, the prosecution introduced as evidence a Case Action Summary report reflecting that Davis was on probation from an earlier offense at the time that he committed the murders. (*Id.* at 180). The prosecution also called Ruth Peters, Davis's probation officer, who testified as to the following. (*Id.* at 181–201). On October 18, 1995, Davis was convicted of Second Degree Criminal Mischief and sentenced to a period of six months' probation to be served by reporting to the county jail to serve one weekend in custody per month for six months. (*Id.* at 185–86). Davis began reporting as required, and his six-month probation would have expired on April 18, 1996, but Davis was arrested on April 5, 1996, on the drug distribution charges stemming from the purchase of marijuana from Boswell, Jr. in Gibbs Village. (*Id.* at 188). Davis's arrest tolled his probationary period, which meant that he was not receiving credit for that time forward. (*Id.* at 190). A probation delinquency report was prepared on April 9, 1996, and Davis was declared

delinquent by a judge on April 16, 1996. (*Id.* at 189, 193). Thus, when Davis committed the murders on November 29, 1996, he was still a probationer, even though he was not serving time on his probation because it was held in delinquent status pending the outcome of his drug distribution case. (*Id.* at 19–94).

After the State rested, Davis's counsel advised the trial court outside the presence of the jury that they had just been in contact with Dr. Freeman and Dr. Freeman had advised them that he "could not ascertain any mental disease, mental defect, diminished capacity, that he found Mr. Davis to be intelligent, articulate, and that he did not think he could offer any testimony in this sentencing phase that would aid in perhaps supporting another statutory mitigation ground." (*Id.* at 203). Thus, Davis's counsel advised the court that they would not call Dr. Freeman to testify. (*Id.*).

Davis's counsel objected to all three aggravating circumstances and recommended to the jury a sentence of life in prison without parole. They also offered as a statutory mitigating circumstance that Davis had no significant criminal history and as non-statutory mitigating circumstances that Davis's life had value and that he was loved by his family. (*Id.* at 178–79). In support, Davis's counsel called Davis's mother, Patricia Davis, to testify briefly. (*Id.* at 204; doc. 15-8 at 2–4). She stated that she had six sons, that Davis's father was killed in a train accident when

Davis was 16, and that she loved her son and knew her son to love her.  (Doc. 15-8 at 3).  Davis did not testify.

After closing arguments and jury instructions, the jury returned their verdict, which recommended a sentence of death by a 10–2 vote.  (*Id.* at 63; doc. 15-1 at 163).

## C.    Judicial Sentencing Hearing

Several months later on November 5, 1998, the trial court held a sentencing hearing to determine whether it would sentence Davis to life in prison without parole or to death as the jury recommended.  (Doc. 15-8 at 68–74).  At the hearing, neither party called any witnesses or offered any evidence.  Davis's counsel asked the trial court to consider "mercy for mercy's sake" as an additional non-statutory mitigating circumstance.  (*Id.* at 69–70).  The State moved to invoke the "gun enhancement" of Ala. Code § 13A-5-6(a)(6) on Davis's sentences for attempted murder and conspiracy to commit murder, which would raise Davis's sentences on each of those crimes from 20 years to 99 years.  (*Id.* at 73).  The trial court granted the State's oral motion to invoke the enhancement.  The trial court stated that it was sentencing Davis to death on the capital murder counts and to 99 years' imprisonment on the attempted murder and conspiracy to commit murder counts.  (*Id.* at 73).

The same day, the trial court issued its Sentencing Order.  (*See* doc. 15-71 at 2–6).  In the order, the trial court found the existence of the three statutory

aggravating circumstances argued by the State: (1) the murders were committed during a burglary, Ala. Code § 13A-5-49(4); (2) the murders were committed while Davis was under a sentence of imprisonment, *id.* § 13A-5-49(1); and (3) the murders were committed to disrupt or hinder the lawful exercise of a governmental function or the enforcement of laws, *id.* § 13A-5-49(7).  (*Id*. at 4–5).  With regard to the second aggravator, the trial court noted the following:

> This Court also finds that the State has proved beyond a reasonable doubt that Davis committed the capital offense while under a sentence of imprisonment.  At the sentencing phase of the trial, the State offered a certified copy of the docket sheet of Davis' conviction for Criminal Mischief II.  Further, the State offered the testimony of Ruth Peters, Davis' probation officer to explain Davis' status as a probationer.  Davis was convicted of the offense of Criminal Mischief II on October 18, 1995, and was placed on probation.  However, because he failed to comply with the terms of his probation, he was declared delinquent, which in effect tolled his probation.  After he was arrested on these charges, his probation was revoked.  Ironically, if Davis had complied with the terms of his probation, his probationary status would have been terminated, and he would not have been on probation at the time of the shootings. Ala. Code § 13A-5-39(7) (1975) clearly states that "under a sentence of imprisonment" includes probation.  Therefore, the Court finds that the State has proved this aggravating circumstance beyond a reasonable doubt.  Code of Ala. § 13A-5-49(1), (1975).

(*Id*. at 5).  Although Davis had argued that the statutory mitigating circumstance that Davis had no significant criminal history should be taken into consideration, the trial court declined to find the existence of that circumstance, noting that Davis was involved in the distribution of marijuana and was on probation at the time he committed the offenses.  (*Id.*).  The trial court also found the existence of the non-

statutory mitigating circumstances that Davis's life has value and that Davis was loved by his family, but the trial court gave them only slight weight. (*Id.*). The trial court concluded that the aggravating circumstances outweighed the mitigating circumstances and sentenced Davis to death. (*Id.* at 6). The trial court concluded:

> This Court cannot erase from its mind the callousness and the utter disregard for life Davis exhibited in committing this crime. He planned to kill an informant to have the cases of he and his brother dismissed. Consequently, Eugene Smith was shot execution style under the mistaken impression that he was the informant. Timothy Ray and John Bradley were executed because they were in the pathway of escape. A colder more callous crime is hard to imagine. Davis took pleasure in taking another person's life. Almost as disturbing is that Davis was on probation when he committed the offense. He had been given numerous opportunities to conform his conduct to the norms of society, but he steadfastly refused to conform. Davis took the opportunity to change and better himself that had been given him by the criminal justice system and chose not to take advantage of the opportunity but instead to take advantage of the criminal justice system. He continued to sell drugs and when caught he attempted to cheat the system and in so doing cheated two innocent men of their lives.

(*Id.*).

## D.    Resolution of Davis's Co-Defendants' Cases

Singleton was tried separately and convicted on the charges in the Indictment and received a sentence of life in prison without parole. (*See* doc. 15-68 at 14). On August 23, 1999, Jointer pled guilty to conspiracy to commit murder, and the State *nolle prossed* the capital murder and attempted murder charges against him in the Indictment. (Doc. 15-42 at 12–24). On September 7, 1999, Jointer received a time-

served sentence, as he had already been incarcerated for over two years by the time that he was sentenced.  (*Id.* at 25–28).

## IV.  POST-TRIAL PROCEEDINGS AND PROCEDURAL HISTORY

### A.    Direct Appeal

Court-appointed lawyer Daniel G. Hamm ("Hamm") represented Davis on appeal.  Davis raised three issues on appeal: 1) the trial court abused its discretion in admitting crime scene and autopsy photographs into evidence because they were more prejudicial than probative; 2) Davis could not have been found guilty of the two counts of capital murder committed in the course of a burglary because Boswell, Sr. allowed Davis entry into his home; and 3) the trial court improperly endorsed the credibility of Smith when the trial court allowed the parties to stipulate that Smith "emphatically" identified Davis in a photo lineup the day before trial.  (Doc. 15-9 at 2–25).  The ACCA conducted oral argument on August 17, 1999.  (*Id.* at 66).  During oral argument, Hamm argued for the first time with respect to the second issue that the burglary-murder verdict could not have been based upon Davis either unlawfully entering or unlawfully remaining in Boswell, Sr.'s home because the jury was never given an instruction explaining what those terms meant under Alabama's Criminal

Code.   The ACCA allowed the parties to file supplemental briefs on that additional

issue.  (*Id*. at 62–88).[3]

---

[3]      The Alabama Criminal Code provides that a person commits the crime of burglary in the first degree if he "knowingly and unlawfully enters or remains unlawfully in a dwelling with intent to commit a crime therein." Ala. Code § 13A-7-5.  The Code further provides that "[a] person 'enters or remains unlawfully' in or upon premises when he is not licensed, invited or privileged to do so."  *Id.* § 13A-7-1(4).  The Alabama Supreme Court has held that the "unlawful remaining" prong of Alabama's burglary statute "cover[s] cases where a person enters with license or privilege but remains after termination of such license or privilege." *Davis v. State*, 737 So. 2d 480, 483 (Ala. 1999).  During oral argument, and in his supplemental brief, Davis's counsel acknowledged that the trial court instructed the jury pursuant to Alabama's Pattern Jury Instructions, which tracked the language of these code provisions, but he argued that the jury should have been further instructed as to *how* one unlawfully enters or remains.  (Doc. 15-9 at 86).

          More specifically, with respect to the "unlawful entry" prong of the burglary statute, Davis's counsel argued that the jury should have been instructed that unlawful entry would occur if entrance was gained by "intimidation, deception, trick or artifice," as contemplated by the Commentary to Ala. Code § 13A-7-1 ("Of course, a person who gains admittance through intimidation, deception, trick or artifice does not enter with 'license or privilege.'").  (*See* doc. 15-9 at 86).  Presumably, Davis's counsel's point was that, had the jury been so instructed, the jury would not have concluded that Davis unlawfully entered Boswell, Sr.'s home through trick or deception because there was testimony that Davis said, "Yes" when asked if he wanted to see "Eugene," and Eugene Smith indeed lived at the house.

          However, the State responded in its supplemental brief that even without an additional jury instruction, there was sufficient evidence for the jury to find beyond a reasonable doubt that Davis gained entry to Boswell, Sr.'s home unlawfully through trick or deception.  (*See id.* at 75).  The State pointed out that the evidence showed that Davis and Singleton were armed; that they parked their vehicle several houses down from Boswell, Sr.'s home; that Davis actually first presented himself as one who was looking for "Louis;" and that upon being told by Boswell, Sr. that "Louis" did not live there, Davis picked up on a name mentioned by Boswell, Sr. as a resident of the house and stated that "Eugene" was really who he wanted to see.  (*Id.*).  Thus, the State responded that, considering that Davis never objected to the jury instructions during trial, there was no plain error involved in the inquiry regarding Boswell, Sr.

          Alternatively, with respect to the "unlawful remaining" prong of the burglary statute, Davis's counsel argued that the jury should have been instructed pursuant to the *Davis* case, *supra*, that in order to establish an "unlawful remaining" when the defendant has a license or privilege to be on the premises, the State must present some additional evidence other than mere evidence that the defendant committed a crime in a dwelling owned or controlled by the victim. (Doc. 15-9 at 86).  In *Davis*, the Alabama Supreme Court condemned a finding of burglary-murder merely from the commission of a homicide inside a dwelling wherein the defendant originally had a privilege or license to enter. 737 So. 2d at 483–84.  The Court reasoned that finding that such circumstances

On December 1, 2000, the ACCA affirmed Davis's convictions and death sentence. *Davis*, 804 So. 2d at 1164. Davis filed an application for rehearing on December 21, 2000 (doc. 15-9 at 90–122), but the ACCA overruled it on February 23, 2001. *See Davis*, 804 So. 2d at 1153. On March 9, 2001, Davis raised the same issues in a petition for a writ of certiorari in the Alabama Supreme Court. (Doc. 15-10 at 2–7, 28–51). On June 1, 2001, the Alabama Supreme Court denied Davis's

---

automatically constitute burglary-murder through the "unlawfully remaining" prong would elevate all homicides committed inside a dwelling into burglaries and run afoul of the constitutional requirement of reserving capital punishment for only the most egregious crimes. *Id.* at 483. The Court held that "evidence of commission of a crime, standing alone, is inadequate to support the finding of an unlawful remaining, but evidence of a struggle can supply the necessary evidence of an unlawful remaining." *Id.* at 484. The Court further clarified that "in homicide cases, the mere fact of a victim's death cannot be equated with a struggle." *Id.* Davis's counsel position on this issue was that the jury must have concluded that since there were two unlawful killings and one attempted murder, that in itself must mean that the shooters had to have unlawfully entered or remained. Davis's counsel argued that the trial court erroneously suggested to the jury that the unlawful entering or unlawful remaining elements were already determined and that the jury need not be concerned with that element of the offense.

However, the State responded in its supplemental brief that, assuming that Davis initially was granted a license to enter Boswell, Sr.'s home, the fact that Smith survived the shot to his right ear and later testified against Davis during trial was sufficient evidence for the jury to find beyond a reasonable doubt that Davis remained unlawfully because Smith's testimony allowed the jury to infer that Smith no longer desired Davis and his accomplices' presence in the home once he was shot. (Doc. 15-9 at 70). In other words, the State argued that the "struggle" prior to the homicides, as required by the *Davis* case, was the shot to Smith's head prior to the execution-style killings of Ray and Bradley. The State further argued that the evidence of Boswell, Sr.'s act of locating and loading his gun, which was prompted by the first gunshot, and then proceeding to the living room to see if Davis was still there further indicated that by that point, Davis's license was certainly revoked. Thus, the State argued that, even without an additional instruction pursuant to the *Davis* case, there was no plain error in the jury's verdict on burglary-murder.

petition for a writ of certiorari without an opinion. *Davis v. State*, No. 1001023 (Ala. June. 1, 2001).

On August 30, 2001, represented by new counsel from the Equal Justice Initiative, Davis filed a petition for a writ of certiorari in the United States Supreme Court. Davis raised one issue: "When does the admission of inflammatory photographic evidence—rendered entirely cumulative by a capital defendant's offer to stipulate to the undisputed and straightforward underlying facts conveyed by the evidence—constitute a due process violation?" (Doc. 15-10 at 101). On November 13, 2001, the United States Supreme Court denied Davis's petition for a writ of certiorari without an opinion. *Davis v. Alabama*, 534 U.S. 1024 (2001).

## B.    Rule 32 Proceedings

On October 28, 2002, Davis, represented by new counsel from Alabama and California law firms, filed a Petition for Relief from Judgment Pursuant to Rule 32 of the Alabama Rules of Criminal Procedure (hereinafter "the Rule 32 petition") in the Montgomery County Circuit Court (hereinafter "the Rule 32 Court"). (Doc. 15-11 at 5–72). Davis raised, among other claims, numerous claims of ineffective assistance of trial and appellate counsel; a claim that the State violated *Brady v. Maryland*, 373 U.S. 83 (1963), by withholding exculpatory information; a claim that the State violated *Batson v. Kentucky,* 476 U.S. 79 (1986), in jury selection; claims of prosecutorial misconduct and juror misconduct; claims that the trial court

44

improperly admitted evidence and made errors in jury instructions and during sentencing that violated his constitutional rights; a claim that the State did not prove all elements of the crimes he was charged with; and a claim that his death sentence was unconstitutional. (*Id.*).

The State filed a motion to dismiss Davis's Rule 32 petition as untimely filed. (*Id.* at 85–96). The Rule 32 Court granted the State's motion and dismissed the petition. (*Id.* at 111–12). The Rule 32 Court reasoned that, pursuant to an amendment to Alabama Rule of Criminal Procedure 32.2(c), which had gone into effect on August 1, 2002, and which reduced the statute of limitations period for filing a Rule 32 petition from two years to one year after the ACCA issues its certificate of judgment, Davis's petition was time-barred. (*Id.*).

Davis appealed the Rule 32 Court's dismissal to the ACCA (doc. 15-12 at 22–37), but the ACCA affirmed the Rule 32 Court's ruling. *Davis v. State*, 890 So. 2d 193 (Ala. Crim. App. 2003). Davis sought rehearing (doc. 15-12 at 109–44), but the ACCA overruled the request. *See Davis*, 890 So. 2d at 193. Davis then filed a petition for a writ of certiorari in the Alabama Supreme Court. (Doc. 15-12 at 145–215). The Alabama Supreme Court granted certiorari on February 6, 2004, and reversed and remanded the ACCA's decision. *Ex parte Davis*, 890 So. 2d 199, 200 (Ala. 2004). The Alabama Supreme Court held that Davis's Rule 32 petition was timely filed, relying upon an earlier decision in which it held that a defendant whose

triggering date for filing a Rule 32 petition occurs on or before July 31, 2001, has two years from the triggering date in which to file his or her petition. *Id*. (citing *Ex parte Gardner*, 898 So. 2d 690 (Ala. 2004)).

On remand to the Rule 32 Court, the State filed an answer and a motion to dismiss Davis's Rule 32 petition. (Doc. 15-14 at 24–137). The Rule 32 Court allowed the parties to engage in discovery and held an evidentiary hearing on January 23–24, 2006. (Doc. 15-59 at 91–201; doc. 15-60 at 2–201; doc. 15-61 at 2–201; doc. 15-62 at 2–40 (evidentiary hearing transcripts)). At the hearing, Davis's counsel was permitted to call 18 witnesses, including two experts, and submit five depositions and numerous exhibits. Davis's counsel told the Rule 32 Court that their focus would be on Davis's claims of ineffective assistance of trial counsel. (Doc. 15-59 at 104). Davis called the following lay witnesses: his trial counsel Copeland and Belser; his appellate counsel Hamm; Davis's mother Patricia Davis and his brothers Princeton, Charleston, Willis, Jr., and Mario; Sonya Walker and Melinda Clayton, who were two of Kaneshia Taylor's friends and with her on the night of the murders; and several former friends, coworkers, and school administrators who knew Davis as a child or teenager, including John Gilcrest, Rosa Payne, Farrah Duncombe, Otis Barnes, Michelle Simmons, Kier Williams, and Valerie Denise Taylor. Davis called as expert witnesses Dr. Solomon Fulero, a psychologist who specialized in eyewitness identification (doc. 15-61 at 47–131), and, over the State's

objection, Jan Vogelsang, a social worker who compiled a social history about Davis and his family and upbringing (*id*. at 131–97). Davis was also permitted to admit the deposition testimony of crime scene experts Robert Tressel and Ross Gardner concerning the forensic evidence collected at the crime scene in 1996. (*See* doc. 15-17 at 181–201; doc. 15-18 at 2–115). Finally, Davis was permitted to admit the deposition testimony of Dr. Freeman, the psychiatrist that Davis's counsel had retained at his trial. (Doc. 15-61 at 166). In rebuttal, the State called Dr. Glen King as an expert in clinical and forensic psychology. (*Id.* at 198–202; doc. 15-62 at 2–23).

Because it is relevant to Davis's claims, the Court has summarized some of the evidence presented at the Rule 32 evidentiary hearing.

First, Copeland and Belser described their work on Davis's criminal trial. (Doc. 15-59 at 111–53 (Copeland's testimony); *id.* at 153–201 & doc. 15-60 at 2 (Belser's testimony)). Both lawyers testified that they did not record all of the time that they spent on Davis's case. (Doc. 15-59 at 118–19, 144, 189). Both lawyers were asked numerous questions about whether they investigated the crime themselves, interviewed various witnesses, and hired various experts, to which their answers were generally no. Copeland recalled that their guilt phase strategy was "identity" and that their penalty phase strategy was "mercy as a mitigating factor." (*Id.* at 132–33). Belser confirmed that their defense theory was to show either that

Davis was not at the scene of the crime or that eyewitness testimony putting him there was not credible. (*Id*. at 177). Copeland recalled that at the penalty phase, he wanted to focus on Davis's mental state in attempting to show that Davis had some sort of inability to control his actions, rather than focus on the poverty of his childhood. (*Id*. at 148–49). Copeland recalled that Dr. Freeman specifically told him that they should not call him to testify at the penalty phase of Davis's trial because he would not have anything useful to report. (*Id*. at 139, 149–50). Belser confirmed that Dr. Freeman told them that "you wouldn't want to use me as an expert in this case" and that Belser took that to mean that "he could not assist us in providing either mitigation or defense in this case." (*Id*. at 187).

Davis's appellate counsel, Hamm, also testified briefly. (*Id.* at 169–77). He recalled meeting with Davis at Holman prison, and he stated that he could not recall what issues he raised on direct appeal. (*Id.*).

In his deposition, Dr. Freeman indicated repeatedly that he could not remember much about his evaluation of Davis, and he noted that he was unable to locate most of his records concerning the evaluation, including his report. (Doc. 15-36 at 47–116). He recalled that he advised Davis's trial counsel that "[t]here was no insanity at the time of the offense as far as the legal definition, but that there were some childhood problems that may have been worthwhile in trying to mitigate, you

know, for sentencing purposes." (*Id*. at 69). However, he could not recall what those childhood problems were. (*Id*. at 70).

Dr. King testified that he conducted a clinical interview with Davis and performed certain tests to measure his intelligence and other cognitive functions. (Doc. 15-62 at 4–5). According to Dr. King, Davis scored a verbal IQ of 95, a performance IQ of 107, and full scale IQ of 100, which are average. (*Id*. at 6–7). It was also Dr. King's opinion that Davis did not suffer from any significant psychological disorders and had never suffered from any serious psychological disorder. (*Id*. at 11).

Walker and Clayton both testified about their relationship with Davis, the night of the murders, and being subpoenaed to testify at Davis's trial. (Doc. 15-60 at 24–41 (Walker's testimony); *id*. at 41–56 (Clayton's testimony)). Walker said that she considered Davis to be like a brother to her, that he was not violent, and that he took care of his family, but she admitted that she saw him selling drugs from his Gibbs Village apartment on numerous occasions. (*Id*. at 25–27, 37). Clayton similarly said that she had known Davis for 20 years, she considered him a brother, he was not violent, and he cared for his brothers. (*Id*. at 44–45). Walker and Clayton both testified that, had Davis's counsel called them to testify at his trial, they would have stated that on the night of the murders, they were actually with Davis at the Top Flight Club until it closed, contrary to what Taylor had said at trial, which was that

the three women could not get into the Top Flight Club so they both spent the entire evening at the 747 Club without the men. (*Id*. at 30–31, 49). Both Walker and Clayton testified that Taylor was "wrong" if she testified that the women were not with Davis because they went to a different club. (*Id*. at 33, 54–55). In fact, Clayton said that she had never been to the 747 Club. (*Id.*). Walker recalled that Davis's counsel asked her if she would be willing to testify on Davis's behalf at his trial, and she said yes, but his counsel did not end up calling her to the stand. (*Id*. at 31–32). Clayton testified that she was subpoenaed to testify at Davis's trial by the prosecution. (*Id*. at 51). She recalled that when she arrived at the courthouse, the prosecutors asked her some questions about the night of the murders, including "were we all together that night." (*Id.* at 53). She recalled that she answered their questions but that about 30 minutes later, they told her that she could go home and they would not be calling her to testify. (*Id.*).

Davis's counsel called numerous other witnesses to show that, although Davis had a tough upbringing, he exhibited good moral character and served his community. For example, Kier Williams testified that he worked with Davis at McDonalds while Davis was in high school, that Davis was a supervisor, and that other employees looked up to him. (Doc. 15-60 at 2–12). Mr. Williams said that Davis supported his family and that, to his knowledge, Davis was not involved in gangs or violence. Mr. Williams said that he never saw Davis sell drugs from his

Gibbs Village apartment. Valerie Denise Taylor, Kaneshia Taylor's mother and the grandmother of one of Davis's children, testified that Davis was a caring person whom everyone loved and that Davis shared in the Taylor family activities. (*Id.* at 12–24). Charleston Davis, Davis's younger brother by 14 years, testified that since Davis's father, Melvin Davis, Sr., was not around much, Davis was a father figure to him, taught him morals, helped provide for him, and kept him out of trouble. However, he also said that he was only 14 years old at the time of Davis's trial. (*Id.* at 56–74). John Gilcrest, who worked in the Gibbs Village area as a member of the Montgomery Fire Department, testified that gangs began to infiltrate Gibbs Village in the 1980s; that he had met and got to know Davis; that Davis cut his hair; but that he had not seen Davis much in the years leading up to the murders. (*Id.* at 74–85).

Mario Davis, another of Davis's brothers, testified that their father was not around much; that Davis was like a father to him; that Davis sold drugs to support the family; that Davis worked long hours at McDonalds to support the family; and that their mother would whip them on occasion. (*Id.* at 85–124). Mario Davis further stated that he had talked with Davis's trial counsel before Davis's trial but was not called to testify. Mario Davis also recalled that Davis and Princeton were arrested for selling marijuana, but that Davis had denied selling it.

Rosa Payne stated she had known Davis since he was a boy; that she met him through his mother; that Davis was like a father to his brothers; that Davis provided

for his brothers and was not violent; and that she had seen bruises on Davis's mother's body.  (*Id.* at 124–35).  She also recalled that Davis was at her house in 1997 when a newsflash came on the television that police were looking for Davis in connection for the murders on Thanksgiving night, 1996, and that Davis actually used her phone to call the police and agreed to be transported to MPD headquarters for questioning.  (*Id.* at 129–30).

Princeton Davis testified that that he was five or six years younger than Davis; that their mother spent a lot of time either working or out socializing; that Davis cared for his brothers; that their mother would whip her sons; that he was put in foster care once after telling his teacher about being whipped; that their mother's second husband, Willis Davis, Sr., would beat their mother; and that he started selling drugs when their mother threw him out of the apartment.  (*Id.* at 135–62).  Princeton said that Davis started selling drugs in 1993 and that he did not attend Davis's trial because he was in prison at the time.  On cross-examination, Princeton said that he and Davis made good money selling marijuana in Gibbs Village; that he never saw Davis with a gun but that he had guns at different times; and that Jointer, Singleton, and Dunn hung out with him and Davis selling drugs.

Davis's mother, Patricia Davis, also testified.  (*Id.* at 177–201; doc. 15-61 at 2–20).  With regard to Davis's upbringing, she stated that she and Davis's father, Melvin Davis, Sr., married about six months after Davis was born.  She said that

Gibbs Village was rough; that she worked at night and had a neighbor keep the children until she found out that the neighbor was sending the boys home alone after she went to work; that on occasion the police were called because the children were home alone; that Davis was in charge when she was not at home; that Princeton was once sent to foster care. She recalled receiving a monetary settlement when Melvin, Sr. was killed on his railroad job, but she said that she mismanaged the money and was broke two and a half years later. She said that her relationship with her second husband Willis Davis, Sr. got worse over time and that he abused her for nine or ten years; that Davis would try to stop the abuse; and that Davis took care of the family. On cross-examination, she said that she provided her family with everything that they needed, including buying Davis and Princeton cars. She said that after she was kicked out of Gibbs Village after Davis and Princeton were arrested for selling drugs, Davis bought her a house on Center Street. She said she received some child support from the fathers of the boys but not much. She said that she also received Veterans Administration benefits for Davis and the other boys by her late husband but that those benefits stopped when the boys turned 16. She said that she worked as a nurse from 1976 to 1995. She claimed that she never saw Davis or Princeton selling drugs at Gibbs Village. She said that Davis's trial counsel did not reach out to her until immediately after her son had been found guilty of capital murder, when they asked her to testify at the penalty phase of his trial. (Doc. 15-60 at 201; doc. 15-61 at 2).

Farrah Duncombe, the principal at Carver High School when Davis attended, testified that Davis was a typical student who did not cause any problems.   (Doc. 15-61 at 21–30).  She recalled that in the late 1980s, gang activity began showing up at Carver and that she relied on Davis, among other students, to keep her updated on the gang violence on campus.  She recalled Davis breaking up a fight at school.  She said that she had not seen him since he graduated from Carver and was not aware of his arrest record.

Otis Barnes, another friend, testified that he met Davis when he was in tenth grade at Carver; that Davis was respected in school and tried to break up fights; that Davis worked at McDonalds after football practice; but that he only saw Davis occasionally between 1991 and 1998 and he was not aware of his arrest record.  (*Id.* at 30–40).   Michelle Simmons testified that she was the volleyball coach at Carver; that she knew Davis and that he dated one of her players; and that Davis helped her with equipment.  On cross-examination, she admitted that she had no contact with Davis since he graduated and was not aware of his arrest record.  (*Id*. at 40–47).

The final witness that Davis called related to mitigation was social worker Jan Vogelsang.  (*Id.* at 131–97).  Over the State's objections, Ms. Vogelsang was permitted to testify about a social history that she compiled about Davis and his family from early childhood through his arrest, describing a dysfunctional environment where Davis made positive contributions to his family and school life

despite the negative forces confronting him. Ms. Vogelsang based this description on her review of documents and information about Davis that she testified would have been available to her or to another social worker at the time of Davis's sentencing, as well as on her perceptions of witnesses who testified at the Rule 32 evidentiary hearing. (*See id.*). However, she admitted that she would not have been able to compile a social history in the four months that Copeland and Belser had to prepare for Davis's trial. (*Id.* at 194).

On June 19, 2006, the Rule 32 Court denied Davis's Rule 32 petition in an order adopted verbatim from the proposed order submitted by the State. (Doc. 15-71 at 31–191).

On April 5, 2007, Davis appealed the Rule 32 Court's decision, raising the following three issues: 1) he was denied effective assistance of trial counsel when Copeland and Belser failed to investigate or present exculpatory and mitigating evidence; 2) he was deprived of his rights to a fair trial and due process when the State withheld exculpatory evidence in violation of *Brady*; and 3) the Rule 32 Court's verbatim adoption of the State's proposed order dismissing his petition violated his due process rights. (Doc. 15-68 at 2–131). The ACCA affirmed the denial of Davis's Rule 32 petition on August 7, 2009. *Davis v. State*, 44 So. 3d 1118 (Ala. Crim. App. 2009). Davis sought rehearing (doc. 15-69 at 50–118), but the ACCA overruled the request (doc. 15-71 at 219).

Davis filed a petition for a writ of certiorari in the Alabama Supreme Court on December 29, 2009, raising the same three issues. (Doc. 15-70 at 2–118). On March 12, 2010, the Alabama Supreme Court denied Davis's petition for a writ of certiorari without an opinion. (Doc. 15-71 at 220). Davis did not file a petition for a writ of certiorari in the United States Supreme Court.

## C.    Davis's 28 U.S.C. § 2254 Habeas Petition

Davis filed this federal habeas petition on March 24, 2010. (Doc. 1). In the petition, Davis raised 24 claims, many of which include numerous separate allegations, for a total of approximately 80 distinct claims for relief. Respondent, Jefferson S. Dunn, the Commissioner of the Alabama Department of Corrections ("Respondent"),[4] filed an answer, the state court record, and a brief arguing that approximately 70 of Davis's claims are procedurally defaulted and thus could not be considered on their merits by this Court. (Docs. 13, 14, 15, 22). Davis responded, arguing that he could show cause and prejudice to excuse the default of the claims so that they could be considered by this Court, and the parties addressed the merits of the remaining claims in further briefs. (Docs. 25, 31, 34). After this action was reassigned to the undersigned, the Court requested that the parties supplement their briefs to address new caselaw, and they did so. (Docs. 47, 50, 53).

---

[4]    Davis sued the Commissioner of the Alabama Department of Corrections in his official capacity, and several successors have been automatically substituted since the inception of this action. *See* Fed. R. Civ. P. 25(d)(1).

## V.  STANDARDS OF REVIEW

A federal court may issue a writ of habeas corpus for a state prisoner "only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).  In other words, this Court's habeas review is limited to federal constitutional questions. *Wilson v. Corcoran*, 562 U.S. 1, 5 (2010).  "[F]ederal habeas corpus relief does not lie for errors of state law." *Estelle v. McGuire*, 502 U.S. 62, 67 (1991).  In reviewing state court proceedings, the federal court applies different standards of review depending on whether the petitioner properly presented his claim to the state courts and whether the state courts addressed the claim.

### A.    Exhaustion and Procedural Default

A petitioner in state custody must exhaust the remedies available to him in the state courts before he can bring his claim in a federal habeas corpus action. 28 U.S.C. § 2254(b)(1).  A remedy is "available" if the petitioner "has the right under the law of the State to raise, by any available procedure, the question presented." *Id.* § 2254(c).  The exhaustion requirement generally permits federal courts to consider only those claims that the petitioner has marshalled through "one complete round of the State's established appellate review process." *O'Sullivan v. Boerckel*, 526 U.S. 838, 845 (1999).  This includes filing a petition for discretionary review in the highest court of the state. *See id.* "[A]n issue is exhausted if 'the reasonable reader

would understand [the] [federal] claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court." *Pope v. Sec'y for Dep't of Corr.*, 680 F.3d 1271, 1286 (11th Cir. 2012) (second alteration in original) (quoting *Kelley v. Sec'y for Dep't of Corr.*, 377 F.3d 1317, 1344–45 (11th Cir. 2004)). Thus, a petitioner must "fairly present every issue raised in his federal petition to the state's highest court, either on direct appeal or on collateral review." *Ward v. Hall*, 592 F.3d 1144, 1156 (11th Cir. 2010).

A habeas petitioner who fails to properly present a claim to the state court and who therefore loses the right to raise the claim within state procedures is said to have "procedurally defaulted" the claim and is no longer able to raise it in either state or federal court. *See Martinez v. Ryan*, 566 U.S. 1, 9 (2012); *see also Coleman v. Thompson*, 501 U.S. 722, 732 (1991) (explaining that "a habeas petitioner who has failed to meet the State's procedural requirements for presenting his federal claims has deprived the state courts of an opportunity to address those claims in the first instance"). A state court's rejection of a federal constitutional claim on state procedural grounds may only preclude federal review if the procedural ruling rests upon an "adequate and independent" state ground. *Marek v. Singletary*, 62 F.3d 1295, 1301 (11th Cir. 1995) (citation omitted). A state procedural ruling is "adequate and independent" if three elements are met. *Ward*, 592 F.3d at 1156. "First, the last state court rendering a judgment in the case must clearly and expressly

state that it is relying on state procedural rules to resolve the federal claim without reaching the merits of that claim." *Id*. (quoting *Judd v. Haley*, 250 F.3d 1308, 1313 (11th Cir. 2001)). "Second, the state court's decision must rest entirely on state law grounds and not be intertwined with an interpretation of federal law." *Id.* (citing *Judd*, 250 F.3d at 1313). "Third, the state procedural rule must be adequate, *i.e.*, firmly established and regularly followed and not applied 'in an arbitrary or unprecedented fashion.'" *Id.* (quoting *Judd*, 250 F.3d at 1313).

However, procedural default is not an absolute bar to federal habeas relief. There are two exceptions to the general rule that a federal court may not consider a procedurally defaulted claim on the merits: "cause and prejudice" and "actual innocence." *Dretke v. Haley*, 541 U.S. 386, 393 (2004) ("[A] federal court will not entertain a procedurally defaulted constitutional claim in a petition for habeas corpus absent a showing of cause and prejudice to excuse the default. We have recognized a narrow exception to the general rule when the habeas applicant can demonstrate that the alleged constitutional error has resulted in the conviction of one who is actually innocent of the underlying offense.").

A habeas petitioner can establish "cause and prejudice" if (1) "some objective factor external to the defense impeded the effort to raise the claim properly in the state court," and (2) "there is at least a reasonable probability that the result of the proceeding would have been different." *Harris v. Comm'r, Ala. Dep't of Corr.*, 874

F.3d 682, 688 (11th Cir. 2017).  Attorney negligence does not generally constitute cause to excuse procedural default unless it rises to the level of ineffective assistance of counsel. *Coleman*, 501 U.S. at 752–54.  Attorney error may also constitute cause for procedural default "when a State requires a prisoner to raise an ineffective-assistance-of-trial-counsel claim in a collateral proceeding," but the prisoner did not have effective counsel in his first collateral proceeding. *See Martinez*, 566 U.S. at 14; *see also Trevino v. Thaler*, 569 U.S. 413, 429 (2013).  As for prejudice, a habeas petitioner must show "not merely that the errors at his trial created a *possibility* of prejudice, but that they worked to his *actual* and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." *United States v. Frady*, 456 U.S. 152, 170 (1982) (emphases in original).

"Actual innocence," on the other hand, "applies to a severely confined category: cases in which new evidence shows 'it is more likely than not that no reasonable juror would have convicted the petitioner.'" *McQuiggin v. Perkins*, 569 U.S. 383, 395, (2013) (quoting *Schlup v. Delo*, 513 U.S. 298, 329 (1995)). The petitioner bears the burden of establishing that one of these exceptions to the procedural default rule applies. *See Gordon v. Nagle*, 2 F.3d 385, 388 (11th Cir. 1993) ("A defendant has the burden of establishing cause and prejudice."); *Arthur v. Allen*, 452 F.3d 1234, 1245 (11th Cir. 2006) ("The petitioner must support the actual innocence claim with new reliable evidence[.]" (quotation marks omitted)).

States "can waive procedural bar defenses in federal habeas proceedings, including exhaustion." *Vazquez v. Sec'y, Fla. Dep't of Corr*., 827 F.3d 964, 966 (11th Cir. 2016) (quotation marks omitted).  However, "[a] State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, *expressly* waives the requirement." 28 U.S.C. § 2254(b)(3) (emphasis added); *see also McNair v. Campbell*, 416 F.3d 1291, 1304 (11th Cir. 2005).

## B.    AEDPA Review of State Court Decisions

When a state prisoner petitions a federal court for a writ of habeas corpus on grounds that were considered and rejected by the state courts, review is governed by the Anti-Terrorism and Effective Death Penalty Act of 1996 ("AEDPA"). *Penry v. Johnson*, 532 U.S. 782, 792 (2001).  The AEDPA establishes a "highly deferential standard for evaluating state-court rulings, which demands that state-court decisions be given the benefit of the doubt." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (quoting *Woodford v. Visciotti*, 537 U.S. 19, 24 (2002) (per curiam)).

Under the AEDPA, a petitioner is not entitled to habeas corpus relief in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either:  (1) resulted in a decision which was contrary to, or involved an unreasonable application of, clearly established federal law, as determined by the United States Supreme Court, or (2) resulted in a decision which was based on an unreasonable determination of the facts

in light of the evidence presented in the state court proceeding. 28 U.S.C. § 2254(d); *Brown v. Payton*, 544 U.S. 133, 141 (2005); *Williams v. Taylor*, 529 U.S. 362, 404–05 (2000). When making this determination, if the relevant state court decision on the merits does not come accompanied with reasons for its decision, the federal court should "look through" the unexplained decision to the last related state court decision that does provide a relevant rationale and presume that the unexplained decision adopted the same reasoning. *Wilson v. Sellers*, 584 U.S. 122, 125 (2018).

The "contrary to" and "unreasonable application" clauses of 28 U.S.C. § 2254(d)(1) have independent meanings. *Bell v. Cone*, 535 U.S. 685, 694 (2002). Under the "contrary to" clause, a federal court may grant relief if the state court "applies a rule that contradicts the governing law set forth" in United States Supreme Court cases, or if the state court decides a case differently than the Supreme Court on a set of materially indistinguishable facts. *Id.*; *Mitchell v. Esparza*, 540 U.S. 12, 15–16 (2003). A state court's failure to cite governing Supreme Court authority does not automatically establish that the state court's decision is "contrary to" clearly established Supreme Court precedent. *Mitchell*, 540 U.S. at 16 (citing *Early v. Packer*, 537 U.S. 3, 8 (2002) (per curiam)). Rather, "a state court need not even be aware of [the relevant] precedents, 'so long as neither the reasoning nor the result of the state-court decision contradicts them.'" *Id.* (citing *Packer*, 537 U.S. at 8).

Under the "unreasonable application" clause, a federal court may grant relief if the state court identifies the correct governing legal principle from the Supreme Court's decisions but unreasonably applies that principle to the facts of the petitioner's case. *Brown*, 544 U.S. at 141; *Wiggins v. Smith*, 539 U.S. 510, 520 (2003). A federal court making this inquiry should ask whether the state court's application of clearly established Supreme Court precedent was "objectively unreasonable." *McDaniel v. Brown*, 558 U.S. 120, 132–33 (2010); *Wiggins*, 539 U.S. at 520–21. An "unreasonable" application is different from a merely "incorrect" one. *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) ("The question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold."); *Wiggins*, 539 U.S. at 520.

The Supreme Court has summarized these two clauses in simple terms: "[A] state prisoner seeking a writ of habeas corpus from a federal court 'must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Bobby v. Dixon*, 565 U.S. 23, 24 (2011) (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)). A legal principle is "clearly established" for AEDPA purposes if it was found in the holdings—as opposed to the dicta—of a Supreme Court decision that existed at the

time of the relevant state court decision. *Yarborough v. Alvarado*, 541 U.S. 652, 660–61 (2004); *see also Lopez v. Smith*, 574 U.S. 1, 2 (2014) (per curiam) (holding that the AEDPA "prohibits the federal courts of appeals from relying on their own precedent to conclude that a particular constitutional principle is 'clearly established'").

The AEDPA also significantly restricts the scope of federal habeas review of state court findings of fact.  A federal court cannot contradict state court factual findings merely because it "would have reached a different conclusion in the first instance." *Williams*, 529 U.S. at 410.  Rather, the state court must have reached an "unreasonable determination of the facts in light of the evidence presented in the State court proceeding" for a federal court to grant habeas relief on that basis. 28 U.S.C. § 2254(d)(2).  Even if reasonable minds reviewing the record might disagree about the factual finding in question (or the implicit credibility determination underlying the factual finding), that is not sufficient grounds for a federal habeas court to supersede the trial court's findings. *Wood v. Allen*, 558 U.S. 290, 301 (2010); *Rice v. Collins*, 546 U.S. 333, 341–42 (2006).  The state court's factual findings are "presumed to be correct," and the petitioner has the burden of rebutting these findings "by clear and convincing evidence." 28 U.S.C. § 2254(e)(1).

Of course, deference does not mean that habeas relief is always precluded. *See Miller-El v. Cockrell*, 537 U.S. 322, 324 (2003) ("Even in the context of federal

habeas, deference does not imply abandonment or abdication of judicial review.");

*Miller-El v. Dretke*, 545 U.S. 231, 240 (2005) ("The standard is demanding but not insatiable.").  However, by setting forth necessary predicates before state court judgments may be set aside, the AEDPA "erects a formidable barrier to federal habeas relief for prisoners whose claims have been adjudicated in state court." *Burt v. Titlow*, 571 U.S. 12, 19 (2013).

For any claims properly presented to the state courts but left unaddressed, this Court conducts a *de novo* review. *Porter v. McCollum*, 558 U.S. 30, 39 (2009); *Rompilla v. Beard*, 545 U.S. 374, 390 (2005).  If reviewed *de novo*, a fact pleading standard is applied. *See* 28 U.S.C. § 2242 (requiring a petition for writ of habeas corpus to "allege the facts concerning the applicant's commitment or detention"). Similarly, Rule 2(c)(2) of the *Rules Governing Section 2254 Cases in the United States District Courts* also requires a petitioner to "state the facts supporting each ground" in the petition. *See also Mayle v. Felix*, 545 U.S. 644, 656 (2005) (acknowledging this particularity requirement).

## VI.  DISCUSSION

Davis's claims are considered in the order in which they appear in his petition. Although the Court will review some of Davis's claims pursuant to the AEDPA's standards set forth in 28 U.S.C. § 2254(d) because Davis exhausted the claims in the state courts, most of Davis's claims are unexhausted or were dismissed by the state

courts based upon adequate and independent state procedural rules, or both, which precludes this Court from reviewing the merits of most of Davis's claims.

## A.    Davis's Claims of Ineffective Assistance of Trial Counsel at the Guilt Phase  (Doc. 1 at ¶¶ 34–75)

Davis's first claim is that Copeland and Belser were ineffective during the guilt phase of his trial in numerous separate instances, amounting to a violation of his Sixth Amendment right to counsel.  Before turning to these allegations, the framework used by courts for evaluating ineffective assistance claims is addressed.

The Sixth Amendment guarantees a criminal defendant the right to the effective assistance of counsel. *See Powell v. Alabama*, 287 U.S. 45 (1932); *Johnson v. Zerbst*, 304 U.S. 458 (1938); *Gideon v. Wainwright*, 372 U.S. 335 (1963).  The "right to counsel exists, and is needed, in order to protect the fundamental right to a fair trial." *Strickland v. Washington*, 466 U.S. 668, 684 (1984).  In *Strickland*, the Supreme Court established the constitutional standard for determining whether a criminal defendant has been denied the effective assistance of trial counsel, as follows:

> A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the

> defense. This requires showing that counsel's errors were so serious as
> to deprive the defendant of a fair trial, a trial whose result is reliable.

466 U.S. at 687.

To satisfy the deficient performance prong of *Strickland*, a defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins*, 539 U.S. at 521; *Williams*, 529 U.S. at 390–91. The defendant has the burden of proof and must overcome a strong presumption that his trial counsel's conduct falls within a wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 687–91. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins*, 539 U.S. at 523 (holding that the proper analysis under *Strickland*'s performance prong is an objective review of the reasonableness of counsel's performance under prevailing professional norms, which includes a context-dependent consideration of the challenged conduct as seen from the perspective of counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Strickland*, 466 U.S. at 688–89.

To satisfy the "prejudice" prong, the defendant must establish a reasonable probability that, but for the objectively unreasonable conduct of his counsel, the result of the proceeding would have been different. *Wiggins*, 539 U.S. at 534;

*Strickland*, 466 U.S. at 694.  A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Strickland*, 466 U.S. at 694. "The likelihood of a different result must be substantial, not just conceivable." *Harrington*, 562 U.S. at 112.

Importantly, "whether defense counsel's performance fell below *Strickland*'s standard" is not the question before a federal habeas court reviewing a state court's decision under 28 U.S.C. § 2254(d). *Harrington*, 562 U.S. at 101.  Where § 2254(d) applies, "the question is not whether counsel's actions were reasonable" but is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Id*. at 105.  This "extra layer of deference that § 2254 provides" means that "it will be a rare case in which an ineffective assistance of counsel claim that was denied on the merits in state court is found to merit relief in a federal habeas proceeding." *Johnson v. Sec'y, DOC*, 643 F.3d 907, 911 (11th Cir. 2011).

Each of Davis's separate allegations of guilt-phase ineffective assistance of trial counsel will be discussed in the order in which they appear in the petition.

1.   **Davis's subclaim that trial counsel failed to locate, interview, and present alibi witnesses who possessed exculpatory information (doc. 1 at ¶¶ 36–41)**

Davis's first specific allegation is that his counsel only interviewed three of the 90 individuals whom the DA's office had listed in its file as possibly having information about the murders.  However, the only witnesses Davis mentions by

name that his counsel failed to interview are Sonya Walker and Melinda Clayton. As noted, Davis's girlfriend, Kaneshia Taylor, testified at Davis's trial that these women were with her on the night of the murders. Davis alleges that, had his trial counsel interviewed these women before his trial, they would have given a different account of the night of the murders than Taylor did, and their account would have not only impeached Taylor's testimony but also helped establish an alibi for Davis. Specifically, Davis alleges that, while Taylor testified at trial that she and the other two women were at the 747 Club that night, and not with Davis, Walker and Clayton would have testified that the women *were* with Davis at the Top Flight Club during the time that the murders were alleged to have been committed. In support of his claim that his counsel's failure to interview these women amounted to ineffective assistance of counsel, Davis cites *Goodwin v. Balkom*, 684 F.2d 794, 805 (11th Cir. 1982), in which the Eleventh Circuit discussed a criminal defense attorney's duty to investigate and prepare for his client's case, and cases from other circuits discussing how this duty is especially important in crafting an alibi defense, such as *Hadley v. Groose*, 97 F.3d 1131, 1135 (8th Cir. 1996), and *Romero v. Tansy*, 46 F.3d 1024, 1029 (10th Cir. 1998).

Davis exhausted this claim in the state courts during his postconviction proceedings, and the state courts denied it on the merits, which means that this Court's review of this claim is for reasonableness under 28 U.S.C. § 2254(d). More

specifically, Davis's "Claim C" in his Rule 32 petition was that he was deprived of

effective assistance of counsel.  The lengthy claim consisted of 110 paragraphs, each

alleging numerous discrete allegations.   (*See* doc. 15-11 at 12–43).   In paragraph

34, he alleged that trial counsel failed to interview numerous individuals, including

Taylor's "friends," without naming anyone specifically.  (*Id.* at 15). To support that

claim, Davis called Walker and Clayton at his Rule 32 evidentiary hearing.  (Doc.

15-60 at 24–41 (Walker's testimony); 41–56 (Clayton's testimony)).   They both

stated that Taylor was "wrong" if she testified at trial that they were at the 747 Club

on the night of the murders because they were all three actually with Davis at the

Top Flight Club that night.  (*Id*. at 31–33; 46–47, 49–50, 54–55).  After the hearing,

the Rule 32 Court denied this claim, finding that Davis had not demonstrated that he

was prejudiced by Walker and Clayton not testifying at his trial pursuant to Ala. R.

Crim. P. 32.2(c) and 32.7(d).  (Doc. 15-71 at 46).

Davis appealed that ruling to the ACCA, but the ACCA affirmed in the

following thorough discussion:

> Davis first argues that his trial counsel were ineffective for
> failing to interview all the State's witnesses.  Davis specifically argues
> that counsel were ineffective for failing to interview what he
> characterizes as two alibi witnesses—Sonya Walker and Melinda
> Clayton.  When addressing this claim, the circuit court stated:
>
> > "At the evidentiary hearing, Davis called two of Kaneshia
> > Taylor's friends, Sonya Walker and Melinda Clayton.  It appears
> > clear that Taylor, Walker, Clayton, Antonio Jointer, Derrick
> > Singleton, and Melvin Davis went out on Thanksgiving night in

1996.  Walker's and Clayton's testimony about the details of the evening differed from Taylor's trial testimony in certain respects. Taylor testified at trial that after the group got to the Top Flight Club, the girls left and went to the 747 Club and that later the girls got to the Waffle House [restaurant] before the men. Walker and Clayton testified at the evidentiary hearing that the girls stayed at the Top Flight Club until it closed and that the men arrived at the Waffle House first.

"Even if Walker's and Clayton's testimony had been offered to impeach Taylor's testimony, the Court finds it would not have changed the outcome of Davis's trial.  Walker did not recall a shooting incident in [the] parking lot of the Top Flight Club and said she saw Marcus Dunn at the Club during the night.  Clayton, on the other hand, did recall the parking lot incident and said she did not recall seeing Dunn at Top Flight on the night in question. Further, Walker indicated during cross-examination that she had witnessed Davis and his brother, Princeton, selling marijuana from their mother's apartment in Gibbs Village.  In light of the evidence presented at trial, the Court finds that Davis's trial counsel were not ineffective for failing to present Walker's and Clayton's testimony.  The Court finds that Davis failed to prove he was prejudiced because Walker and Clayton were not called to testify at the guilt phase of his trial. Rules 32.2(c) and 32.7(d), Ala. R. Crim. P."

(C.R. 809–10.)

"'[The] failure to conduct a pretrial investigation and interview witnesses is not a per se sixth amendment violation.' *Code v. Montgomery*, 799 F.2d 1481, 1484 (11th Cir. 1986).  A counsel's decision to not investigate 'must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.' *Strickland* [*v. Washington*], 466 U.S. [668] at 691 [(1984)].  Also, the question of deficient performance "'is not what is possible or "what is prudent or appropriate, but only what is constitutionally compelled."'" *Payne v. Allen*, 539 F.3d 1297, 1315 (11th Cir. 2008) (quoting *Burger v. Kemp*, 483 U.S. 776, 794, 107 S. Ct. 3114, 97 L.Ed.2d 638 (1987))."

71

*Hall v. Thomas*, 623 F. Supp. 2d 1302, 1318 (M.D. Ala. 2009). *See Aldrich v. Wainwright*, 777 F.2d 630, 636–37 (11th Cir. 1985); *McCleskey v. Kemp*, 753 F.2d 877, 900 (11th Cir. 1985) (en banc); *Boykins v. Wainwright*, 737 F.2d 1539, 1543 (11th Cir. 1984); *Solomon v. Kemp*, 735 F.2d 395, 402 (11th Cir. 1984). *See Commonwealth v. Johnson*, 966 A.2d 523, 536 (Pa. 2009) ("[S]uch a per se failing [to interview witnesses], of course, does not make out a case of prejudice, or overall entitlement to *Strickland* relief."); *Sanders v. Trickey*, 875 F.2d 205, 209 (8th Cir. 1989) ("[N]o per se rule that failure to interview witnesses constitutes ineffective assistance of counsel."); *United States v. Glick*, 710 F.2d 639, 644 (10th Cir. 1983) ("[a]n attorney's decision not to interview witnesses and to rely on other sources of information, if made in the exercise of professional judgment, is not ineffective counsel.").

Walker testified at the evidentiary hearing that she, Kaneshia Taylor, Melinda Clayton, Melvin Davis, Derrick Singleton, and Antonio Jointer went to the Top Flight Disco night club on the night of the murders. She said that she rode with Taylor and Clayton and that they met the others at the club. They stayed at the club until closing, she said, and then left separately and met at a Waffle House restaurant around 2:00 a.m. or 2:30 a.m. She said that Davis, Singleton, and Jointer left the club first and that the men arrived at the Waffle House before the women arrived. Walker also testified that before trial one of Davis's lawyers contacted her and asked her if she would be willing to testify in Davis's behalf. She said that she and Clayton were at the courthouse for Davis's trial but that the attorney informed them that they would not be needed. On cross-examination at the evidentiary hearing Walker testified that she had seen Davis and his brother selling drugs from their home in Gibbs Village.

Melinda Clayton testified that the group went to the Top Flight Disco on Thanksgiving night in 1996. She said that they were going to meet at a Waffle House restaurant when the club closed at 2:00 a.m. Clayton said that they were delayed leaving the Club about 45 minutes because there was a shooting in the parking lot. She said that they got to the Waffle House after 3:00 a.m. and that Davis, Singleton, and Jointer were already there.

Copeland testified that he did not interview Walker or Clayton. Belser was not specifically asked if he interviewed Walker or Clayton.

Witnesses at Davis's trial testified that the murders occurred around 2:00 a.m. Neither Walker nor Clayton offered Davis an alibi for the night in question.[FN 7] Their testimony, at most, tended to conflict with portions of Kaneshia Taylor's testimony. Taylor testified at trial that she, Clayton, and Walker went to the Top Flight Disco on Thanksgiving night in 1996 and that the line was too long so they left and went to 747 Club. Taylor further testified that they went back to the Top Flight Disco at around 2:00 a.m. but there was a "conflict" in the parking lot so they met Davis, Singleton, and Jointer at a Waffle House.

> [FN 7]  "An alibi 'to be successful must cover the entire time when [appellant's] presence was required for accomplishment of the crime. . . . [A] purported alibi that leaves it possible for the accused to be the guilty person is no alibi at all.'"
>
> *State v. Goodroad*, 521 N.W.2d 433, 440 (S.D. 1994), quoting *State v. Floody*, 481 N.W.2d 242, 248 (S.D. 1992).

Moreover, Marcus Dunn testified that Davis and his brother Princeton were arrested after a confidential informant, Charlie Boswell, Jr., reported to police that they were selling drugs. Dunn said that he, Davis, and Singleton discussed how they could stop Boswell from testifying against Davis and his brother. On the night of the murders Davis paged him, he said, and he knew what it meant but he did not answer the page because he was babysitting his daughter. Dunn further testified that sometime after the shooting Davis told him that they had "hit the wrong house."

Antonio Jointer testified that Davis told him that he had discovered the name of the confidential informant from his attorney and that Davis wanted to kill the informant. Jointer said that on the night of the murders Davis picked him up at his house, that they went back to Davis's house and he retrieved something from the house, that Singleton pulled up, and that the three went to the Top Flight Disco. Jointer said that when the club was about to close they left. He testified

that when they reached the interstate Davis stopped the vehicle, he pulled out a gun, and said "it was time." Singleton had a revolver and Davis an automatic weapon, Jointer said, but he was not armed. They pulled up in front of a house on Loveless Curve and Davis knocked on the door. They all entered the house and walked to the rear. Davis and Singleton started shooting. They all left and went to a Waffle House restaurant. Jointer's testimony surrounding the murders was consistent with the details of the murders that police had not released to the public.

Charlie Boswell, Sr., testified that at around 2:00 a.m. on the night of the murders someone knocked on the door of his house on Loveless Curve. He did not answer immediately because he thought that Eugene Smith, John Bradley, or Timothy Ray, who were staying at his house, would answer the door. Boswell testified that three young males were at the door, that he could not identify the males because it was dark and no lights were on in the front of the house, and that he led them to Smith's room in the back of the house. Boswell said that he went back to his room and he then heard several gunshots.

> "'To establish prejudice from counsel's failure to investigate a potential witness, a petitioner must show that the witness would have testified and that their testimony "would have probably changed the outcome of the trial."' [*Hadley v. Groose*, 97 F.3d 1131 (8th Cir. 1996)] (quoting *Stewart v. Nix*, 31 F.3d 741, 744 (8th Cir. 1994) (emphasis added)). In conducting this analysis, we will consider: '(1) the credibility of all witnesses, including the likely impeachment of the uncalled defense witnesses; (2) the interplay of the uncalled witnesses with the actual defense witnesses called; and (3) the strength of the evidence actually presented by the prosecution.' *McCauley-Bey v. Delo*, 97 F.3d 1104, 1106 (8th Cir. 1996)."

*Siers v. Class*, 581 N.W.2d 491, 497–98 (S.D. 1998).

Based on the fact that Walker and Clayton offered inconsistent versions of what happened on the night of the murders and on the overwhelming evidence presented against Davis, we hold that the failure to interview and present the testimony of Walker or Clayton did not result in any prejudice to Davis. Accordingly, Davis failed to satisfy the requirements of *Strickland* and was due no relief.

*Davis*, 44 So. 3d at 1126–29 (footnote omitted).  Davis raised the claim again in a petition for certiorari in the Alabama Supreme Court (doc. 15-70 at 57–61), but the Alabama Supreme Court denied the petition without an opinion (doc. 15-71 at 220).

Under 28 U.S.C. § 2254(d), in order to obtain relief on this claim, Davis must demonstrate that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d).  Davis argues that the ACCA unreasonably applied the Supreme Court's clearly established federal law in *Strickland*, 466 U.S. at 687, when it rejected this ineffective assistance of counsel claim on the ground that he did not demonstrate that he was prejudiced by his trial counsel's failure to interview Walker and Clayton.

However, the argument is not persuasive.  The ACCA concluded that, had Davis's counsel interviewed Walker and Clayton and called them to testify at trial, the outcome of Davis's trial would not have changed. *Davis*, 44 So. 3d at 1129.  That was the correct standard for determining prejudice under *Strickland*, 466 U.S. at 694, and that conclusion was not "objectively unreasonable," *see Brown*, 558 U.S. at 132–33, for several reasons, as follows.

First, neither Walker nor Clayton's Rule 32 hearing testimony provided an alibi for Davis during the time that the murders were committed, which trial witnesses recalled was sometime between 2:00 a.m. and 3:00 a.m.[5]  The women's testimony did not provide an alibi because, although they stated that they were with Davis and others at the Top Flight Club until it closed at 2:00 a.m., afterwards, the men traveled separately to the Waffle House from the women.  (Doc. 15-60 at 30–31 (Walker's testimony); 49 (Clayton's testimony)).[6]  Thus, as the ACCA reasoned, because the women were not with Davis after they left the club and before they arrived at the Waffle House, neither Walker nor Clayton's testimony "cover[ed] the entire time when [Davis's] presence was required for accomplishment of the crime," *Davis*, 44 So. 3d at 1128 n.7; *see id.* ("[A] purported alibi that leaves it possible for

---

[5]     Although witnesses had to approximate the time that the shootings occurred, they undoubtedly occurred during this time frame.  (*See* doc. 15-5 at 29 (Boswell, Sr. stating that he heard banging on his door at "approximately two a.m. in the morning"); *id.* at 70 (Smith stating that the murders occurred "between one and three o'clock in the morning"); doc. 15-6 at 108–09, 117–18 (Jointer stating that he, Davis, and Singleton left the Top Flight Club at 2:00 a.m.; that there was a shooting in the parking lot that delayed them; that it took 15 minutes to get to Boswell's Sr.'s house; and that immediately after they left Boswell, Sr.'s house they went to the Waffle House).  *See also* doc. 15-5 at 37–39 (Boswell, Sr. stating that he ran into the living room after hearing the shots, immediately found Smith hurt, and called the police); *id.* at 98–99 (Cpl. Higgins stating that he was called to the scene of the crime around 2:00 a.m.); *id.* at 164 (Det. Cunningham stating that he arrived at the crime scene around 3:00 a.m.).

[6]     Specifically, Walker stated that the women did not arrive at the Waffle House until "probably 2:00, 2:30 in the morning" and that although the men were already there, "they weren't there that long, because they hadn't ordered their food yet."  (Doc. 15-60 at 31).  Clayton stated that due to a fight in the parking lot of the Top Flight Club at closing time, the women weren't able to leave the parking lot until "three something in the morning."  (*Id.* at 48).  Clayton also stated that the men arrived at the Waffle House before the women but that they were just "getting ready to eat" when the women arrived.  (*Id.* at 49, 55).

the accused to be the guilty person is no alibi at all.") (alteration in original and quotation marks omitted). Thus, it was objectively reasonable that the ACCA concluded that Davis was not prejudiced because Walker and Clayton's testimony would not have provided an alibi for Davis that would have changed the outcome of his trial.

Additionally, the ACCA reasonably concluded that Clayton's and Walker's testimonies would not have impeached Taylor's testimony at trial to the point of persuading the jury to acquit Davis. It is true that Clayton's and Walker's testimonies at the Rule 32 evidentiary hearing conflicted with Taylor's trial testimony in some respects. For example, Taylor testified at trial that the women were at the 747 Club that evening, not the Top Flight Club with Davis (*see* doc. 15-6 at 26–29), but Clayton and Walker later testified at the Rule 32 hearing that all three women *were* with Davis at the Top Flight Club until it closed at 2:00 a.m. (*see* doc. 15-60 at 29–31, 34–35, 47–48, 50).[7] However, Clayton's and Walker's testimonies also contradicted *each other's* in some respects, which would have likely undermined their credibility to the jury. For example, as the ACCA noted, Walker did not recall a shooting in the parking lot of the Top Flight Club, and she stated that she saw Dunn at the Top Flight Club that night (*id.* at 33, 35–36), while Clayton *did*

---

[7]    Walker stated that Taylor was "wrong" if she said at trial that they were at the 747 Club. (Doc. 15-60 at 33). Clayton stated that Taylor's testimony was incorrect and that she had never been to the Top Flight Club. (*Id.* at 54–55).

recall the parking lot incident and said that she did *not* remember seeing Dunn at the club that night (*id.* at 48, 55–56).  Thus, had Davis's trial counsel presented testimony from Walker and Clayton, in addition to Taylor, at Davis's trial, the jury likely would have been confused as to which club the partiers went to that evening, or whether they visited different clubs, but it is not likely that the jury would have found that Davis did not commit the murders.  This is particularly true in light of the overwhelming evidence of Davis's guilt that was presented at trial and that the ACCA summarized in its opinion. *See Davis*, 44 So. 3d at 1128–29.

Finally, had Davis's counsel called Walker to testify at Davis's trial, she likely would have offered information that further incriminated Davis rather than exculpated him.  For example, at the Rule 32 hearing, Walker admitted during cross-examination that she had witnessed Davis and Princeton selling marijuana from their mother's apartment in Gibbs Village every time that she was there, which was often. (Doc. 15-60 at 37–38).  This is another reason that it was reasonable for the ACCA to conclude that Davis could not show that he was prejudiced by his counsel's failure to call Walker and Clayton.

In sum, Davis has failed to meet his burden to show that the ACCA unreasonably applied clearly established federal law in *Strickland* in holding that he failed to demonstrate that the outcome of his trial would have been different but for counsel's failures to interview and call these witnesses. *See* 28 U.S.C. § 2254(d);

*Strickland*, 466 U.S. at 694.  On AEDPA review, Davis is not entitled to federal habeas relief on this claim.

> **2.     Davis's subclaim that trial counsel failed to begin any trial preparation until five days before trial and did not meet with Davis enough (doc. 1 at ¶¶ 42–46)**

Next, Davis complains that his trial counsel did not spend enough time preparing his case.  He alleges that Belser and Copeland's timesheets show that they spent only 30 hours each on his case from the time that they were appointed on April 20, 1998, until five days before his trial in August 1998.  He also alleges that they spent only seven hours actually meeting with him before his trial.  Davis contends that, although the Sixth Amendment does not require a minimum number of meetings between counsel and client, additional meetings between Davis and his trial counsel would have further established their relationship and would have enhanced the flow of information.  In support of his claim that his counsel's lack of preparation amounted to ineffective assistance, Davis cites *Rompilla*, 545 U.S. at 387, in which the Supreme Court held that a capital defense lawyer has a duty to conduct a prompt investigation into the circumstances of the case, and *Williams*, 529 U.S. at 395, in which the Supreme Court found capital defense counsel constitutionally ineffective in part because they did not begin preparing for the guilt phase of their client's trial until one week before the trial.  Davis also cites several

manuals on defending capital cases in Alabama, which instruct lawyers to begin preparing months in advance and to develop a relationship with their clients.

Although Respondent contends that this claim is procedurally barred, the Court finds that Davis exhausted this claim in the state courts during his postconviction proceedings, and the state courts denied it on the merits. This means that review of this claim is for reasonableness under 28 U.S.C. § 2254(d). More specifically, in paragraph 35 of his Rule 32 petition, within his ineffective assistance of counsel claim, Davis alleged the following: "Trial counsel met with Mr. Davis on only a few occasions in the time that elapsed between counsel's appointment and the beginning of trial. This limited number of visits greatly compromised Mr. Davis's right to assist in his own defense and impeded any efforts to formulate a reasonably coherent defense theory." (Doc. 15-11 at 15). The Rule 32 Court denied this claim on several grounds: it was without merit pursuant to Ala. R. Crim. P. 32.7(d), and Davis failed to demonstrate that he was prejudiced pursuant to Ala. R. Crim. P. 32.2(c) and 32.7(d). (Doc. 15-71 at 47). In support of that conclusion, the Rule 32 Court reasoned as follows:

> Davis never complained to this Court that he was dissatisfied with Copeland or Belser because they did not visit or confer with him before trial. Further, Davis did not testify at the evidentiary hearing, so there is nothing before this Court proving that if his trial counsel had visited him more before his trial the outcome of the guilt phase might have been different.

(*Id.*).

On postconviction appeal, Davis added more specifics to the claim, alleging that Belser and Copeland spent only 30 hours each on his case from the time they were appointed until five days before trial and complaining that they only spent seven hours actually meeting with him.  (Doc. 15-68 at 64–65).  The ACCA addressed the two parts of this claim separately.  Regarding Davis's claim that his counsel did not sufficiently prepare until five days before trial, the ACCA first held that the claim was not properly before it because Davis failed to raise it in his Rule 32 petition, but the ACCA also denied the claim on the merits as unsupported by the record, stating as follows:

> Davis next argues that his attorneys were ineffective because, he says, they did not begin to prepare for his trial until five days before it was scheduled to begin.  He relies on the fee declarations and time sheets submitted by his two appointed attorneys.

> Initially, we note that this specific claim was not raised in Davis's Rule 32 petition.  Thus, it is not properly before this Court.  "An appellant cannot raise an issue from the denial of a Rule 32 petition which was not raised in the Rule 32 petition." *Arrington v. State*, 716 So. 2d 237, 239 (Ala. Crim. App. 1997).

> Moreover, this claim is not supported by the record. Both attorneys testified that they spent time on the case that they did not record on their fee sheets and that both began work on the case when they were appointed.  Davis was due no relief on this claim.

*Davis*, 44 So. 3d at 1129.  Regarding Davis's claim that counsel should have met with him for more than seven hours, the ACCA affirmed the Rule 32 Court's denial of the claim on the merits, stating as follows:

Davis next argues that his attorneys were ineffective for failing to meet with their client in a "timely and reasonable manner."

The circuit court stated the following when addressing this claim:

"[Davis] attempts to raise a claim of ineffective assistance by contending his trial counsel met with him 'on only a few occasions in the time that elapsed between counsel's appointment and the beginning of trial.' Davis's only attempt to support this assertion is his contention that '[t]his limited number of visits greatly compromised [his] right to assist in his own defense and impeded any efforts to formulate a reasonable coherent defense theory.'

"Davis never complained to this Court he was dissatisfied with Copeland or Belser because they did not visit or confer with him before trial. Further, Davis did not testify at the evidentiary hearing, so there is nothing before this Court proving that if his trial counsel had visited him more before his trial the outcome of the guilt phase might have been different.

"The Court finds that this allegation of ineffective assistance is without merit. Rule 32.7(d), Ala. R. Crim. P. In the alternative, the Court finds Davis failed to carry his burden of proving he was prejudiced as required by Rule 32.2(c), Ala. R. Crim. P. Rule 32.7(d), Ala. R. Crim. P."

(C.R. 811.)

The attorney-fee declarations completed by both Davis's attorneys are contained in the record certified to this Court. Copeland's time sheet shows that he met with Davis on three different occasions, for a total of 8.5 hours. Belser's time sheet shows that he met with Davis on four occasions, for a total of 9.8 hours. Both attorneys testified that they did not bill for all the time they spent on the case. Copeland billed for 157.9 hours and Belser for 120.4 hours.

"We know of no case establishing a minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide effective assistance of counsel." *United States ex*

> *rel. Kleba v. McGinnis*, 796 F.2d 947, 954 (7th Cir. 1986). "[B]revity
> of consultation time between a defendant and his counsel, alone, cannot
> support a claim of ineffective assistance of counsel. *Jones v.
> Wainwright*, 604 F.2d 414, 416 (5th Cir. 1979)." *Murray v. Maggio*,
> 736 F.2d 279, 282 (5th Cir. 1984). Here, Davis makes no specific
> argument as to how any more meetings between Davis and his attorneys
> would have been beneficial to his defense. Davis failed to satisfy the
> requirements of *Strickland*.

*Id.* at 1130. Davis raised these claims again in his petition for a writ of certiorari

before the Alabama Supreme Court, arguing that his trial counsel failed to meet with

him in a timely and reasonable manner and asserting that the ACCA's rejection of

this claim was misguided and oversimplified. (Doc. 15-70 at 61–63). However, the

Alabama Supreme Court denied the petition without an opinion. (Doc. 15-71 at

220).

As noted, Respondent argues that this entire claim is procedurally defaulted

from this Court's review because the ACCA, which issued the last reasoned

decision, denied it based upon an adequate and independent state procedural rule,

*i.e.*, because Davis failed to raise it in his Rule 32 petition. (*See* doc. 22 at 11–12;

doc. 31 at 11–12 (Respondent's briefs)). Actually, the ACCA denied only part of

the claim on that ground: the part in which Davis claimed that Copeland and Belser

did not spend sufficient time on his case until immediately before trial. *See Davis*,

44 So. 3d at 1129. However, the ACCA also addressed that part of the claim on the

merits, finding that it was unsupported by the record because Copeland and Belser

both testified that they spent time on Davis's case that they did not record on their

time sheets. *See id.* In order for a state court's rejection of a federal constitutional claim based on a state procedural ruling to preclude federal review, the state procedural ruling must be "adequate and independent." *Marek*, 62 F.3d at 1301. A state procedural ruling is not "adequate and independent" if the state court also addresses the merits of the claim. *Ward*, 592 F.3d at 1156. Because the ACCA also addressed the merits of the claim, the claim is not procedurally defaulted, and this Court must consider it, albeit within the confines of 28 U.S.C. § 2254(d). Thus, to obtain relief on this claim, Davis must show that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d).

Davis argues that the ACCA's decision was contrary to and an unreasonable application of *Strickland* generally insofar as the ACCA concluded that the record did not support Davis's allegation that Copeland and Belser spent only 30 hours each on his case until immediately before trial. However, the ACCA referenced the record from the Rule 32 proceedings, and Davis called Copeland and Belser to testify at his Rule 32 evidentiary hearing. (*See* doc. 15-59 at 111–53 (Copeland's testimony); *id.* at 153–201 & doc. 15-60 at 2 (Belser's testimony)). Copeland and Belser both testified that they did not record all the time that they spent on Davis's

case.  (Doc. 15-59 at 144 (Copeland's testimony that he did not record and was not compensated for all the time that he spent on Davis's case), 189 (Belser's testimony as to the same)).  The Rule 32 Court found that testimony credible, and Davis does not dispute the truthfulness of the testimony.

Davis also quarrels with the ACCA's statement that he never explained how more frequent or longer meetings with Copeland and Belser would have changed the outcome of his trial.  Yet, Davis acknowledges that the Supreme Court does not require a certain number of meetings between attorney and client.  To the contrary, the Supreme Court has rejected specific performance guidelines for attorneys. *See Strickland*, 466 U.S. at 688–89 ("No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.").  Nor has Davis demonstrated that it was unreasonable that the ACCA concluded that he did not show that he was prejudiced by his counsel's failure to meet with him or often or for longer periods of time.

Davis has failed to meet his burden to show that the ACCA's rejection of his claim that his attorneys did not spend enough time on his case was contrary to *Strickland*. *See* 28 U.S.C. § 2254(d).  On AEDPA review, Davis is not entitled to federal habeas relief on this claim.

### 3.    Davis's subclaim that trial counsel failed to conduct an independent investigation of the facts or to investigate alternative theories of the crime (doc. 1 at ¶¶ 47–56)

Davis raises numerous separate and unrelated allegations within this claim. He again alleges that his counsel failed to interview 87 of the 90 potential witnesses whom the DA's office listed in its file on the murders.  (Doc. 1 at ¶ 49).  He alleges that his counsel should have investigated alternative theories of how the crimes occurred instead of merely accepting the investigation done by the MPD.  (*Id*. at ¶ 50).  He alleges that his counsel should have investigated other suspects, including Jerome Henderson, John McClenney, Steve McLemore, and Damon Washington, and other witnesses, including Yulonda Belser and Kaneshia Taylor.  (*Id*. at ¶ 51). For example, he states that that his counsel knew that Timothy Ray, one of the victims of the shootings, was involved in drug dealing, and that Belser had given a statement to Det. Naquin that she had overheard two people, including Henderson, talking about murdering Ray.  (*Id*. at ¶ 52).  Thus, he says his counsel should have investigated whether Henderson actually committed the murders.  Davis also alleges that his counsel should have challenged the admissibility of a statement that he made to Dets. Cunningham and Naquin when he was arrested as violative of *Miranda v. Arizona*, 384 U.S. 436 (1966), without specifying what that statement was.  (*Id*. at ¶ 54).  Finally, Davis alleges that his counsel should have objected when Dunn and Jointer testified at trial that they did not have deals with the State to reduce their

86

sentences in exchange for their testimony. (*Id*. at ¶ 54). Davis argues that this list of alleged failings amounted to ineffective assistance of counsel, relying upon *Rompilla*, 545 U.S. at 387, and *Wiggins*, 539 U.S. at 534, in which the Supreme Court held that capital defense counsel's failure to investigate their client's background for mitigation purposes was the result of "inattention, not reasoned strategic judgment."

Two of these allegations are procedurally defaulted and thus barred from review because Davis did not exhaust them in the state courts, while the rest of the allegations will be reviewed for reasonableness under 28 U.S.C. § 2254(d) because the state courts denied them on their merits. The procedurally defaulted allegations will be discussed first.

Regarding Davis's claim that his counsel were ineffective in failing to challenge the admissibility of an unidentified statement that he made to police before he was Mirandized, although Davis raised this claim in his Rule 32 petition (doc. 15-11 at ¶ 40),[8] he did not argue it on appeal to the ACCA from the Rule 32 Court's denial of the claim or in a petition for certiorari to the Alabama Supreme Court. The same occurred with regard to Davis's claim that his counsel should have objected to Dunn's and Jointer's testimonies that they did not have deals with the State for lesser

---

[8]    For more specific reference, when referring to claims that Davis made in his Rule 32 petition, the paragraph number within the petition that contains the claim will be cited, rather than the underlying page number or the page number delineated by the CM-ECF system.

sentences in exchange for their testimony. Davis raised that claim in his Rule 32 petition (doc. 15-11 at ¶ 52), but he did not argue it in further appeals. As a result, Davis has not met the exhaustion requirement of 28 U.S.C. § 2254(b)(1), and he is procedurally barred from raising these claims in a federal habeas petition. *See O'Sullivan*, 526 U.S. at 845; *Pope*, 680 F.3d at 1286; *Ward*, 592 F.3d at 1156. Dismissal of this habeas petition to allow Davis to present these claims as federal claims in state court would be futile because he would be barred from raising them under Ala. R. Crim. P. 32.2(c), because they would be barred by the applicable statute of limitations, and under Ala. R. Crim. P. 32.2(b), because such a petition would be successive. Thus, because any state remedy with respect to these claims is procedurally barred by state procedural rules, these two claims are procedurally defaulted from federal habeas review.

Davis protests that he *did* exhaust these two claims in his state postconviction proceedings, but the cases Davis relies on in support of his argument are distinguishable from this case.

Taking the *Miranda*-violation claim first, Davis argues that the allegation that his trial counsel should have raised a *Miranda* challenge is merely an additional example of the ineffective assistance of counsel claim that he *did* raise in his collateral appeal brief to the ACCA. Davis contends that the law allows petitioners to add "supplemental evidence" in their federal habeas proceedings to existing

claims if the evidence does not "fundamentally alter the legal claim already considered by the state courts," quoting *Vasquez v. Hillery*, 474 U.S. 254 (1986). (Doc. 25 at 26). However, the procedural posture of *Vasquez* is so different from this case that *Vasquez*'s holding is not applicable here. In *Vasquez*, the federal district court, pursuant to its power to expand the record under Rule 7 of the *Rules Governing Section 2254 Cases in the United States District Courts*, directed the petitioner and the respondent to provide additional statistical data to clarify the petitioner's existing equal protection claim of racial discrimination in grand jury selection. 474 U.S. at 257 (district court directing the respondent to "provide more figures demonstrating what portion of the Black population in Kings County was eligible for grand jury service") (quotation marks omitted). The respondent objected that the additional evidence requested by the court and provided by the parties rendered the petitioner's equal protection challenge so different from the claim that he presented to the state courts that it had not been exhausted, and the federal court should not consider it. *Id.*

The Supreme Court rejected the respondent's argument and held that "the supplemental evidence presented . . . did not fundamentally alter the legal claim already considered by the state courts, and, therefore, did not require that [the petitioner] be remitted to state court for consideration of that evidence." *Id*. at 260. In contrast here, neither the parties nor this Court has sought to expand the record

under Rule 7. Davis's claim that his counsel were ineffective because they failed to argue that there was a *Miranda* violation is not just "supplemental evidence" in support of some other ineffective assistance of counsel claim that Davis presented to the ACCA on collateral appeal. *Contra Vasquez*, 474 U.S. at 260. It is a separate and distinct claim based upon a different set of facts that Davis never mentioned on collateral appeal to the ACCA or to the Alabama Supreme Court. Because those courts were never afforded the opportunity to adjudicate this claim, it cannot be considered here.

Davis also cites *Willis v. Newsome*, 771 F.2d 1445, 1449 n.5 (11th Cir. 1985), in support of his argument that his failure to mention on collateral appeal his claim that his counsel should have raised a *Miranda* challenge does not mean that he did not exhaust the claim. (Doc. 25 at 26). However, the Eleventh Circuit's holding in a footnote in *Willis* was based upon a Fifth Circuit case that is also distinguishable from this case. In *Willis*, the federal habeas petitioner raised six allegations of ineffective assistance of trial counsel in his state postconviction proceedings; the state courts rejected them all; and the petitioner subsequently added a seventh allegation in his federal habeas petition: that his trial counsel failed to challenge the introduction of his confession at his trial. 771 F.2d at 1149 n.5. The respondent claimed that this created a mixture of exhausted and non-exhausted claims in one federal habeas petition, and thus, under *Rose v. Lundy*, 455 U.S. 509 (1982), the

petition should have been dismissed for the petitioner to exhaust the seventh allegation in the state courts. *Id.* The magistrate judge, to whom the district court assigned the case, found that the petitioner had met the exhaustion requirement, reasoning that it would be futile to force the petitioner to go back to state court to relitigate his claim of ineffective assistance on that single factual allegation because the Georgia Supreme Court "had made an affirmative finding that petitioner received ineffective assistance of counsel." *Id.* The Eleventh Circuit stated that it found no error in the magistrate judge's ruling, citing *Vela v. Estelle*, 708 F.2d 954 (5th Cir. 1983), *cert. denied sub nom.*, *McKaskle v. Vela*, 464 U.S. 1053 (1984). *Id.*

In *Vela*, the Fifth Circuit case on which the Eleventh Circuit relied, the petitioner asserted three errors in both his state habeas petition and in his federal habeas petition as grounds for a finding that his counsel was ineffective at his trial (counsel failed to properly object to prejudicial character testimony, failed to properly object to his widow's testimony, and failed to properly object to the State's closing argument). 708 F.2d at 957–58. In his federal habeas appellate brief to the Fifth Circuit, however, the petitioner added for the first time four additional instances supporting his claim (counsel failed to prepare him for questions regarding his guilty plea, neglected to make various objections or objected on improper grounds, failed to properly stipulate to evidence, and performed inadequately in his closing argument). *Id.* The respondent urged the Fifth Circuit to dismiss the appeal

as essentially a mixed petition to require the petitioner to return to state court to exhaust these additional allegations. *Id*. at 957. The Fifth Circuit discussed at length the principle that the exhaustion requirement is not normally satisfied if a petitioner presents new legal theories or entirely new factual claims in his petition to federal court. *Id.* at 958. Nonetheless, the Fifth Circuit reasoned that in that particular case, the petitioner's state habeas petition asserted ineffective assistance on the basis of his counsel's *entire* performance; the state courts conducted their own independent analysis of the petitioner's counsel's performance based on a review of the record as a whole; and by urging four new assertions of error in his federal habeas appeal, the petitioner was merely "singling out for comment certain strikingly prejudicial errors." *Id*. at 959. The Fifth Circuit thus concluded that the petitioner had exhausted his state remedies because "[c]haracterizing these allegations as 'unexhausted claims' would require [the court] to find that the state habeas court failed in its duty to evaluate counsel's performance on the basis of the record as a whole." *Id*. at 960.

Although *Vela* is an example of a court loosening the stringent requirement that all factual instances of ineffective assistance of trial counsel be pled at the state court level, *Vela* appears to only apply when the state court has affirmatively stated that it has reviewed the entire trial record to evaluate the petitioner's ineffective assistance claim as a whole. *See id.* at 960. Indeed, in subsequent cases, the Fifth Circuit has rejected petitioners' attempts to liken their cases to *Vela* because the

92

petitioners presented new factual instances of ineffective assistance claims and there was no indication that the state courts ever reviewed the petitioners' counsel's performances in light of the new factual allegations. *See Thomas v. Collins*, 919 F.2d 333, 334 (5th Cir. 1990), *Allridge v. Cockrell*, 92 F. App'x 60, 73–74 (5th Cir. 2003);[9] *Ries v. Quarterman*, 522 F.3d 517, 526 & n.4 (5th Cir. 2008).

Davis's case is certainly distinguishable from *Vela*. Davis's claim based on counsel's failure to raise a *Miranda* violation is completely different from the ineffective assistance claims that he did raise on collateral appeal to the ACCA. Specifically, Davis enumerated in his collateral appeal brief to the ACCA the following specific instances of guilt-phase ineffective assistance of trial counsel: 1) counsel failed to interview all of the State's witnesses, especially Clayton and Walker; 2) counsel failed to begin preparing for his trial until five days before it was scheduled to begin; 3) counsel failed to meet with Davis in a timely and reasonable manner; 4) counsel failed to conduct an independent investigation of the State's case against Davis; 5) counsel failed to retain experts and failed to cross-examine the State's experts; 6) counsel failed to effectively challenge the credibility of witnesses Dunn and Jointer; and 7) counsel should not have agreed to a stipulation about Smith's identification of Davis based on a photo lineup. (Doc. 15-68 at 61–82). The

---

[9]    Here, and elsewhere in this Opinion, the Court cites nonbinding authority. While the Court acknowledges that these cases are nonprecedential, the Court finds them persuasive.

ACCA examined each of those alleged instances separately, which included reviewing the record for the purpose of evaluating those specific claims. *See Davis*, 44 So. 3d at 1127–37. There is no indication that the ACCA considered, much less decided, the *Miranda* claim. Nor did it make any affirmative findings that it was reviewing the record as a whole to determine whether Davis's counsel's performance was defective as a whole. To the contrary, the ACCA expressly stated that it was deeming abandoned all issues that Davis raised in his Rule 32 petition but did not restate on appeal. *See id.* at 1125 n.4. In sum, because Davis did not present the *Miranda*-based ineffective assistance of counsel claim to the ACCA on collateral appeal (or to the Alabama Supreme Court, for that matter), this Court is precluded from considering it on federal habeas review.

As noted, Davis also protests that he did in fact raise the claim that his counsel should have challenged Dunn's and Jointer's allegedly false testimonies in his collateral appeal brief to the ACCA. However, the portion of his collateral appeal brief that Davis refers to in support of this contention concerns a different claim. (*See* doc. 15-68 at 33–38, 70–83). In the portion of his collateral appeal brief that Davis references, Davis argued that his counsel should have 1) challenged Jointer's testimony of how the shootings occurred with forensic evidence from the crime scene that was inconsistent with that description, and 2) done more to highlight the fact that Smith was confused when he identified Davis in a photo lineup the day

before trial began. (*See id*.). These are different arguments, and Davis's collateral appeal brief to the ACCA simply does not contain the claim that his counsel were ineffective for failing to object to Dunn and Jointer's allegedly false testimony regarding their deals for lesser sentences with the State. Thus, the ACCA, and the Alabama Supreme Court, were not afforded the opportunity to adjudicate this claim. Since Davis did not exhaust it, this Court cannot consider it.

Finally, with regard to both ineffective assistance of counsel claims discussed above—the one premised on counsel's failure to raise a *Miranda* violation and the one premised on counsel's failure to object to Dunn's and Jointer's testimonies— Davis does not offer any argument that the procedural default of these claims should be excused under the "cause and prejudice" or "actual innocence" doctrines. *See Haley*, 541 U.S. at 393. Thus, they are both procedurally barred from this Court's review.

As for the rest of the allegations that Davis makes in this section (that his counsel should have investigated alternative theories for how the crimes could have occurred and investigated other suspects and witnesses), Davis exhausted them throughout all stages of his Rule 32 proceedings (*see* doc. 15-11 at ¶¶ 14–20 (Rule 32 petition); doc. 15-68 at 38–41 (brief to the ACCA); doc. 15-70 at 35–37 (certiorari petition)), and the state courts denied the claims on the merits. First, the Rule 32 Court found that Davis had abandoned some of the allegations by failing to present

evidence in support of them at the evidentiary hearing, that some of them were

without merit, and that as to others, Davis had not demonstrated that he was

prejudiced pursuant to Ala. R. Crim. P. 32.2(c) and 32.7(d).  (Doc. 15-71 at 44–46).

Then on collateral appeal, the ACCA affirmed the Rule 32 Court's ruling, stating:

> Davis further argues in this section of his brief that counsel were ineffective for failing to investigate and present alternative theories of the case.
>
> When addressing this claim, the circuit court stated:
>
> "Davis identified four individuals as other suspects and two individuals as other witnesses [in his postconviction petition]. Davis, however, did not present any specific information at his evidentiary hearing that his trial counsel could have discovered and presented that could have made a difference in the outcome of his trial.
>
> "Because Davis failed to pursue this allegation of ineffective assistance at the evidentiary hearing, the Court finds that he has abandoned it. *See Burgess v. State*, [962 So. 2d 272 (Ala. Crim. App. 2005)] (holding Burgess had abandoned claim his trial counsel was ineffective for failing to object to victim-impact-evidence introduced at sentencing where he did not present evidence at the Rule 32 hearing to support it).  In the alternative, the Court finds Davis failed to carry his burden of proving by a preponderance of evidence he was prejudiced as required by Rule 32.2(c), Ala. R. Crim. P. Rule 32.7(d), Ala. R. Crim. P."

(C.R. 811-12.)

At Davis's trial his attorneys vigorously argued in closing that Smith could not identify the person who shot him and had in fact twice named another individual, that two fingerprints found at the scene could not be identified, and that there was no physical evidence at the murder scene connecting Davis to the murders.  They further argued that Officer Guy Naquin testified that he interviewed Yulonda Belser and

she said that she overheard two people talking about murdering one of the victims and that Davis was not one of two individuals. Counsel attacked the State's case and argued that there was reasonable doubt on which to acquit Davis.

In the postconviction proceedings Davis asserts that counsel should have argued alternative theories. However, he provided no factual support nor did he present any witnesses at the evidentiary hearing to support this claim. As one court stated in a similar case:

"Rose posits no viable alternative theories to account for Aldape's allegations, nor does he specify what other defenses his attorney should have advanced. Mere conclusory allegations in support of claims of ineffective assistance of counsel, such as those made by Rose, are insufficient as a matter of law to raise a constitutional issue. *See Miller v. Johnson*, 200 F.3d 274, 282 (5th Cir.), cert. denied, 531 U.S. 849, 121 S. Ct. 122, 148 L.Ed.2d 77 (2000); *Kinnamon v. Scott*, 40 F.3d 731, 735 (5th Cir.), cert. denied, 513 U.S. 1054, 115 S. Ct. 660, 130 L.Ed.2d 595 (1994); *Flores v. Johnson*, 957 F. Supp. 893, 910 (W.D. Tex. 1997). In the absence of a specific showing of the manner in which counsel's alleged errors and omissions were constitutionally deficient and how they prejudiced his right to a fair trial, a habeas petitioner cannot prevail on an ineffective assistance of counsel claim. *See Miller*, 200 F.3d at 282; *Barnard v. Collins*, 958 F.2d 634, 642 n.11 (5th Cir. 1992), cert. denied, 506 U.S. 1057, 113 S. Ct. 990, 122 L.Ed.2d 142 (1993)."

*Rose v. Johnson*, 141 F. Supp. 2d 661, 689–90 (S.D. Tex. 2001). "'[T]he mere existence of a potential alternative defense theory is not enough to establish ineffective assistance based on counsel's failure to present that theory.'" *Hunt v. State*, 940 So. 2d 1041, 1067 (Ala. Crim. App. 2005), quoting *Rosario-Dominguez v. United States*, 353 F. Supp. 2d 500, 513 (S.D.N.Y. 2005). "Hindsight does not elevate unsuccessful trial tactics into ineffective assistance of counsel." *People v. Eisemann*, 248 A.D.2d 484, 484, 670 N.Y.S.2d 39, 40–41 (1998).

Davis failed to satisfy the requirements of *Strickland* and was due no relief on this claim.

*Davis*, 44 So. 3d at 1131–32 (alternations in original) (footnote omitted).  Finally, the Alabama Supreme Court denied Davis's petition for certiorari without opinion. (Doc. 15-71 at 220).

Because Davis fully exhausted these claims in the state courts during his Rule 32 proceedings, and the state courts rejected the claims on the merits, 28 U.S.C. § 2254(d) applies.  Thus, to obtain relief on these claims, Davis must show that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d).

Davis argues that the ACCA unreasonably applied the Supreme Court's clearly established law in *Strickland*, 466 U.S. at 690–91, *Rompilla*, 545 U.S. at 390–93, and *Wiggins*, 539 U.S. at 526, when it "derived strategic judgment from trial counsel's failure to investigate and independently examine the facts."  (Doc. 25 at 30–31).  Davis is referring to the Supreme Court's language in *Strickland* about whether deference is still owed to counsel's strategic judgments if counsel's investigation is lacking:

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support

the limitations on investigation.  In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary.

466 U.S. at 690–91.

However, contrary to Davis's suggestion, the ACCA did not merely assume that Davis's counsel had a strategy and ignore their failure to investigate.  Rather, the ACCA pointed out all of the arguments that Davis's counsel made on Davis's behalf to support a finding of reasonable doubt—including that Smith was confused when he identified Davis in a photo lineup, that there was no physical evidence from the crime scene connecting Davis to the crimes, and that there were other individuals who might have had a motive to harm both Ray, the victim, and Boswell, Jr., the intended victim.  The record shows that Davis's counsel made a strategic choice to cast whatever doubt it could upon the State's case, and, thus, it cannot be said that the ACCA's conclusion with regard to the performance component of Davis's ineffective of counsel claim was unreasonable.

Additionally, *Wiggins* and *Rompilla* address counsel's failures to investigate and present mitigation evidence at the sentencing phase—not failure to interview witnesses for the guilt phase. *See Wiggins*, 539 U.S. at 526, 538; *Rompilla*, 545 U.S. at 390–93.  Because of these differences, the cases do not aid Davis in showing that the ACCA's prejudice determination with respect to the guilt phase of Davis's trial was unreasonable, particularly in light of the substantial evidence of his guilt

presented at trial. *See Strickland*, 466 U.S. at 694; *cf. Jones v. Sec'y, Dep't of Corr.*, 644 F.3d 1206, 1212 (11th Cir. 2011) (per curiam) (concluding that the cases upon which the petitioner relied were "too different" from the petitioner's case for the court to conclude that the state court's decision was unreasonable under the AEDPA).

The ACCA's conclusion was that Davis failed to show that he was prejudiced by his counsel's failure to interview other suspects and witnesses because Davis did not offer any evidence that his counsel could have uncovered that would have changed the outcome of his trial. Davis still does not offer any such evidence. (*See* doc. 25 at 31 (Davis's brief, in which he states, "Had trial counsel submitted the State's case to a rigorous challenge, as Davis deserved, the jury would have received numerous facts that together would have established a reasonable doubt as to Davis'[s] guilt," without specifying what those facts are)). In sum, while Davis disagrees with the ACCA's reasoning, he has not demonstrated that it was objectively unreasonable under the AEDPA. Davis is not entitled to federal habeas relief on this claim.

### 4. Davis's subclaim that trial counsel failed to cross-examine or challenge the credibility of Jointer, Smith, Boswell, Jr., and Dunn (doc. 1 at ¶¶ 57–64)

This claim again raises a litany of separate allegations against Davis's counsel that he argues amounted to ineffective assistance in violation of his Sixth

Amendment rights. First, Davis alleges that his counsel did not adequately cross-examine Jointer or otherwise challenge his credibility by calling rebuttal witnesses. (Doc. 1 at ¶ 57). Specifically, Davis argues that because Jointer testified that Davis and Singleton used some type of automatic weapon or revolver in the shootings, his counsel should have confronted Jointer with forensic evidence that another weapon was likely used or that one of the shooters reloaded. (*Id.*). Additionally, because Jointer testified that he never saw the victims, Ray and Bradley, on the couches in the living room as he entered the house with Davis and Singleton, Davis argues that his counsel should have confronted Jointer with crime scene evidence showing that the house was so small that it was unlikely that Ray and Bradley could not be seen. (*Id.* at ¶ 58).

Second, Davis argues that his counsel should have highlighted inconsistencies between Smith's and Jointer's testimonies. (*Id.*). Davis points out that Smith testified that he was shot in the head with a .45 caliber weapon by a man who was taller than Davis, but that Jointer testified that, in the car, Davis had the automatic weapon that would have been the .45 caliber weapon, and Singleton carried the revolver that would have been a .38 caliber weapon. (*Id.*). Davis argues that his counsel should have cross-examined Jointer and Smith as to these inconsistencies about which man had which gun. (*Id.* at ¶¶ 58, 61).

101

—

Third, Davis argues that his counsel should have called Clayton, Walker, and Davis's brother Mario Davis as rebuttal witnesses to raise questions about Jointer's credibility.  (*Id.* at ¶ 59).  Davis points out that Jointer testified that on the night of the murders, Davis picked Jointer up from Jointer's mother's house and that Davis and Jointer rode to the Top Flight Club alone to meet the rest of the group.  (*Id.*). Davis claims that to challenge that testimony, Clayton and Walker could have testified that they were with Davis at Davis's mother's house before leaving for the Top Flight Club that night.  (*Id.*).  Davis also points out that Jointer testified that after the shootings, he was terrified of Davis; he thought that Davis would follow through on his threats to kill him; he only saw Davis five or six times after the shootings and before Davis's arrest; and those times that he saw Davis were only when Jointer went to Singleton's house to purchase clothes from Singleton.  (*Id*). Davis argues that to challenge that testimony, Mario Davis could have testified that Jointer actually continued to spend a considerable amount of time with Davis at Davis's family's house in the time frame between the murders and Davis's arrest. (*Id.*).

Fourth, Davis argues that after his counsel learned from the prosecution that Smith had expressed some confusion when he identified Davis as being with the man who shot him in a photo lineup, Davis's counsel should have re-called Smith to the stand to elicit testimony about those inconsistencies or called an expert witness

to explain the inherent complexities and flaws in eyewitness identification.  (*Id.* at ¶ 60).

Fifth, Davis argues that his counsel should have cross-examined Smith to elicit testimony regarding the severity of Smith's injuries after being shot in the head. (*Id.* at ¶ 62).  Davis contends that his counsel should have questioned Smith as to how the impact and effects of his head injury could have impaired his ability to remember the night of the shootings.  (*Id.*).  Relatedly, Davis argues that his counsel should have argued to the jury that Smith's identification of Davis in a photo lineup shortly before Davis's trial was questionable due to the 21-month lapse of time between when Smith was shot and Davis's trial.  (*Id.*).

Sixth, Davis argues that his counsel did not adequately challenge Boswell, Jr.'s testimony.  (*Id.* at ¶ 63).  Davis argues that counsel should have investigated Boswell, Jr.'s past, drug use, medical and criminal history, work as a CI, involvement as a witness in other criminal proceedings, and his whereabouts before, during, and after the night of the murders.  (*Id.*).

Finally, Davis argues that his counsel did not adequately challenge Dunn's testimony.  (*Id.* at ¶ 64).  Davis argues that counsel should have investigated Dunn's criminal history, substance abuse, relationship with Davis, and exposure to information about the crimes and the prosecution's investigation of the crimes prior to giving a statement to police.  (*Id.*).

Respondent contends that Davis exhausted all of these allegations in his Rule 32 proceedings and all are thus subject to a reasonableness review under 28 U.S.C. § 2254(d). A careful review of the record, however, makes it clear that two of these allegations are procedurally defaulted from this Court's review because Davis did not fully exhaust them in the state courts. Regarding Davis's allegations that his counsel should have further cross-examined Boswell, Jr. and Dunn about their criminal pasts (*see* doc. 1 at ¶¶ 63–64), although Davis raised these claims in his Rule 32 petition (doc. 15-11 at ¶¶ 49, 56), he did not argue them on appeal to the ACCA from the Rule 32 Court's denial of these claims or in a petition for certiorari to the Alabama Supreme Court. As a result, Davis has not met the exhaustion requirement of 28 U.S.C. § 2254(b)(1), and he is procedurally barred from raising these claims in a federal habeas petition. *See O'Sullivan*, 526 U.S. at 845; *Pope*, 680 F.3d at 1286, *Ward*, 592 F.3d at 1156. Dismissal of his habeas petition to allow Davis to present these claims as federal claims in state court now would be futile because he would be barred from raising them in state court under Ala. R. Crim. P. 32.2(c) (statute of limitations bar) and Ala. R. Crim. P. 32.2(b) (successive petition bar). Thus, because any state remedy with respect to these claims is procedurally barred by these state procedural rules, the specific claims that Davis's counsel should have cross-examined Boswell, Jr. and Dunn about their criminal pasts are procedurally defaulted from habeas review.

Although a respondent may waive a procedural default defense, the AEDPA mandates that "[a] State shall not be deemed to have waived the exhaustion requirement . . . unless the State, through counsel, expressly waives the requirement." 28 U.S.C. § 2254(b)(3); *see also Dill v. Holt*, 371 F.3d 1301, 1302 n.1 (11th Cir. 2004) (stating that the AEDPA requires a court to address exhaustion when it is not expressly waived by the State). Although Respondent has not identified these claims as procedurally defaulted in his briefs to this Court, he has also not made an express waiver of the exhaustion requirement. Thus, because 1) Davis has failed to properly exhaust these claims, 2) Respondent has not expressly waived that failure to exhaust, and 3) these claims could no longer be brought in state court if this Court dismissed Davis's petition to return to state court, these claims are procedurally barred. *See McNair*, 416 F.3d at 1304–05 (holding the same in a case where the respondent did not expressly waive exhaustion).

Turning to the remaining claims in this section (concerning his counsel's alleged failure to properly cross-examine Jointer and Smith or call rebuttal witnesses to undermine their testimony), Davis raised all of these claims in his Rule 32 proceedings (*see* doc. 15-11 at ¶¶ 36, 39, 43, 44, 46, 47, 53 (Rule 32 petition); doc. 15-68 at 33–38, 70–83 (brief to the ACCA); doc. 15-70 at 70–75 (petition for certiorari)), and the state courts denied them on the merits. Thus, they are subject to a reasonableness review by this Court under 28 U.S.C. § 2254(d). More specifically,

the Rule 32 Court found that Davis had abandoned some of these claims by failing to present evidence in support of them at his Rule 32 evidentiary hearing, some of them were without merit, and some were due to be dismissed because Davis had not demonstrated that he was prejudiced pursuant to Ala. R. Crim. P. 32.2(c) and 32.7(d). (Doc. 15-71 at 47–49, 57–62).

On collateral appeal, the ACCA affirmed the Rule 32 Court's rulings on the remaining claims in this section in a thorough discussion, stating the following:

F.

Next, Davis argues that counsel were ineffective for failing to properly cross-examine and challenge the credibility of witnesses Antonio Jointer and Eugene Smith.

The circuit court made the following findings of fact on Davis's claim that counsel failed to attack Jointer's credibility:

"[Davis] contends his trial counsel were ineffective for failing to impeach Antonio Jointer's testimony with apparent inconsistencies between his testimony and the testimonies of Kaneshia Taylor and Eugene Smith.

"The Court first notes that Davis did not call Jointer, Kaneshia Taylor, or Eugene Smith to testify at the evidentiary hearing. Further, during Jointer's cross-examination, Copeland elicited that although he was charged with capital murder, Jointer was testifying without a plea agreement with the State. Copeland also presented Jointer's assertion he was forced into the house on Loveless Curve at gunpoint. Copeland also got Jointer to admit that he had initially lied to police and told them he had not gone to the house on Loveless Curve. Copeland also got Jointer to admit he had seen Davis since the murders despite Jointer's claim that Davis had threatened to kill him and that he was scared of Davis. Further, Davis completely ignores that during Copeland's

106

guilty phase closing argument he vigorously argued that Jointer's testimony was not credible.

"Based on this Court's personal knowledge of Copeland's cross-examination of Jointer, the Court finds that this allegation of ineffective assistance is without merit. In the alternative, the Court finds Davis failed to carry his burden of proving by a preponderance of evidence he was prejudiced as required by Rule 32.2(c), Ala. R. Crim. P. Rule 32.7(d), Ala. R. Crim. P."

(C.R. 821-22.)  The record supports the circuit court's findings. Counsel thoroughly cross-examined Jointer and attacked his credibility. "The method and scope of cross-examination 'is a paradigm of the type of tactical decision that [ordinarily] cannot be challenged as evidence of ineffective assistance of counsel.'" *State ex rel. Daniel v. Leqursky*, 195 W.Va. 314, 328, 465 S.E.2d 416, 430 (1995).  Davis was due no relief on this claim.

The circuit court stated the following in regard to Davis's claim that counsel failed to attack Smith's credibility:

"[Davis] contends that trial counsel were ineffective for failing to 'adequately' cross-examine Eugene Smith about the fact that he identified people other than Davis as the one that shot him. Davis also contends his trial counsel were ineffective for not impeaching Smith's testimony with his inconsistent statements to police.

"At the evidentiary hearing, Belser indicated he and Copeland did not consider hiring an expert on memory and, instead, relied on cross-examining witnesses. At the evidentiary hearing, Davis presented the testimony of Dr. Solomon Fulero, a psychologist specializing in memory and line-up techniques. Fulero testified about the process of acquiring, retaining, and retrieving memories. Fulero also discussed factors that could affect the accuracy of a particular memory, including exposure to the event, whether a weapon was used, stress, lighting, and a witness's age and whether they had used alcohol or drugs. Fulero also indicated that memories fade over time and people can forget events rapidly. Fulero testified that post-event

107

information, such as being exposed to multiple line-ups, can affect a witness's memory and that there is almost no relationship between a witness's confidence in an identification of a suspect and the accuracy of the identification.

"In light of Davis's trial counsel's performance, the Court finds the fact they did not call an eyewitness expert to testify did not cause [Davis] to be prejudiced. Belser vigorously cross-examined Smith about his statements to police. Further, Detective [Derrick] Cunningham testified about Smith's description of the subjects [who] entered Boswell's house and indicated that Smith gave numerous names of suspects and would give police the names of people from newspapers and television as possible suspects. Cunningham also indicated that Smith changed his story several times and seemed confused. Copeland and Belser entered into a stipulation with the State that shortly after Smith had identified Davis in a photo line-up that he could not identify Davis from the same line-up. During his closing arguments, Copeland emphasized that Boswell's Sr.'s and Smith's testimonies were different and vigorously attacked the credibility of Smith's testimony.

"Based on this Court's personal knowledge of trial counsel's performance, the Court finds these allegations of ineffective assistance are without merit. . . . In the alternative, the Court finds Davis failed to carry his burden of proving by a preponderance of evidence he was prejudiced by his trial counsel's failure to retain an expert on eye-witness identification and memory. Rule 32.2(c) and 32.7(d), Ala. R. Crim. P."

(C.R. 823-25.)

Davis argued that counsel were ineffective for failing to retain the services of a[n] expert in eyewitnesses identifications to impeach Smith's testimony. However, "'[T]he failure to call an expert and instead rely on cross-examination does not constitute ineffective assistance of counsel.'" *State v. Hartman*, 93 Ohio St. 3d 274, 299, 754 N.E.2d 1150, 1177 (2001), quoting *State v. Nicholas*, 66 Ohio St. 3d 431, 436, 613 N.E.2d 225, 230 (1993). Decisions "'[w]hether to engage in cross examination, and if so to what extent and in what matter, are .

. . strategic in nature' and generally will not support an ineffective assistance claim." *Dunham v. Travis*, 313 F.3d 724, 732 (2nd Cir. 2002).

The record of Davis's trial shows that Smith was thoroughly cross-examined concerning his difficulties in identifying the individuals involved in the shootings. Detective Derrick Cunningham of the Montgomery Police Department also detailed Smith's difficulties in identifying the shooters. Counsel did an admirable job of attacking Smith's credibility. Thus, the circuit court correctly denied relief on this claim.

G.

Davis next argues that counsel were ineffective for agreeing to a stipulation regarding Eugene Smith's identification of Davis based on a photographic lineup. At trial, defense counsel agreed to the following stipulation:

"On August 23, 1998, Eugene Smith met with Randy McNeill [deputy district attorney] to discuss trial testimony. Present at the meeting was his sister, Mary Glover. Mr. McNeill knew that he had not previously been shown a lineup of the defendant, including the defendant, Melvin Davis. So, therefore, Mr. McNeill asked him if he thought he could identify the man who shot him if he was shown a lineup. He stated he could.

"Mr. McNeill then produced a photo lineup containing the defendant's picture, which has been introduced as evidence, and I believe it is marked as Defendant's Exhibit 4. Mr. McNeill did not prompt him to suggest to him the identity of the defendant. Mr. Smith studied the lineup for less than ten seconds and then emphatically stated that number four, who was in fact, Mr. Davis, was the person that stood at the door and was the man-and was with the man who shot him. Mr. McNeill then asked him if he was certain, in which he stated that this was the defendant. And Mr. Smith reiterated that the defendant did not shoot him but was present when he was shot.

"Approximately fifteen minutes later, Mr. Smith was again shown the lineup by [an investigator in the district attorney's office] and was asked if he could identify the person who shot him. Mr. Smith seemed confused and acted as if he had not previously been shown the lineup and stated that he recognized number six and number two who were in the photo lineup.

"Mr. McNeill did not question him any further because he seemed confused."

(Trial record, 838–40.)

We do not know why counsel agreed to this stipulation. Neither Copeland nor Belser were asked at the evidentiary hearing the purpose of this stipulation. As we previously stated, when the record is silent as to why counsel pursued a specific course, we must assume that counsel's actions were reasonable. *See Grayson v. Thompso*n, *supra*.

Moreover, on direct appeal we noted that the stipulation appeared to be "favorable to [Davis]." *See Davis v. State*, 804 So. 2d at 1162. Davis failed to show how he was prejudiced.

*Davis*, 44 So. 3d at 1134–37 (alterations in original). The Alabama Supreme Court denied Davis's petition for certiorari without an opinion. (Doc. 15-71 at 220).

Because Davis fully exhausted these claims in the state courts during his Rule 32 proceedings, and the state courts rejected the claims on the merits, 28 U.S.C. § 2254(d) applies. Thus, to obtain relief on these claims, Davis must show that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28

U.S.C. § 2254(d).  Davis argues that the ACCA's rejection of these claims was contrary to and an unreasonable application of *Strickland*.

Yet, the only specific argument Davis makes in support is to disagree with the ACCA's conclusion that his trial counsel "thoroughly" attacked Jointer's credibility and "did an admirable job of attacking" Smith's credibility. *See Davis*, 44 So. 3d at 1136.  However, the record supports the ACCA's descriptions of Davis's trial counsel's performance.  Because the Rule 32 Court also presided over Davis's trial, the court was able to rely on its firsthand knowledge of Davis's counsel's performance at trial in reaching the conclusion that the performance was not deficient, and the ACCA reasonably relied upon the Rule 32 Court's observations when addressing the claims on collateral appeal.  The decision to cross-examine a witness and the manner in which a cross-examination is conducted is a strategy decision that is "well within the discretion of a defense attorney." *Fugate v. Head*, 261 F.3d 1206, 1219 (11th Cir. 2001) (citing *Messer v. Kemp*, 760 F.2d 1080, 1090 (11th Cir. 1985)).  Absent a showing of "a single specific instance where cross-examination arguably could have affected the outcome of either the guilt or sentencing phase of the trial," the petitioner is unable to show prejudice necessary to satisfy the second prong of *Strickland*. *Fugate*, 261 F.3d at 1219.  Additionally, ineffective assistance of counsel will not generally be found merely because other testimony might have been elicited from those who testified. *Id.* at 1220.

111

Considering the evidence of Davis's guilt, the topics that Davis argues his counsel should have cross-examined Jointer and Smith about are simply not of sufficient import to be considered specific exculpatory evidence that would have changed the outcome of Davis's trial. *See Fugate*, 261 F.3d at 1219.  For example, as to Davis's claim that his counsel should have confronted Jointer with evidence that the house was so small that it was unlikely that he did not see Ray and Bradley on the couches in the living room when he entered the house, Jointer testified that he did not see Ray and Bradley on the couches "at the time."  (Doc. 15-6 at 104). Jointer also testified that he was intoxicated, there were no lights on, and he had a gun to his back.  (*Id.*).  Jointer later stated that he saw one of them "raise up" after being shot.  (*Id.* at 107).  It was a reasonable conclusion for the ACCA to reach that the outcome would not have changed had Davis's counsel pressured Jointer about the size of the house.  The same rationale applies with regard to Davis's claim that his counsel should have questioned Smith and Jointer about which man had which gun.  Additionally, with regard to Davis's claim that his counsel should have called Mario Davis to contradict Jointer's testimony that he remained frightened of Davis after the murders and only saw Davis occasionally, Davis's counsel had already cast doubt on Jointer's testimony on this issue by emphasizing in closing that Jointer saw Davis at Singleton's house where Singleton was selling clothes.  (Doc. 15-7 at 103). More cross-examination on this issue would have been merely cumulative.  The

same is true for Davis's claim that his counsel should have done more to emphasize Smith and Boswell, Sr.'s inconsistencies in identifying the shooter over the year-long investigation. The record indicates that the jury was cognizant of the difficulties both witnesses faced in identifying the shooter.

In sum, Davis has not overcome the deference that this Court must give the ACCA's decision under the AEDPA, and he is not entitled to relief on the remaining claims in this section that the state courts considered.

### 5. Davis's subclaim that trial counsel failed to consult or retain experts (doc. 1 at ¶¶ 65–74)

Davis again makes numerous separate allegations against his counsel that he argues amounted to ineffective assistance in violation of his Sixth Amendment rights. First, Davis faults his counsel for not consulting any experts on forensic evidence, firearms, the crime scene, the medical examinations performed on the victims, the time and cause of death of the victims, ballistics, blood stains, or fingerprinting. (Doc. 1 at ¶¶ 66, 69). Davis also argues that his counsel should have spoken in advance of trial with Mr. Thornton, the evidence technician; Mr. Saloom, the firearms expert; and Dr. Wanger, the medical examiner who performed the autopsies on the victims, who each testified as experts for the prosecution. (*Id*. at ¶ 67).

Second, Davis complains that his counsel did not cross-examine the evidence technician as to the apparent fact that he did not collect from the crime scene the furniture, the victims' clothing, and the carpet that contained a large pool of blood. (*Id*. at ¶ 70). Davis argues that his counsel should have cross-examined the evidence technician on how he dealt with the evidence in order to help the jury understand if the victims' bodies had been moved, if the victims were in motion during the shootings, or whether a third party was injured and bleeding at the time of the crime. (*Id*.). Davis contends that such evidence would have impeached Jointer's testimony as to what occurred at the crime scene. (*Id.*).

Third, Davis points out that the weapons used in the shootings were never recovered; that the crime scene records reported that a total of seven .38 caliber bullets were recovered from the scene; but that the State's expert was unable to match all of the seven .38 caliber bullets found at the crime scene to one weapon. (*Id*. at ¶ 71). Davis argues that, had his counsel retained a crime scene or ballistics expert, they would have learned that at the time of the shootings, no .38 caliber weapons existed that would have fired more than six rounds, which meant that either more than one .38 caliber weapon was used in the shootings or that a single .38 caliber weapon was reloaded, either of which would be at odds with Jointer's testimony because he never stated that more than one weapon was used or that one weapon was reloaded. (*Id*.).

114

Fourth, Davis argues that since there were blood stains on the floor in the crime scene photographs and video, his counsel should have asked to inspect the flooring and carpet and attempted to locate and inspect the furniture as well. (*Id*. at ¶¶ 68, 72). Davis contends that if they had done so, his counsel could have retained an expert to analyze bloodstain patterns, including the absence or presence of "blow back" or "back spatter," which would have told his counsel, and in turn, the jury, more about the position of the victims when they were shot, the location of the shooters in the rooms, and the general sequence of events. (*Id*.).

Finally, Davis argues that his counsel should have retained an expert to analyze the two fingerprints that were collected from the crime scene to see who they belonged to or if they belonged to third parties and not to the defendants. (*Id*. at ¶ 73).

Davis exhausted these claims throughout all stages of his postconviction proceedings (*see* doc. 15-11 at ¶¶ 13, 16, 17, 18, 23–24 (Rule 32 petition); doc. 15-68 at 67–69 (brief to the ACCA); doc. 15-70 at 66–68 (certiorari petition)), and the state courts denied them on the merits, which means that this Court's review of these claims is for reasonableness under 28 U.S.C. § 2254(d). First, the Rule 32 Court found that Davis had abandoned these allegations by failing to present evidence in support of them during his Rule 32 evidentiary hearing and that he had not

demonstrated that he was prejudiced pursuant to Ala. R. Crim. P. 32.2(c) and 32.7(d). (Doc. 15-71 at 74–76).

Then on appeal, the ACCA affirmed, stating as follows:

Davis next argues that his trial counsel were ineffective for failing to consult or retain experts and for failing to cross-examine the State's experts. Davis identifies no specific expert in this section of his brief to this Court. Davis does argue that according to the American Bar Association Guidelines relative to the appointment of counsel in a death-penalty case, his counsel's performance was deficient.

The circuit court stated the following in regard to this claim:

"Davis first alleges that his trial counsel were ineffective for not securing the assistance of a forensic pathologist, contending that a pathologist 'would have assisted [Davis] in establishing that the [S]tate's evidence was speculative and not probative and at [a] minimum, would have been of assistance in the cross-examination of the [S]tate's experts.'

"This conclusory statement is Davis's only attempt to support this allegation. Davis proffered no facts that, if presented at trial, could have undermined the testimony of the State medical examiner regarding the cause of death of the victims. Davis also failed to proffer in his Rule 32 petition or at his evidentiary hearing a single cross-examination question his trial counsels could have asked that would have impeached the State's pathologist. Further, since Davis's defense was that he did not participate in the shootings at Boswell, Sr.'s house, the Court cannot think of why challenging the State's evidence of how the victims were murdered would have been beneficial to Davis's defense.

"Because Davis did not present any evidence to prove this allegation of ineffective assistance, the Court finds Davis has abandoned it. *See Burgess v. State*, [962 So. 2d 272 (Ala. Crim. App. 2005)] (holding Burgess had abandoned claim his trial counsel was ineffective for failing to object to victim-impact

116

evidence introduced at sentencing where he did not present evidence at the Rule 32 hearing to support it). In the alternative, the Court finds Davis failed to carry his burden of proving he was prejudiced by a preponderance of evidence as required by Rule 32.2(c), Ala. R. Crim. P. Rule 32.76(d), Ala. R. Crim. P.

> "Davis contends that his trial counsel were ineffective for not requesting funds for an investigator and a fingerprint expert. Davis contends that a fingerprint expert 'would have been able to assist trial counsel in understanding the flaws in the [S]tate's fingerprint evidence.' Davis also contends that '[h]ad an investigator interviewed the potential witnesses identified by [Davis], critical information would have been discovered and presented that would have altered the outcome at trial.' Davis further contends that his trial counsel should have retained a traffic expert because, according to Davis, '[t]he timeline the [S]tate gave of these events was highly improbable.'

> "As stated previously, Davis did not identify in his Rule 32 petition or at his evidentiary hearing one specific flaw in the analysis of the State's fingerprint expert. Davis also failed to offer at his evidentiary hearing any evidence as to what a traffic expert might have testified about.

> "Because Davis did not present any evidence to prove these allegations of ineffective assistance, the Court finds Davis has abandoned them."

(C.R. 838–40.)

Only two experts testified at Davis's trial—the medical examiner and a firearms expert. The medical examiner, Gregory Wanger, testified that Timothy Ray died of seven gunshot wounds to his head, chest, back, abdomen, and right thigh. Dr. Wanger further testified that John Bradley died of three gunshots wounds to his head and upper back. The causes of death were not contested at trial or in the Rule 32 proceedings.

Two fingerprints that could not be identified were recovered from the crime scene. However, Davis offered no evidence at the

postconviction hearing showing how the State's fingerprint evidence was flawed.  Likewise, Davis failed to offer any evidence as to why counsel were ineffective for failing to obtain the assistance of a traffic expert.

Moreover, the United States Supreme Court in *Strickland v. Washington* stated:

"As all the Federal Courts of Appeals have now held, the proper standard for attorney performance is that of reasonably effective assistance. . . .

"More specific guidelines are not appropriate.  The Sixth Amendment refers simply to 'counsel,' not specifying particular requirements of effective assistance.  It relies instead on the legal profession's maintenance of standards sufficient to justify the law's presumption that counsel will fulfill the role in the adversary process that the Amendment envisions. *See Michel v. Louisiana*, 350 U.S. 91, 100-101, 76 S. Ct. 158, 163-164, 100 L.Ed. 83 (1955).  The proper measure of attorney performance remains simply reasonableness under prevailing professional norms.

". . . .

". . . In any case presenting an ineffectiveness claim, the performance inquiry must be whether counsel's assistance was reasonable considering all the circumstances.  Prevailing norms of practice as reflected in American Bar Association standards and the like, e.g., ABA Standards for Criminal Justice 4-1.1 to 4-8.6 (2d ed. 1980) ('The Defense Function'), are guides to determining what is reasonable, but they are only guides.  No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant.  Any such set of rules would interfere with the constitutionally protected independence of counsel and restrict the wide latitude counsel must have in making tactical decisions. *See United States v. Decoster*, 199 U.S. App. D.C., at 371, 624 F.2d, at 208.  Indeed, the existence

> of detailed guidelines for representation could distract counsel from the overriding mission of vigorous advocacy of the defendant's cause. Moreover, the purpose of the effective assistance guarantee of the Sixth Amendment is not to improve the quality of legal representation, although that is a goal of considerable importance to the legal system. The purpose is simply to ensure that criminal defendants receive a fair trial."
>
> 466 U.S. at 687–89, 104 S. Ct. 2052. *See also Roe v. Flores-Ortega*, 528 U.S. 470, 120 S. Ct. 1029, 145 L.Ed.2d 985 (2000) ("'[P]revailing norms of practice as reflected in American Bar Association standards and the like . . . are only guides,' and imposing 'specific guidelines' on counsel is 'not appropriate.'").
>
> Davis failed to present any evidence in support of these claims; thus, he failed to meet his burden of proof.

*Davis*, 44 So. 3d at 1132–34 (alterations in original). Finally, the Alabama Supreme Court denied Davis's petition for certiorari without an opinion. (Doc. 15-71 at 220).

Under 28 U.S.C. § 2254(d), in order to obtain relief on this claim, Davis must demonstrate that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d).

Davis again argues that the ACCA unreasonably applied *Strickland*, and he cites *United States v. Fessel*, 531 F.2d 1275 (5th Cir. 1976). In *Fessel*, the Fifth Circuit addressed defense counsel's failure to file a motion, pursuant to 18 U.S.C. § 3006A(e), for a court-appointed psychiatrist to assist in the preparation of an insanity

defense. *Id.* at 1278. The Fifth Circuit held that when an insanity defense is appropriate and the defendant lacks funds, it is the duty of defense counsel to seek psychiatric assistance through the use of § 3006A(e), and that the defense counsel's failure to do so in that case constituted ineffective assistance of counsel under the Sixth Amendment. *Id.* at 1279. *Fessel* is not clearly established Supreme Court precedent, and it is distinguishable from this case on its facts. *See Jones*, 644 F.3d at 1212. *Fessel* certainly does not mandate that defense counsel retain their own experts in forensics, firearms, ballistics, fingerprinting, or eyewitness identification.

Because Davis did not before the state courts, and still does not, offer specific information that any such experts would have told the jury, he cannot show that the result of his case would have been different had the experts testified. For example, Davis alleges that his counsel's failure to retain experts on issues like eyewitness identification "likely impacted the jury's verdict" and that expert testimony on crime scene evidence "would have helped determine if the bodies had been moved or if the victims were in motion during the shootings, and could impeach purported witness testimony." (Doc. 25 at 33). However, speculation about what witnesses or experts would have said is not enough to establish prejudice under *Strickland*. *See Fugate*, 261 F.3d at 1220. Moreover, as the trial court pointed out, if Davis's defense was "I was not there," Davis has not explained how body position, traffic patterns, or how many rounds a particular gun holds would have benefited his defense. Davis is not

due relief on this claim because the ACCA's decision was not unreasonable under the AEDPA.

### 6. Davis's subclaim that trial counsel failed to adequately prepare to cross-examine the State's expert witnesses (doc. 1 at ¶ 75)

Davis's final subclaim within this section is that his counsel did not speak to the prosecution's experts until immediately before they testified at his trial, and thus, his trial counsel did not conduct an informed cross-examination of those experts.

Davis raised this claim in his Rule 32 proceedings (*see* doc. 15-11 at ¶¶ 17–18 (Rule 32 petition); doc. 15-68 at 69 (brief to the ACCA); doc. 15-70 at 68 (certiorari petition)), but the state courts denied the claim on the merits. The Rule 32 Court found that Davis did not present evidence in support of this claim, such as what questions his counsel could have asked on cross-examination that would have changed the result of his trial. (Doc. 15-71 at 74). On appeal, the ACCA discussed and rejected this claim in the section of its opinion that this Court reproduced in the preceding section. *See Davis*, 44 So. 3d at 1132–34. The Alabama Supreme Court denied Davis's petition for certiorari without an opinion. (Doc. 15-71 at 220).

Because Davis fully exhausted this claim in the state courts during his Rule 32 proceedings, and the state courts rejected the claim on the merits, 28 U.S.C. § 2254(d) applies. Thus, to obtain relief on this claim, Davis must show that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*,

584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or that it was based on an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d).

Davis argues that the ACCA unreasonably applied *Strickland*, but he merely restates the allegation from his petition that his trial counsel's failure to cross-examine the State's expert witnesses allowed the State to present its version of events unchallenged, to his prejudice. As discussed in the previous section, although Davis disagrees with the ACCA's reasoning, he has not demonstrated that it was objectively unreasonable under the AEDPA. Davis is not entitled to federal habeas relief on this claim.[10]

## B.    Davis's Claims of Ineffective Assistance of Trial Counsel at the Penalty Phase (Doc. 1 at ¶¶ 76–117)

Davis's second claim is that Copeland and Belser were ineffective during the penalty phase of his trial in numerous separate instances, amounting to a violation of his Sixth Amendment right to counsel. Before turning to these allegations, the framework for evaluating ineffective assistance claims specifically in the capital sentencing context is relevant.

---

[10]    Davis does not make the argument that the cumulative effect of his trial counsel's alleged guilt-phase errors prejudiced him, so the Court will not consider that issue.

In that context, defense counsel's main goal is to counter the State's alleged aggravating circumstances with "evidence in mitigation." *Rompilla*, 545 U.S. at 381; *see also Lawhorn v. Allen*, 519 F.3d 1272, 1296 (11th Cir. 2008) ("[O]ne of the most important functions of the capital sentencing process is the opportunity to humanize the defendant[.]").  Penalty-phase counsel has an "obligation to conduct a thorough investigation of the defendant's background" for such mitigating evidence. *Williams*, 529 U.S. at 396.  Still, to perform adequately, counsel need not "present mitigating evidence at sentencing in every case" or "investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." *Wiggins*, 539 U.S. at 533.

To establish *Strickland* prejudice in the capital sentencing context, "the question is whether there is a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *Strickland*, 466 U.S. at 695.  In determining whether there is a reasonable probability of a different result, a court must "consider 'the totality of the available mitigation evidence—both that adduced at trial, and the evidence adduced in the habeas proceeding'—and 'reweig[h] it against the evidence in aggravation.'" *Gavin v. Comm'r, Ala. Dep't of Corr.*, 40 F.4th 1247, 1263 (11th Cir. 2022) (quoting *Porter*, 558 U.S. at 41).  Prejudice may occur when newly

123

adduced descriptions and details about the defendant's "depth of abuse . . . far exceeded what the jury was told." *Johnson v. Sec'y, DOC*, 643 F.3d 907, 936 (11th Cir. 2011). Again, as to both prongs of the *Strickland* analysis, when 28 U.S.C. § 2254 applies, the issue is not whether counsel's actions were reasonable but whether "there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard." *Harrington*, 562 U.S. at 105; *see also Johnson*, 643 F.3d at 911 (explaining the "double deference" standard).

Each of Davis's separate allegations of penalty-phase ineffective assistance of trial counsel is addressed in the order in which it appears in Davis's petition. The Court has combined its analysis of the first two subclaims because the same analysis applies to both.

**1.    Davis's subclaim that trial counsel failed to investigate mitigation evidence of Davis's dysfunctional childhood and bleak life history (doc. 1 at ¶¶ 80–94)**

**2.    Davis's subclaim that trial counsel failed to investigate mitigation evidence of Davis's good character in the community (doc. 1 at ¶¶ 95–105)**

Davis alleges that his counsel should have uncovered and presented to the jury at the penalty phase of his trial 1) evidence of Davis's dysfunctional and violence-filled upbringing and 2) evidence of Davis's good moral character and contributions to his community. Davis argues that the failure to present this evidence was

constitutionally deficient and prejudiced him because, if the jury had heard it in support of mitigation, the jury would not have recommended a death sentence.

The evidence that Davis claims that his counsel should have offered in mitigation includes the following evidence from the testimony of witnesses he called at his Rule 32 evidentiary hearing. (*See* doc. 1 at ¶¶ 80–105). Davis was raised in the Gibbs Village housing projects, which was a dangerous and impoverished area of Montgomery, and in an unstable home environment created by his parents' tumultuous relationship. Davis is one of six boys born to Patricia Davis. Davis only saw his father several times a year. His mother beat him and his brothers at times, and she was often absent from the home as well. Davis's father was killed in a train accident when Davis was 16 years old. Davis's mother received a monetary settlement from the accident but did not use the money wisely. As a result, Davis was forced to become the provider for his family while still in high school, working multiple jobs including at an auto shop, at McDonald's, and cutting people's hair for money. Davis worked 40 hours or more at McDonald's per week and often took the closing shift that ended at three a.m. during the school week. He attended Carver High School, which, like Gibbs Village, was a violence-ridden place. Additionally, Davis was providing emotional and financial support to his brothers, friends, and others in the community, including setting up rules to attempt to shield his brothers from gangs and violence and breaking up neighborhood fights. Davis sold drugs to

earn money to support his family's basic needs. Despite this domestic trauma and Davis's heavy responsibility for his family, Davis still managed to attend high school and participate in activities, such as football and volleyball. Davis was generous and respected his elders. He has four biological daughters, and he raised another child as his own.

Davis exhausted these claims in the state courts during his postconviction proceedings, and the state courts denied them on the merits, which means that this Court's review of these claims is for reasonableness under 28 U.S.C. § 2254(d). More specifically, Davis raised these claims in his Rule 32 petition (doc. 15-11 at ¶¶ 31–38), and at the evidentiary hearing, he called 14 witnesses in support of this claim—family members, friends, former teachers, and former coworkers—who testified about what they would have said if they had been called by his trial counsel to testify at the penalty phase of his trial. The Rule 32 Court summarized the new evidence that Davis presented at the evidentiary hearing but found that Davis had not demonstrated that he was prejudiced pursuant to Ala. R. Crim. P. 32.2(c) and 32.7(d). (Doc. 15-71 at 124–35).

Davis appealed that ruling (doc. 15-68 at 42–44, 83–106), and the ACCA affirmed in a thorough discussion, stating:

> Davis next argues that he was denied the effective assistance of counsel during the penalty phase of his capital trial.

126

When reviewing claims of ineffective assistance of counsel during the penalty phase of a capital trial we apply the following legal standards.

> "When the ineffective assistance claim relates to the sentencing phase of the trial, the standard is whether there is 'a reasonable probability that, absent the errors, the sentencer—including an appellate court, to the extent it independently reweighs the evidence—would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.' *Strickland* [*v. Washington*], 466 U.S. [668,] at 695, 104 S. Ct. [2052,] at 2069 [(1984)]."

*Stafford v. Saffle*, 34 F.3d 1557, 1564 (10th Cir. 1994).

In *Wiggins v. Smith*, 539 U.S. 510, 123 S. Ct. 2527, 156 L.Ed.2d 471 (2003), the United States Supreme Court in reviewing a claim of ineffective assistance of counsel at the penalty phase of a capital trial, stated:

> "In *Strickland* [*v. Washington*, 466 U.S. 668 (1984)], we made clear that, to establish prejudice, a 'defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.' *Id.*, at 694. In assessing prejudice, we reweigh the evidence in aggravation against the totality of available mitigating evidence."

539 U.S. at 534, 123 S. Ct. 2527.

> "'The reasonableness of counsel's investigation and preparation for the penalty phase, of course, often depends critically upon the information supplied by the defendant. *E.g. Commonwealth v. Uderra*, 550 Pa. 389, 706 A.2d 334, 340-41 (1998) (collecting cases). Counsel cannot be found ineffective for failing to introduce information

127

uniquely within the knowledge of the defendant and his family which is not provided to counsel.'"

*Waldrop v. State*, 987 So. 2d 1186, 1195 (Ala. Crim. App. 2007), quoting *Commonwealth v. Bond*, 572 Pa. 588, 609-10, 819 A.2d 33, 45-46 (2002).

> "'A defense attorney is not required to investigate all leads, however, and "there is no per se rule that evidence of a criminal defendant's troubled childhood must always be presented as mitigating evidence in the penalty phase of a capital case.'" *Bolender* [*v. Singletary*], 16 F.3d [1547,] at 1557 [(11th Cir. 1994)] (footnote omitted) (quoting *Devier v. Zant*, 3 F.3d 1445, 1453 (11th Cir. 1993), cert. denied, [513] U.S. [1161], 115 S. Ct. 1125, 130 L.Ed.2d 1087 (1995)). 'Indeed, "[c]ounsel has no absolute duty to present mitigating character evidence at all, and trial counsel's failure to present mitigating evidence is not per se ineffective assistance of counsel.'" *Bolender*, 16 F.3d at 1557 (citations omitted)."

*Marek v. Singletary*, 62 F.3d 1295, 1300 (11th Cir. 1995).

## A.

Davis asserts that counsel were ineffective for failing to investigate and present mitigation evidence at the penalty phase concerning his life and character.

The circuit court stated the following when denying relief on this claim:

> "In *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir. 1995) (en banc), the Eleventh Circuit held that '[t]he mere fact that other witnesses might have been available or that other testimony might have been elicited from those who testified is not a sufficient ground to prove ineffectiveness of counsel.' This Court is also aware that evidence in mitigation in the penalty phase of a capital murder trial is a two-way street. While a capital defendant may present

any evidence that is relevant as to why jurors should recommend the defendant be sentenced to less than death, such a presentation will give the State the opportunity through cross-examination of defense witnesses or through presenting rebuttal evidence to present evidence that could be prejudicial to the defendant.

"The testimony and evidence presented during these proceedings indicated that Davis was a good brother to his sibling and supported his family. Davis was gainfully and lawfully employed and contributed to the financial support of his family. He grew up in Gibbs Village, a rough neighborhood in Montgomery. Testimony indicated that in his youth, Davis did not engage in acts of violence and, on occasion, helped to prevent violence. It appears Davis was loved and respected by members of his family, by many of his peers, and by other adults. During his childhood, he and his sibling witnessed his mother being physically abused by Willis Davis, Sr.

"The testimony presented in these proceedings that despite having the intelligence and ability to [obtain] lawful employment or further his education, Davis made the conscious decision to sell marijuana to make money. Witnesses testified about Davis and Princeton selling marijuana and making good money. The fact that Davis may have sold marijuana to support his family claimed by one of his brothers, would not lessen its affect.

"Moreover, even if the testimony and evidence presented in connection with these Rule 32 proceedings had been presented at Davis's trial, this Court is convinced beyond any doubt that there is no reasonable probability the outcome at the penalty phase might have been different. Davis was 25 years, 4 months old when he committed the offenses underlying these proceedings. The State proved beyond any reasonable doubt the existence of three aggravating circumstances. Instead of relying on the judicial system after being arrested for selling marijuana, Davis formulated a plan to murder the

confidential police informant that was going to testify against him and his brother. The manner in which Davis committed these offenses was cold, callous, and demonstrated a complete disregard for the dignity of human life. The evidence presented at the evidentiary hearing by Davis and the State proved beyond all doubt that Davis knew right from wrong, also that Davis was solely responsible for conceiving a chain of events that resulted in two completely innocent people being killed and another being seriously wounded.

"Even if this Court were to find that Copeland's investigation for mitigating evidence was not as extensive as his collateral counsel, Davis would not be entitled to relief because he has failed to prove he was prejudiced. *See Boyd v. State*, 746 So. 2d 364, 379 (Ala. Crim. App. 1999) (holding that 'even if the alleged failure to present mitigating evidence was an oversight and not a tactical choice by counsel, it was harmless').

"Davis's allegation his trial counsel were ineffective in their presentation of mitigating evidence is dismissed. Rules 32.3 and 32.7(d), Ala. R. Crim. P."

(C.R. 896–99).

We agree with the circuit court's findings. At the postconviction hearing, Davis presented the following witnesses:

*Family members*. Charleston Davis testified that he was Davis's younger brother and the youngest of six boys, that Davis was like a father to him while he was growing up, and that Davis helped to support his family. However, on cross-examination he stated that he was 14 years of age at the time of Davis's trial. Mario Davis testified that Davis supported the family by selling drugs and that he was like a father to him. Princeton Davis testified that Davis was like a father to him, that his mother frequently beat him and that Davis would attempt to intervene on his behalf, that his brother's father, Willis Davis, would beat their mother, that Davis sold drugs to help the family, and that he was in prison at the time of Davis's trial. Patricia Davis, Davis's

mother, testified that she and her six children moved to Gibbs Village in 1976, that she worked at Jackson Hospital, that she paid a neighbor to watch the children while she was working, that the Department of Human Resources was called when it was discovered that the neighbor was sending the children back to their house to stay alone, that the father of two of her children was abusive to her, that Davis witnessed some of this abuse, and that when Davis got older he helped pay the bills. However, on cross-examination she testified that she got a large cash settlement when Davis's father was killed when Davis was 16 years old, that she provided for her children, that she bought Davis and Princeton vehicles, that she received money from the Veterans Administration for Davis, that she received child support from the fathers of the boys, and that she worked as a nurse from 1978 until 1995.

*Friends*. Valerie Taylor testified that her daughter, Kaneshia, is the mother of one of Davis's children, that Davis regularly communicated with his daughter, and that Davis was like part of her family. Sonya Walker testified that Davis was like a brother to her, that he was not violent, that he was always trying to break up fights, and that he was good to his siblings. On cross-examination Walker testified that she had seen Davis and his brother sell marijuana from their house in Gibbs Village. Melinda Clayton testified that she had known Davis for 20 years, that she considered Davis to be like a "big brother" to her, that he was not violent, that Davis raised his younger siblings, and that he supported his siblings. John Gilcrest, Jr., testified that he lived at Gibbs Village when Davis's family lived there and that Davis was never a problem. Rosa Payne, who had known Davis for most of his life, testified that Davis helped his siblings and that he was never in trouble but was always breaking up fights in Gibbs Village. Otis Barnes said that he met Davis when they were both at Carver High School, that Davis was respected at the school, and that Davis helped with the gang situation at the school.

*Coworker*. Keir Williams testified that he met Davis when he was working at a McDonald's fast-food restaurant as a teenager and Davis was his supervisor. He said that he respected Davis and that Davis helped support Davis's siblings.

*Teachers*. Farrah Duncombe, who was the assistant principal at Carver High School when Davis was a student there, testified that Davis was a

typical student and that he did not cause problems. Michelle Simmons, the athletic director at Carver High School, testified that she taught Davis. She said that Davis was a very cooperative student. On cross-examination she indicated that she had not seen Davis since he graduated from high school in 1991.

The record shows that at the penalty phase counsel informed the court that funds had been granted for an independent mental evaluation of Davis and that the expert "could not ascertain any mental disease, mental defect, diminished capacity, that he found Mr. Davis to be intelligent, articulate, and that he did not think he could offer any testimony in this sentencing phase that would aid in perhaps supporting another statutory mitigation ground." (R. 999.) Davis's mother testified at the penalty phase that she had six sons, that Davis was the second oldest of her children, that Davis's father died when he was 16, and that she loved her son and he loved her. In closing argument counsel argued that there was one statutory mitigating circumstance present—that Davis had no significant history of prior criminal activity. Counsel asked the jury to spare Davis's life.

When questioned about the penalty phase, Copeland stated:

"[Postconviction counsel]: With regard to the mitigation and penalty phase, sir, what was your theory?

"[Copeland]: Well, in terms of the penalty phase, we at first—we requested that Mr. Davis, we have an independent psychiatrist assess Mr. Davis. I had, and I mentioned this in the deposition, a theory that was I have to admit a bit speculative, perhaps even creative. I had a theory in which we would argue that Mr. Davis suffered from a sort of chronic post-traumatic stress syndrome based on having had a very difficult life; drugs, being surrounded by violence, things like that. I was going to—I did not think that would exactly result in—there was nothing to indicate that Mr. Davis was at the time—that an insanity defense would have been available to him at the time of the crime or for that matter during the trial. However, using that particular mental disorder, I was going to use it to supplement what our basic strategy was

for the penalty phase, which was mercy as a mitigating factor.

        ". . . .

        "[Postconviction counsel]:  Did you talk with anybody who could put together a social history of Mr. Davis?

        "[Copeland]:  Again, I mean, certainly wanting to allow you to enumerate, but, again, the answer is, we talked to his mother.  We talked to Mr. Davis.  *We kept asking Mr. Davis, you know, help us out, give us something, tell us somebody to talk to.  He was unresponsive to us.*"

(R. 43-47) (emphasis added). On cross-examination, Copeland stated:

        "[Copeland]:  All factors of mitigation are relevant to the extent that you can produce them for that person.  For example, school records having to do with somebody's performance in school might indeed be very valuable as a mitigating factor.  If you are going to develop a long-range picture of depravity; for example, say if somebody was sexually abused as a child, clearly that would only apply to a particular defendant, so it wouldn't be relevant, for example, to Mr. Davis's case because there was no evidence that happened.  That would be extremely relevant in the case of somebody who was standing trial for a capital murder who had been molested.  It would obviously have a great deal of impact.  The fact that a particular individual did well in school or didn't do well in school in and of itself might or might not be of value.  In Mr. Davis's case, it was apparent because of the nature of the crime, and I say this, I suppose, because this was my thinking, it was apparent because of the nature of the crime which included killings of two people and an attempt to kill another, but one of them was a sort of execution style killing of a guy sleeping on a sofa, shot him in the head, as I recall, that what Mr. Davis had done in grade school might not have been of the greatest value."

133

(R. 57-59.)

"As a matter of trial strategy, counsel could well decide not to call family members as witnesses because family members can be easily impeached for bias." *Bergmann v. McCaughtry*, 65 F.3d 1372, 1380 (7th Cir. 1995).

> "Once counsel conducts a reasonable investigation of law and facts in a particular case, his strategic decisions are 'virtually unchallengeable.' [*Strickland v. Washington*, 466 U.S. 668] at 690, 104 S. Ct. 2052 [(1984)]. Tactical or reasonable professional judgments are not deficient but a failure to investigate a material matter due to inattention may be deficient. When the claim is that counsel failed to present a sufficient mitigating case during sentencing, the inquiry 'is not whether counsel should have presented a mitigation case' but 'whether the investigation supporting counsel's decision not to introduce mitigating evidence . . . was itself reasonable.' *See Wiggins* [*v. Smith*], 539 U.S. [510] at 523, 123 S. Ct. 2527 [(2003)] (internal citations omitted)."

*Powell v. Kelly*, 562 F.3d 656, 670 (4th Cir. 2009). *See also Villegas v. Quarterman*, 274 Fed. Appx. 378, 382 (5th Cir. 2008). Evidence of a difficult childhood has been characterized as a "double-edged" sword. *See Bacon v. Lee*, 225 F.3d 470, 481 (4th Cir. 2000). "[E]mphasizing a client's deprived childhood does not have a very beneficial impact on a northwest Florida jury, given the fact that many jurors have had difficult lives, but have not turned to criminal conduct." *Card v. Dugger*, 911 F.2d 1494, 1511 (11th Cir. 1990). What one juror finds to be mitigation another juror may find aggravating. "[M]itigation may be in the eye of the beholder." *Stanley v. Zant*, 697 F.2d 955, 969 (11th Cir. 1983). *See also Ford v. Schofield*, 488 F. Supp. 2d 1258, 1346 (N.D. Ga. 2007) ("The Supreme Court has stated that the reasonableness of counsel's actions should be evaluated based on 'strategic choices made by the defendant and on information supplied by the defendant.' *Burger v. Kemp*, 483 U.S. 776, 795, 107 S. Ct. 3114, 97 L.Ed.2d 638 (1987) . . . ."); *Carroll v. State*, 815 So. 2d 601, 615 (Fla. 2002) ("By failing to respond to counsel's requests to provide trial counsel with the names of witnesses who could assist in presenting

134

mitigating evidence, Carroll may not now complain that trial counsel's failure to pursue such mitigation was unreasonable."); *Rose v. State*, 617 So. 2d 291, 295 (Fla. 1993) ("In light of the harmful testimony that could have been adduced from Rose's brother and the minimal probative value of the cousins' testimony, we are convinced that the outcome would not have been different had their testimony been presented at the penalty phase.").

Copeland testified that he made a strategic decision to rely on a plea for mercy. It is clear from both attorneys' testimony that they conducted an investigation and were aware of Davis's background and upbringing. Copeland stated that he did not believe evidence of Davis's performance in school would have had any value because of the nature of the murders. Based on the unique circumstances presented in this case we cannot say that counsel's actions were unreasonable. Moreover, the testimony at the evidentiary hearing was neither strong nor compelling. Davis was over the age of 25 at the time of the murders. One of Davis's brothers who testified at the postconviction proceedings was 14 years of age at the time of Davis's trial. Another brother who testified was in prison at the time of Davis's trial. Davis's mother painted a different picture of Davis's childhood than did Davis's siblings. Many witnesses admitted that they knew that Davis was selling drugs from his home in Gibbs Village. Other witnesses had not seen Davis for many years. The testimony offered at the postconviction hearing would have been entitled to little weight.

Also, we have reweighed the omitted mitigation evidence against the aggravating circumstances that were proven in this case. The circuit court found as aggravating circumstances that the murders were committed during a burglary, that Davis was on parole for another offense at the time of the murders, and that the murders were committed to disrupt or to hinder the lawful exercise of any governmental function or the enforcement of laws. *See* §§ 13A-5-49(1), (4), and (7), Ala. Code 1975. We agree with the circuit court that the testimony offered at the postconviction hearing was not sufficient to outweigh the aggravating circumstances that were present in this case. *See Wiggins v. Smith, supra*. Thus, relief was correctly denied on this claim.

135

*Davis*, 44 So. 3d at 1139–42 (footnote omitted) (alterations in original). Davis raised these claims a final time in his petition for a writ of certiorari before the Alabama Supreme Court (doc. 15-70 at 75–103), but the court denied Davis's petition without an opinion (doc. 15-71 at 220).

Under 28 U.S.C. § 2254(d), in order to obtain relief on this claim, Davis must demonstrate that the decision of the ACCA, which was the last reasoned state court decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d). Davis's arguments in an attempt to do that are discussed in turn.

Davis first contends that the evidence that he says his trial counsel should have offered to humanize him parallels the evidence in *Rompilla*, 545 U.S. at 393; *Porter*, 558 U.S. at 453; and *Sears v. Upton*, 561 U.S. 945 (2010), three of the cases in which the Supreme Court has applied *Strickland* in the capital sentencing context. However, the Court does not agree. Although in those cases, the Supreme Court found ineffective assistance of counsel at the penalty phase of capital defendants' trials, the Eleventh Circuit has noted that the Supreme Court has faulted lower courts for reading those cases as establishing "a 'constitutional duty to investigate' capital cases in a particular, prescribed way." *Anderson v. Sec'y, Fla. Dep't of Corr.*, 752

F.3d 881, 906 (11th Cir. 2014) (quoting *Pinholster*, 563 U.S. at 195). Additionally, after considering the evidence, Davis's case is materially distinguishable from each of those cases.

First, Davis does not elaborate on how the ACCA's decision was contrary to *Rompilla*, but that case is distinguishable. *Rompilla* focused on counsel's failure to examine a publicly available file containing information about the defendant's prior convictions for rape and assault, despite knowing that the prosecution planned to use the prior conviction during the penalty phase as an aggravating factor. 545 U.S. at 383–84. The information in the file suggested that Rompilla was schizophrenic and had a third-grade level of cognition. *Id*. at 391–92. Later testing showed that Rompilla had "an extreme mental disturbance . . . likely caused by fetal alcohol syndrome." *Id*. at 392. Davis's counsel's failure to investigate Davis's childhood is not analogous to the defense lawyer's failure in *Rompilla* to review the file, which would have produced strong mitigating evidence to counter the aggravating factors in Rompilla's case.

Next, Davis argues that the ACCA's failure to give appropriate weight to the evidence of his dysfunctional childhood because it occurred years earlier than the murders was contrary to the Supreme Court's decision in *Porter*. Yet, it was not unreasonable for the state court to give less mitigating weight to evidence about Davis's childhood because he was 25 years old when he committed his crimes. It is

true that in *Porter*, the Supreme Court held that it was "unreasonable to discount to irrelevance the evidence of [the petitioner's] abusive childhood" even though he was 54 years old at the time of the trial. 558 U.S. at 43.  But Davis does not point to anything in *Porter* that explicitly forbids courts from considering age as one factor among many in their prejudice analyses—just as the state court did here.  Regardless of whether *Porter* might be warning courts not to weigh age heavily in their prejudice analyses, it was not contrary to or an unreasonable application of clearly established federal law for the state court to consider Davis's age as a factor weighing against prejudice.  Additionally, *Porter* is materially distinguishable on its facts.  Had Porter's trial counsel performed a mitigation investigation, they would have discovered that Porter had been physically abused as a child (he was his father's "favorite target" for beatings, especially when he tried to protect his mother, and his father once shot at him for coming home late); he fought in two horrific battles during the Korean War at a young age; he suffered from long-term substance abuse; and he had brain damage and PTSD from his military service that "could manifest in impulsive, violent behavior." 558 U.S. at 33–36.

The mitigating circumstances in *Porter* do not exist in the present case.  Davis argues that the evidence of his good moral character and reputation in the community is akin to Porter's "heroic military service," 558 U.S. at 41, but the argument is not

convincing. *See id.* at 35 ("Porter individually received two Purple Hearts and the Combat Infantryman Badge, along with other decorations.").

Next, Davis does not elaborate on how the ACCA's decision was contrary to *Sears*, but the mitigation evidence in *Sears* was far stronger than that in Davis's case. The mitigation evidence included that Sears "suffer[ed] from substantial cognitive impairment" and he was "among the most impaired individuals in the population in terms of ability to suppress competing impulses and conform behavior"; he had a history of head trauma and "significant frontal lobe abnormalities"; and he was raised in a physically abusive home and suffered sexual abuse from a family member. 561 U.S. at 948–50. Furthermore, Sears was not subject to the AEDPA's deferential review standard because the *Sears* appeal was not from a federal petition for a writ of habeas corpus. Instead, Sears had appealed from the state court's decision directly to the United States Supreme Court. *Id*. at 946. Finally, the Supreme Court in *Sears* did not make a finding as to *Strickland* prejudice because the Supreme Court determined that the state court failed to apply the proper prejudice inquiry, and it remanded the case for the state court to conduct "[a] proper analysis of prejudice" in the first instance. *Id*. at 956.

Quoting *Williams*, 529 U.S. at 398, another Supreme Court case in which *Strickland* was applied in the capital sentencing context, Davis also asserts that the evidence regarding his bleak childhood yet positive contributions to the lives of

others "might well have influenced the jury's appraisal of his moral culpability." (Doc. 1 at ¶ 95). Davis does not elaborate on how the ACCA's decision was contrary to or an unreasonable application of *Williams*, but the balance of aggravating factors and mitigating factors in *Williams* was significantly different from Davis's case. The Supreme Court described Williams's childhood as "nightmarish" and noted that Williams was 'borderline mentally retarded,' 529 U.S. at 395, 398. Williams also has no precedential value because the Supreme Court "did not apply AEDPA deference to the question of prejudice" in that case. *Pinholster*, 563 U.S. at 202.

Davis also argues that the ACCA downplayed the gravity of his violent childhood and family history in violation of *Wiggins*, 539 U.S. at 535. It is true that in *Wiggins*, the Supreme Court held that Wiggins was prejudiced by his counsel's failure to uncover and present evidence of childhood abuse. Yet, as the Supreme Court noted, the abuse was severe:

> Wiggins experienced severe privation and abuse in the first six years of his life while in the custody of his alcoholic, absentee mother. He suffered physical torment, sexual molestation, and repeated rape during his subsequent years in foster care. The time Wiggins spent homeless, along with his diminished mental capacities, further augment his mitigation case. Petitioner thus has the kind of troubled history we have declared relevant to assessing a defendant's moral culpability.

*Id*. While Davis witnessed some abuse and experienced some poverty and neglect during his childhood, he has no such history of extreme abuse, molestation and rape, diminished mental capacity, or homelessness. To the contrary, many witnesses

testified that he was loved by his mother and other family members, that friends and others in the community looked up to him, and that he was involved in various school activities.

Here, the ACCA held that Davis was not prejudiced from the missed-mitigation evidence because it was not particularly compelling and because the way the murders were committed was so systematic and intentional. The record supports that conclusion. Many of the individuals who testified at the Rule 32 evidentiary hearing had not seen Davis in many years. Their recollections that Davis tried to break up fights in school and cared for his family were just not enough to counter the cold and calculated nature of the murders and the fact that three men were shot execution style. Davis was solely responsible for formulating a plan to murder a police informant who was going to testify against him and his brother. The testimony and evidence presented during the Rule 32 proceedings was that Davis was a good brother and supported his family; at one time was gainfully employed; and at one time, did not engage in violence and tried to stop violence. However, the testimony also indicated that despite having the intelligence to make a living through lawful employment, and despite being given at least one break by the court system—through being sentenced to only probation—Davis continued to sell drugs to make money.

The ACCA's decision was entirely reasonable when it decided that the evidence presented at the Rule 32 proceedings, had it been presented at Davis's trial, would not have led to a reasonable probability that the jury would have recommended life without parole. Indeed, the Eleventh Circuit has held that even extensive mitigating evidence would not have been reasonably likely to change the outcome of sentencing in light of significant aggravating factors. *See, e.g., Windom v. Sec'y, Dep't of Corr.*, 578 F.3d 1227, 1251 (11th Cir. 2009) (per curiam) (noting that given the strength of the State's case "and the nature of the crimes themselves," the state court did not "unreasonably apply *Strickland* when it found that the available mitigating evidence, taken as a whole, did not outweigh the aggravating nature of [the defendant's] crimes" (citing *Payne v. Allen*, 539 F.3d 1297, 1318 (11th Cir. 2008))); *Suggs v. McNeil*, 609 F.3d 1218, 1232 (11th Cir. 2010) (explaining that significant aggravating facts are "difficult to overcome" and holding that a state supreme court's prejudice decision was not unreasonable); *Clisby v. Alabama*, 26 F.3d 1054, 1057 (11th Cir. 1994) ("Sometimes the best lawyering, not just reasonable lawyering, cannot convince the sentencer to overlook the facts of a brutal murder—or, even, a less brutal murder for which there is strong evidence of guilt in fact.").

In sum, it was not "so obviously wrong [as to be] beyond any possibility for fairminded disagreement," *Harrington*, 562 U.S. at 103, for the state court to

conclude that on balance, given the significant aggravating evidence, there was not a substantial likelihood that the jury would have voted for anything less than death even had Davis's counsel conducted further investigation into Davis's background. Davis is not due relief on this claim under the AEDPA.

### 3. Davis's subclaim that trial counsel failed to offer expert testimony about his mental health for mitigation purposes (doc. 1 at ¶¶ 106–09)

Davis alleges that his trial counsel were ineffective in their failure to offer expert testimony regarding Davis's mental health during the penalty phase. Davis argues that his counsel should have called their retained psychiatrist, Dr. Freeman, to testify, and that Dr. Freeman would have testified about Davis's childhood problems, which would have persuaded the jury to recommend a sentence of life in prison without parole.

Davis exhausted this claim in the state courts during his postconviction proceedings, and the state courts denied it on the merits, which means that this Court's review of this claim is for reasonableness under 28 U.S.C. § 2254(d). Davis raised this claim in his Rule 32 petition (doc. 15-11 at ¶¶ 31–38), and the Rule 32 Court allowed Davis to admit Dr. Freeman's deposition testimony into evidence during the Rule 32 evidentiary hearing. The Rule 32 Court found that Davis had not demonstrated that he was prejudiced by his counsel's failure to call Dr. Freeman at

the penalty phase, pursuant to Ala. R. Crim. P. 32.2(c) and 32.7(d).  (Doc. 15-71 at

119–20).

Davis appealed (doc. 15-68 at 106–10), but the ACCA affirmed, stating:

Davis further argues that his trial counsel were ineffective for
failing to secure mental-health testimony in mitigation.

When denying relief on this claim, the circuit court stated:

"Copeland and Belser retained Dr. William Freeman, a
psychiatrist, to evaluate Davis for possible mitigation evidence.
Dr. Freeman was deposed by the parties on September 14, 2005.
Freeman indicated he had been unable to locate most of his
records concerning his evaluation of Davis and his memory of
the evaluation was very vague.  Freeman did recall finding some
'childhood' problems that might be worthwhile for mitigation.
Freeman could not, however, recall what specific childhood
problems he believed might have been presented in mitigation.
At Davis's evidentiary hearing, however, Copeland and Belser
specifically testified that Freeman advised them against calling
him during the penalty phase of trial.

"The Court finds Davis failed to carry his burden of proving
by a preponderance of evidence he was prejudiced because
Copeland and Belser did not consult more with Freeman or call
him during the penalty phase of his trial. Rule 32.2(c), Ala. R.
Crim. P. Rule 32.7(d), Ala. R. Crim. P. *See Brooks v. State*, 695
So. 2d 176, 182 (Ala. Crim. App. 1996) (holding that '[p]rejudice
cannot merely be alleged; it must be affirmatively proved')."

(C.R. 883-84.)

At the postconviction hearing, the State called Dr. Glen King, a
clinical and forensic psychologist, as a rebuttal witness.  Dr. King
testified that he performed a mental evaluation of Davis which included
conducting an IQ test.  Davis scored a verbal IQ of 95, a performance
IQ of 107, and full scale IQ of 100.  It was also Dr. King's opinion that

> Davis did not suffer from any significant psychological disorders and
> had never suffered from any serious psychological disorder.
>
> There was no evidence that Davis had any mental-health
> problems. Accordingly, counsel was not ineffective for failing to
> present testimony as to Davis's mental health.

*Davis*, 44 So. 3d at 1142–43. Davis raised the claim a final time in his petition for

a writ of certiorari to the Alabama Supreme Court (doc. 15-70 at 100–03), but the

court denied the petition without an opinion (doc. 15-71 at 220).

Under 28 U.S.C. § 2254(d), in order to obtain relief on this claim, Davis must

demonstrate that the decision of the ACCA, which was the last reasoned state court

decision, *see Wilson*, 584 U.S. at 125, was contrary to, or an unreasonable

application of, clearly established federal law as determined by the Supreme Court,

or that it was based on an unreasonable determination of the facts that were before

the state courts. *See* 28 U.S.C. § 2254(d). Davis argues that the ACCA's decision

that he was not prejudiced was contrary to and an unreasonable application of

*Strickland.* In support, he contends that the ACCA failed to consider that, even

though there was no evidence that Davis had any mental health problems, Dr.

Freeman could have testified about Davis's bleak childhood.

Davis merely speculates that Dr. Freeman could have offered some testimony

that would have been outcome-determinative at the penalty phase. Davis does not

offer any specific information about Davis's childhood that Dr. Freeman may have

been able to testify about. Davis also ignores Copeland's and Belser's Rule 32

hearing testimony wherein they both testified that Dr. Freeman himself advised them against calling him as a witness because he would not have any useful information. Davis has not shown that the ACCA's conclusion that Davis failed to show prejudice was unreasonable. Davis has not overcome the deference that this Court must show to the ACCA's decision, and Davis is not entitled to habeas relief on this claim.

### 4. Davis's subclaim that trial counsel failed to use readily available expert "social history" testimony in mitigation (doc. 1 at ¶¶ 110–12)

Davis alleges that his trial counsel were ineffective in their failure to offer testimony from a social worker familiar with his plight who could have presented a "social history" of Davis from his early childhood until the time of his arrest. Davis claims that, had counsel presented such testimony during the penalty phase, he would not have been sentenced to death.

Davis exhausted this claim in the state courts during his postconviction proceedings, and the state courts denied it on the merits, which means that this Court's review of these claim is for reasonableness under 28 U.S.C. § 2254(d). More specifically, although Davis did not initially raise this claim in his Rule 32 petition, at his evidentiary hearing he called Jan Vogelsang, a social worker, to testify about a biopsychosocial assessment or "social history" of Davis that she had compiled. In its order denying Davis's Rule 32 petition, the Rule 32 Court noted that Davis had presented Ms. Vogelsang's testimony in support of his larger claim that his counsel

were ineffective in failing to present mitigation evidence at the penalty phase. The Rule 32 Court stated the following with specific regard to Ms. Vogelsang's testimony at the evidentiary hearing:

237) The final witness called by Davis related to mitigation was Janet Vogelsang. (H.R. 442–507). Ms. Vogelsang is a licensed clinical social worker. Over the State's objections, Ms. Vogelsang was permitted to testify about the social history she compiled about Davis and his family. Ms. Vogelsang identified the witnesses and documentation she reviewed in preparing her testimony. (Petitioner's Exhibits 200 and 201). Much of Ms. Vogelsang's testimony was cumulative to other the other [sic] witnesses' testimony. For example, Vogelsang testified her investigation revealed that when Davis moved to Gibbs Village it was a nice area that later got rough. Ms. Vogelsang also said that Davis took care of his siblings and discussed Davis' mother and her attempts to educate herself and provide for he[sic] children.

238) On cross-examination, Ms. Vogelsang indicated she would not have been able to prepare a social history within four months; the amount of time Copeland and Belser had to prepare for Davis [sic] trial. Ms. Vogelsang also indicated she did not advertise her services in any legal publication circulated in Alabama and had never heard of Mr. Copeland or Mr. Belser before being retained by Davis' collateral counsels.

239) In rebuttal to Davis' witnesses, and over Davis' objections, the State called Dr. Glen King, an expert in clinical and forensic psychology and a licensed attorney. (H.R. 510–532). King testified he conducted a clinical interview with Davis and performed certain tests to measure his intelligence and other cognitive functions. According to Dr. King, Davis has a full-scale I.Q. of 100, which is considered average. (H.R. 516–517). King also testified that Davis' reading and spelling skills were on a high school level and were what King expected given Davis' education attainment. (H.R. 518). In King's opinion, Davis has never suffered from any significant psychological disorder or dysfunction. (H.R. 520–521). King was present during Ms.

Vogelsang's testimony and indicated nothing she said would have affected his opinion. (H.R. 531–532).

(Doc. 15-71 at 134–35). The Rule 32 Court ultimately denied Davis's claim that his counsel were ineffective in failing to present mitigation evidence at the penalty phase because Davis did not show that he was prejudiced under *Strickland*. (Doc. 15-71 at 124–35).

Davis appealed the Rule 32 Court's order to the ACCA, raising for the first time the specific claim that his counsel should have offered social history testimony from a social worker like Ms. Vogelsang. However, he placed this subclaim within his larger claim that his counsel were ineffective for failing to present mitigation evidence at the penalty phase. (Doc. 15-68 at 42–44, 110–12). The ACCA did not specifically address Davis's subclaim about Ms. Vogelsang or otherwise mention Ms. Vogelsang's testimony in its opinion. Nonetheless, the ACCA affirmed the Rule 32 Court's conclusion that Davis could not prevail on the broader penalty-phase ineffective assistance of counsel claim because he could not show that his counsel's failure to present mitigation testimony prejudiced him. *See Davis*, 44 So. 3d at 1139–42. Presumably, Ms. Vogelsang's social history testimony was one form of that mitigation testimony referenced by the ACCA.

Davis also included the specific subclaim about Ms. Vogelsang in his petition for a writ of certiorari to the Alabama Supreme Court (doc. 15-70 at 75–103), but the Alabama Supreme Court denied Davis's petition for certiorari without opinion.

(Doc. 15-71 at 220).  The Court presumes that the ACCA, and for that matter the Alabama Supreme Court, adopted the same reasoning that the Rule 32 Court did for rejecting this claim, despite the fact that the appellate courts did not specifically address the claim. *Wilson*, 584 U.S. at 125.

Thus, under 28 U.S.C. § 2254(d), in order to obtain relief on this claim, Davis must demonstrate that the decision of the state courts was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d).  Davis contends that a social worker's testimony would have helped humanize him before the jury, citing *Porter*, 558 U.S. at 41 ("The judge and jury at Porter's original sentencing heard almost nothing that would humanize Porter or allow them to accurately gauge his moral culpability.").  However, as the ACCA noted, the testimony that Davis claims his counsel should have offered in mitigation, which included Ms. Vogelsang's testimony, was not compelling, certainly not overwhelmingly so.  It was not as compelling as that presented in *Porter*, where the Court noted that the jury would have heard about "(1) Porter's heroic military service in two of the most critical— and horrific—battles of the Korean War, (2) his struggles to regain normality upon his return from war, (3) his childhood history of physical abuse, and (4) his brain abnormality, difficulty reading and writing, and limited schooling." 558 U.S. at 41.

Additionally, as the Rule 32 Court found, Davis did not demonstrate that Ms. Vogelsang would have been able to provide a social history in the four months that Copeland and Belser had to prepare for Davis's trial. It was thus not unreasonable that the state courts concluded that, even if the jury had heard such evidence in mitigation, they would still have recommended a sentence of death. Davis is due no relief on this claim.

### 5. Davis's subclaim that trial counsel failed to adequately prepare for his judicial sentencing hearing before the judge (doc. 1 at ¶¶ 113–17)

Davis's final subclaim is that his counsel did not prepare for the judicial sentencing hearing, and, as a result, they did not adequately rebut the State's proffered aggravating circumstances. Davis again includes several separate allegations within this claim. He points out that his counsel's fee declarations showed that they spent only 48 minutes researching mitigating factors in preparation for the judicial sentencing hearing and did not interview any witnesses or present a psychiatric report from Dr. Freeman to the trial court. (Doc. 1 at ¶ 113). Davis also alleges that his counsel did not investigate the accuracy of the presentence investigation report and did not meet with Davis to discuss it until the day of the judicial sentencing hearing. (*Id*. at ¶ 114). Finally, Davis highlights several

statements that Copeland made at his judicial sentencing hearing.  At the hearing,

Copeland described the murders as "heinous" and stated to the judge:

> I am too humble of an advocate for what I have to ask of your honor.
> This is a horrible, brutal, bloody crime, and nothing can change that
> fact . . . I ask your honor . . . to consider mercy itself, mercy for the sake
> of mercy, mercy for the goodness of mercy, mercy because we are in a
> position to show mercy.

(*Id.* at ¶ 116 (quoting doc. 15-8 at 69–70).[11]  Davis contends that in making these

comments, Copeland effectively offered an aggravating circumstance to the trial

court that the State did not even offer—that the murders were especially atrocious,

heinous, and cruel when compared to other capital murders, under Ala. Code § 13A-

---

[11]    The full portion of Copeland's plea to the trial court for mercy was as follows:

> Your Honor, as I stated at trial before the jury, I am too humble an advocate for
> what I have to ask of your Honor. This is a horrible, brutal, bloody crime, and
> nothing can change that fact, nothing ever will. I ask Your Honor in deliberations
> on Mr. Davis's sentence to consider mercy itself, mercy for the sake of mercy,
> mercy for the goodness of mercy, mercy because we are in a position to show
> mercy. There has been way too many lives blighted by this heinous crime. It
> serves—and to take another life will simply extend the ripples further out and ruin
> more lives. Mr. Davis has four children. If Mr. Davis is put to death, those four
> children will grow up with the idea that their father was executed, and perhaps in
> their own heart they believe was murdered by the State. We have a death penalty
> in this state, but in this particular case, Your Honor, I think—and again, I am far
> too humble an advocate, but I think in this particular case Your Honor has a unique
> opportunity to show the purpose of mercy.  It is when things are at their worse that
> mercy has its greatest meaning and message, and mercy is good for mercy's sake.
>
>     For those reasons, Your Honor, I would also request that Your Honor
> consider mercy as mitigating circumstances and that my client be allowed to serve
> his life without parole, paying until his last breath for the crime for which he was
> convicted and perhaps being able to contribute to society within the narrow
> confines of prison world which would hold him forever.

(Doc. 15-8 at 69–71).

5-49.  Davis also contends that in pleading for mercy for mercy's sake, Copeland suggested to the trial court that no other mitigating circumstances existed.  (*Id.*).  Davis argues that this conduct prejudiced him and amounted to ineffective assistance of counsel in violation of his Sixth Amendment rights.

Davis exhausted these claims in the state courts during his postconviction proceedings, and the state courts denied them on the merits, which means that this Court's review of these claims is for reasonableness under 28 U.S.C. § 2254(d).  More specifically, Davis first raised them in his Rule 32 petition (doc. 15-11 at ¶¶ 37–38), but the Rule 32 Court denied the claims, stating:

> . . . Davis contends that his trial counsels were ineffective for not offering more mitigation evidence at the judicial sentencing before the Court.
>
> 253) In *Boyd v. State*, 746 So. 2d at 398, the Alabama Court of Criminal Appeals held that:
>
>> [Section] 13A-5-47, Ala. Code 1975, governs the determination of sentence by the trial court.  Section 13A-5-47, Ala. Code 1975, does not provide for the presentation of additional mitigation evidence at sentencing by the trial court.  Therefore, trial counsel did not err in failing to do so.
>
> Based on the law in Alabama, the Court finds this allegation of ineffective assistance fails to state a claim or establish that a material issue of facts or law exists as required by Rule 32.7(d); therefore it is denied.
>
> 254) Davis also contends in paragraph 104 that "[b]y characterizing the crime as 'heinous,' horrible, brutal, and bloody,' that his trial counsels "effectively offered an aggravating circumstance[] that even the prosecutor did not offer." (Petition on p. 34)

255) This Court presided at Davis' trial and heard all the evidence presented by the State. The fact that Davis' trial counsels were truthful and acknowledged to the Court the nature in which Davis committed these offenses was not the same as admitting an aggravating circumstance existed. Moreover, this Court did not consider the aggravating circumstance that the offense was heinous, atrocious, and cruel when compared to other capital murders; thus, Davis cannot establish that he was prejudiced by trial counsel's argument at the judicial sentencing.

256) The Court finds this allegation of ineffective assistance is without merit. Rule 32.7(d), Ala. R. Crim. P. Moreover, the Court finds that because Davis did [sic] pursue this allegation of ineffective assistance he has abandoned it. *See Burgess v. State*, 2005 WL 3118812, at *1 (Ala. Crim. App. Nov. 23, 2005) (holding Burgess had abandoned claim his trial counsel was ineffective for failing to object to victim-impact evidence introduced at sentencing where he did not present evidence at the Rule 32 hearing to support it). In the alternative, the Court finds Davis failed to carry his burden of proving he was prejudiced by a preponderance of evidence as required by Rule 32.2(c), Ala. R. Crim. P. Rule 32.7(d), Ala. R. Crim. P.

(Doc. 15-71 at 137–39).

Davis appealed the Rule 32 Court's order to the ACCA, raising this subclaim within his larger claim that his counsel were ineffective for failing to present mitigation evidence at the penalty phase. (Doc. 15-68 at 44, 112–15). The ACCA did not specifically address this subclaim in its opinion. Nonetheless, the ACCA affirmed the Rule 32 Court's conclusion that Davis could not prevail on the broader penalty-phase ineffective assistance of counsel claim because he could not show that his counsel's failure to present mitigation testimony prejudiced him. *See Davis*, 44 So. 3d at 1139–42. Davis included this specific subclaim in his petition for a writ of

certiorari to the Alabama Supreme Court (doc. 15-70 at 75–103), but the Alabama Supreme Court denied Davis's petition for certiorari without opinion (doc. 15-71 at 220). The Court presumes that the ACCA, and for that matter the Alabama Supreme Court, adopted the same reasoning that the Rule 32 Court did for rejecting this subclaim, despite the fact that the appellate courts did not specifically address the subclaim. *Wilson*, 584 U.S. at 125.

Thus, under 28 U.S.C. § 2254(d), in order to obtain relief on this claim, Davis must demonstrate that the decision of the state courts was contrary to, or an unreasonable application of, clearly established federal law as determined by the Supreme Court, or that it was based on an unreasonable determination of the facts that were before the state courts. *See* 28 U.S.C. § 2254(d). However, Davis merely restates the allegations from his petition without demonstrating how the state courts' decision was unreasonable. In addressing this subclaim, the Rule 32 Court noted that it also presided over Davis's judicial sentencing hearing, and that during that hearing, it did not consider Copeland's statements about the nature of the crimes to be admissions that an additional aggravating circumstance existed. The Rule 32 Court also noted that it did not consider the aggravating circumstance that the offense was especially heinous, atrocious, and cruel when compared to other capital murders when it was weighing aggravating and mitigating circumstances in determining an appropriate sentence for Davis. Thus, it was not unreasonable that the state courts

found that Davis could not show that he was prejudiced by Copeland's statements made at the judicial sentencing hearing, and Davis is due no relief under the AEDPA on this subclaim.

* * *

Before concluding the discussion on Davis's penalty phase ineffectiveness claims, the Court addresses Davis's claim that the cumulative effects of these alleged failures during the penalty phase rendered his counsel's assistance ineffective. (*See* doc. 1 at ¶ 117).  Respondent does not reply to Davis's "cumulative effects" allegation.  Nonetheless, the Court has examined whether Davis exhausted this claim in the state courts, and it appears that he did.  Davis raised a cumulative effects allegation in his Rule 32 petition (doc. 15-11 at ¶ 105), and his collateral appeal brief to the ACCA and his petition for certiorari to the Alabama Supreme Court can be read to show that he continued to pursue this allegation on collateral appeal (*see* doc. 15-68 at 114, doc. 15-70 at 107).  The Rule 32 Court denied the cumulative effects claim as without merit and concluded that, whether his claims were considered individually or in total, Davis was not denied effective assistance of trial counsel because he could not show prejudice.  (Doc. 15-71 at 139).

Thus, even if the state courts' prejudice determinations as to each ground of allegedly deficient performance were reasonable, this Court must still decide whether the state courts' conclusions as to the cumulative prejudice constituted an

unreasonable application of *Strickland*. *See Strickland*, 466 U.S. at 694–96, *United States v. Blakey*, 14 F.3d 1557, 1561 (11th Cir. 1994) (discussing cumulative effect of counsel's errors).  This question asks whether it was reasonable for the state courts to conclude that there was no substantial likelihood that at least one juror would have voted against imposing the death penalty had Davis's counsel not committed all the errors that Davis alleges that they committed— *i.e.*, if his counsel had presented additional evidence of Davis's bleak upbringing and good moral character and community involvement, offered some kind of testimony from Dr. Freeman about Davis's childhood problems, and called a social worker like Ms. Vogelsang to offer a social history of Davis from childhood to his arrest.

However, even considering Davis's counsel's alleged deficiencies cumulatively, it was not unreasonable for the state courts to conclude that Davis failed to establish prejudice.  The aggravating nature of the murders weighed heavily in favor of the jury imposing a death sentence.  Additionally, the difficulties already described, which prevented Davis from establishing prejudice with respect to any individual deficiency—including the lack of evidence of any mental health problems and the underwhelming nature of the social history evidence—could also, to a fairminded jurist, preclude him from establishing cumulative prejudice.  Davis is due no relief on a cumulative effects claim.

**C.    Davis's Claim that the Prosecution Violated *Brady* in Various Ways (Doc. 1 at ¶¶ 118–25)**

Davis alleges that the prosecution deprived him of his rights to due process and a fair trial by withholding exculpatory evidence in violation of *Brady*, in which the Supreme Court held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." 373 U.S. at 87.   Davis lists four circumstances in which he claims that the prosecution withheld exculpatory information.

First, he alleges that the prosecution failed to disclose to his counsel until after Smith had already testified that, on the Sunday before Davis's trial, Smith was shown a photo lineup at the DA's office that included a photo of Davis, and, although he at first identified Davis as being with the man who shot him, an hour later he could not remember being shown the lineup and appeared to be confused.   (Doc. 1 at ¶¶ 119–22).   Second, Davis alleges that the prosecution failed to disclose to his counsel that the prosecution had spoken with Clayton about her memory of the night of the murders and that, based on what Clayton told them, she could have an alibi for Davis.   (*Id.* at ¶ 123).   Third, Davis alleges that the prosecution did not disclose to his counsel that Boswell, Jr. had worked as a CI in other cases that were eventually prosecuted, which would have demonstrated that a number of people other than Davis also had a motive to kill Boswell, Jr.   (*Id.* at ¶ 124).   Fourth, Davis alleges that

the prosecution did not disclose its arrangements with Jointer and Dunn to reduce their sentences for their pending criminal charges in exchange for their testimony against Davis, which, if revealed, would have cast doubt on their credibility at Davis's trial. (*Id.*).

Each of these four allegations is procedurally barred from this Court's review, but the Court will discuss each separately. The first allegation, pertaining to Smith's identification of Davis in a photo lineup, is procedurally barred because the state courts dismissed it due to an adequate and independent state procedural rule, which precludes this Court from being able to review its merits. Specifically, Davis did not raise the first allegation at trial or on direct appeal. Davis raised it for the first time in his Rule 32 petition. (Doc. 15-11 at ¶ 11). The Rule 32 Court dismissed the claim as procedurally barred because Davis could have, but did not, raise the claim during trial or on direct appeal. (Doc. 15-71 at 37). The ACCA affirmed the Rule 32 Court's ruling that the claim was procedurally barred, stating:

> Davis next argues that he was deprived of his right to due process when the State withheld exculpatory information in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963). Specifically, he asserts that the State failed to disclose that Eugene Smith was unable to identify Davis until after he testified and that there were potential alibi witnesses.
>
> The circuit court stated the following concerning this claim:
>
> "Davis contends the State did not inform him or his trial counsel before trial about Eugene Smith's inability to remember picking Davis out of a photo line up. Davis was

made aware during his trial of Smith's actions during the photo line-up. The Court finds this allegation is precluded from postconviction review because it could have been but was not raised on direct appeal. See Rule 32.2(a)(3) and (a)(5), Ala. R. Crim. P. Therefore, this allegation is summarily dismissed."

(C.R. 802.)

In *Payne v. State*, 791 So. 2d 383 (Ala. Crim. App. 1999), we stated:

"Because this *Brady* claim was first presented in a Rule 32 petition, Payne can obtain relief only if it involves 'newly discovered evidence.' Newly discovered evidence is defined under Rule 32.1, Ala. R. Crim. P., as follows:

"'Subject to the limitations of Rule 32.2, any defendant who has been convicted of a criminal offense may institute a proceeding in the court of original conviction to secure appropriate relief on the ground that:

"'. . . .

"'(e) Newly discovered material facts exist which require that the conviction or sentence be vacated by the court, because:

"'(1) The facts relied upon were not known by petitioner or petitioner's counsel at the time of trial or sentencing or in time to file a post-trial motion pursuant to Rule 24, [Ala. R. Crim. P.,] or in time to be included in any previous collateral proceeding and could not have been discovered by any of those times through the exercise of reasonable diligence;

"'(2) The facts are not merely cumulative to other facts that were known;

159

"'(3) The facts do not merely amount to impeachment evidence;

"'(4) If the facts had been known at the time of trial or of sentencing, the result probably would have been different; and

"'(5) The facts establish that petitioner is innocent of the crime for which petitioner was convicted or should not have received the sentence that petitioner received.'

"Rule 32.1(e), Ala. R. Crim. P. We note that because of the conjunctive 'and' between (4) and (5), Payne must meet all five prerequisites of Rule 32.1(e), Ala. R. Crim. P., in order to prevail. *Cf. Brown v. State*, [807 So. 2d 1 (Ala. Crim. App. 1999)]."

791 So. 2d at 397. Davis failed to plead and to prove the requirements for newly discovered evidence. Thus, this claim was barred in this Rule 32 proceeding.

*Davis*, 44 So. 3d at 1143–44. Davis appealed that ruling to the Alabama Supreme Court (doc. 15-70 at 41–42), but the court denied Davis's petition for certiorari without opinion (doc. 15-71 at 220). Thus, because the last state court to render a reasoned decision dismissed this claim based upon adequate and independent state procedural rules (Rules 32.2(a)(3) & (5) of the Alabama Rules of Criminal Procedure, which preclude collateral review of issues that could have been but were not raised at trial or on appeal), this Court cannot consider the claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

Davis contends that this claim is not procedurally defaulted for several reasons. First, he argues that the default is excused under the cause and prejudice doctrine because the prosecution's withholding of the evidence prevented him from discovering the factual or legal basis for the claim in time to timely raise it. In support, he cites *Banks v. Dretke*, 540 U.S. 668, 691–98 (2004) ("a petitioner shows 'cause' when the reason for his failure to develop facts in state-court proceedings was the State's suppression of relevant evidence"). He argues that courts have declined to hold that *Brady* claims are procedurally defaulted in federal habeas cases because punishing the petitioner for failing to raise the claim at the first possible instance would reward the wrongdoer who suppressed the evidence. The only case that Davis cites in support, however, is *Julius v. Jones*, 875 F.2d 1520, 1525 (11th Cir. 1989) (per curiam). *Julius* is inapplicable because in that case, the State did not disclose the *Brady* material at the time of the petitioner's trial, and the petitioner did not discover it until years later. *See id.* at 1521–26. In contrast here, the record shows that Davis was aware during his trial of the evidence that he claims the prosecution withheld. Indeed, the prosecution disclosed to Davis's counsel the fact that Smith had made inconsistent statements during his identification of Davis on the Sunday before the trial, and the prosecution and Davis's counsel in fact agreed to a stipulation by which the jury was advised of what happened. (Doc. 15-5 at 146–47,

doc. 15-7 at 40–42). Davis was thus aware of the factual basis for this *Brady* claim during trial, but he did not raise the issue then or on direct appeal.

Second, Davis argues that it should be enough for exhaustion purposes that he pursued this *Brady* claim throughout his postconviction proceedings, even if he did not raise it at trial or on direct appeal. In support for that proposition, he cites *Castille v. Peoples*, 489 U.S. 346, 350–51 (1989). However, the Supreme Court in *Castille* merely reaffirmed its prior holding in *Brown v. Allen*, 344 U.S. 443, 448–49, n.3 (1963), that once state courts have ruled upon the merits of a claim on direct review, it is not necessary for a habeas petitioner to ask the state courts for relief on collateral review based upon the same evidence. 344 U.S. at 350–51. *Castille* does not authorize Davis's failure to raise this *Brady* claim at trial or on direct appeal or cast doubt upon the ACCA's conclusion that it is procedurally defaulted.

Davis's second allegation, pertaining to the prosecution's alleged knowledge that Clayton could have been an alibi witness for Davis, is also procedurally barred from this Court's review because the state courts dismissed it due to an adequate and independent state procedural rule. Specifically, Davis did not raise this claim until his postconviction *appeal*. (Doc. 15-68 at 117–18). The ACCA dismissed it as procedurally barred because Davis had not raised it in his Rule 32 petition, stating:

> Furthermore, Davis did not allege in his Rule 32 petition that the State failed to disclose the identities of potential "alibi" witnesses. Thus, the issue is not properly before this Court. "An appellant cannot raise an issue from the denial of a Rule 32 petition which was not raised in the

Rule 32 petition." *Arrington v. State*, 716 So. 2d 237, 239 (Ala. Crim. App. 1997).

*Davis*, 44 So. 3d at 1144. Davis appealed that ruling to the Alabama Supreme Court (doc. 15-70 at 41–42), but the court denied Davis's petition for certiorari without opinion (doc. 15-71 at 220). Thus, because the last state court to render a reasoned decision dismissed this claim based upon an adequate and independent state procedural rule, this Court cannot consider the claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

Davis again argues generally that his failure to raise this *Brady* claim should be excused under the cause and prejudice doctrine because the prosecution's withholding of the evidence prevented him from discovering the factual or legal basis of the claim at an earlier time. Although Davis does not make this specific argument, it is conceivable that Davis did not learn about Clayton's conversation with prosecutors until his evidentiary hearing, after he had filed his Rule 32 petition. Indeed, at the hearing, Clayton testified that she was subpoenaed to testify at Davis's trial by the prosecution and that once she arrived, the prosecutors asked her about "[t]he night . . . when we was at Top Flight . . . They asked me particularly about that night, *were we all together that night*." (Doc. 15-60 at 53 (emphasis added)). She said that she told prosecutors "what I had to say," and "that's when they kept me in the side room. That's when they came back probably about thirty or forty minutes and they told me they didn't need me." (*Id.*). From this testimony, Davis

later alleged that the State withheld the substance of its conversation with Clayton from the defense, and it would have established that Davis had an alibi because he was at the Top Flight all evening. However, Davis did not amend his Rule 32 petition after his evidentiary hearing to include a *Brady* claim based on Clayton's testimony. Because the Rule 32 Court did not enter an order on his petition until six months after the hearing, there was time for Davis to attempt to amend his petition. But since he did not, he never gave the Rule 32 Court the opportunity to consider the merits of a *Brady* claim based on this factual basis.

More importantly, however, even if Davis could show that he had cause to excuse the procedural default of this claim in the state courts because he *did* raise the claim at the earliest possible time, the claim would still be due to be denied on the merits. Clayton's testimony from the hearing is simply too vague to be considered material exculpatory evidence under *Brady*. A *Brady* claim consists of three elements: (1) the evidence must be favorable to the accused, either because it is exculpatory or impeaching; (2) the evidence must have been suppressed by the State, either willfully or inadvertently; and (3) the evidence must be "material," *i.e.*, prejudice must have ensued from its non-disclosure. *Banks*, 540 U.S. at 691. Although Clayton testified that the three women were with Davis at the Top Flight Club until closing and then at the Waffle House, Clayton also testified that the women rode separately from the men to the Waffle House. (Doc. 15-60 at 49). Thus,

as discussed previously in this opinion, her testimony does not present an alibi for Davis during the entire time that the murders were committed.  Thus, even if she told prosecutors this information, and prosecutors did not tell the defense, the information was not exculpatory. *See Banks*, 540 U.S. at 691.  Nor was it material.  If prosecutors had disclosed it to Davis's counsel, and his counsel had called Clayton to testify, her testimony would not have changed the result.  As noted previously, the jury likely would have been confused as to which club the partiers went to that evening, or whether they visited different clubs, but it is not likely that the jury would have found that Davis did not commit the murders.  This is particularly true in light of the overwhelming evidence of Davis's guilt that was presented at trial.  The fact that the evidence was not material also means that Davis cannot establish the other prong of the cause and prejudice exception to procedural default: that he was prejudiced by the alleged withholding of the evidence.  In sum, Davis procedurally defaulted this subclaim about Clayton's testimony, and the default is not excused.

Davis's third allegation, pertaining to the prosecution's alleged failure to disclose other cases in which Boswell, Jr. was a CI and other threats made against Boswell, Jr., is also procedurally barred from this Court's review.  The state courts dismissed it due to an adequate and independent state procedural rule and Davis did not exhaust it in the state courts.  Specifically, although Davis moved for a mistrial on this ground, he did not raise this claim on direct appeal.  When he raised the claim

in his Rule 32 petition (doc. 15-11 at ¶ 11), the Rule 32 Court dismissed it as procedurally barred because it was addressed at trial and because Davis could have but did not raise the claim on direct appeal, pursuant to Ala. R. Crim. P. 32.2(a)(2) & (5). (Doc. 15-71 at 39 (citing doc. 15-4 at 166; doc. 15-7 at 29–36)). Davis did not appeal the Rule 32 Court's ruling with specific reference to this allegation. Thus, this Court cannot consider the claim. *See Ward*, 592 F.3d at 1156–57.

Davis's arguments to the contrary lack merit. Davis argues that the claim is not procedurally defaulted based upon *Julius*, 875 F.2d at 1525, but, as noted, that case is distinguishable because there, the petitioner did not discover the *Brady* evidence until years after his trial. Here, the prosecution disclosed to the defense during trial the following information: Boswell, Jr. had worked as a CI in other cases that were ultimately prosecuted; McClenney had once threatened to shoot Boswell, Jr.; and Henderson also bought drugs from Boswell, Jr. as a CI and at one time had pending drug charges based upon that controlled buy. Indeed, as noted, Davis even asked the trial court to declare a mistrial based on the information because his counsel did not have time to investigate the other cases and threats. (Doc. 15-4 at 166; doc. 15-7 at 29–36). Davis could have challenged the trial court's refusal to do so on direct appeal, but he did not.

Davis's fourth allegation, pertaining to the prosecution's alleged failure to disclose deals that it had made with Dunn and Jointer, is also procedurally barred

from this Court's review because the state courts dismissed it due to an adequate and independent state procedural rule and because Davis did not exhaust it in the state courts. More specifically, Davis raised this claim for the first time in his Rule 32 petition (doc. 15-11 at ¶ 11), but the Rule 32 Court dismissed it as procedurally barred because it was addressed at trial and because Davis could have but did not raise the claim on direct appeal, pursuant to Ala. R. Crim. P. 32.2(a)(2) & (5). (Doc. 15-71 at 39 (citing doc. 15-7 at 10–14, which is the portion of the trial transcript in which Davis moved, unsuccessfully, for a judgment of acquittal based on the argument that Dunn and Jointer were not credible because they were both testifying against him in exchange for reduced sentences)). Davis did not appeal the Rule 32 Court's ruling with specific regard to this allegation. Thus, this Court cannot consider the claim. *See Ward*, 592 F.3d at 1156–57.

Davis's reliance on *Julius* in hopes of convincing this Court that this claim is not procedurally defaulted is misplaced for the same reasons given above. While the petitioner in *Julius* was not made aware of *Brady* evidence until years after his trial, the record here establishes that during his trial, Davis certainly suspected that the prosecution had made deals with Dunn and Jointer. Prior to his trial, Davis filed a motion asking the trial court to order the prosecution to reveal any deals that it had with Dunn, Jointer, and any other witnesses that the prosecution planned to call in Davis's case. (Doc. 15-1 at 35). The State filed a response in which it stated that it

had not offered a deal to Jointer to secure his testimony but that it had placed Dunn's pending drug possession charges on the administrative docket and anticipated that they would be *nolle prossed* once Dunn testified against Davis and Princeton. (*Id.* at 37). Then at trial, when Davis's counsel cross-examined both Dunn and Jointer, counsel asked both if they had been offered deals for their testimony. (Doc. 15-6 at 57–58, 111). They both answered no.

However, one of the grounds on which Davis sought a judgment of acquittal after the State's case-in-chief was that the testimony of Dunn and Jointer was not credible because they were testifying pursuant to deals with the State. (*See* doc. 15-7 at 11 (Copeland stating: "Mr. Dunn admitted that he has a pending drug charge, and though he refused to say he had a deal, there is a clear inference he has a deal that that drug charge will be dismissed."); *id.* at 14–15 (Copeland stating: "Mr. Jointer is attempting to, though he testified he had no deal with the State, it seems a fair inference that he does.")). Thus, Davis's counsel were aware of the alleged *Brady* evidence at Davis's trial, such that his counsel could have raised a *Brady* claim to the trial court or on direct appeal. Additionally, with specific regard to Jointer, Davis points out that in August 1999, the State *nolle prossed* the capital murder and attempted murder charges against Jointer, and Jointer pled guilty to conspiracy to commit murder, receiving a time served sentence. (*See* doc. 15-42 at 12–28). The ACCA did not issue an opinion in Davis's direct appeal until December

168

1, 2000. After Jointer's case was resolved in that manner, Davis could have added a *Brady* claim based on these grounds on direct appeal, but he did not.

Accordingly, because Davis procedurally defaulted these claims in the state courts, and he cannot demonstrate cause and prejudice to excuse the default, the claims are due to be dismissed.

## D. Davis's Claim that the Rule 32 Court's Verbatim Adoption of the Proposed Order Submitted by the State Violated his Right to Due Process (Doc. 1 at ¶¶ 126–33)

Davis alleges that the Rule 32 Court violated his right to due process when it adopted the State's proposed final order as its own. Davis argues that in doing so, the Rule 32 Court mischaracterized key evidence and did not conduct an independent, careful analysis of his claims. Davis specifically contends that the proposed order submitted by the State, and in turn, the Rule 32 Court's order, erroneously applied the prejudice prong of the *Strickland* analysis because it did not acknowledge the Supreme Court's decisions in *Williams*, 529 U.S. 362, and *Rompilla*, 545 U.S. 374, and because it misconstrued the Supreme Court's reasoning in *Wiggins*, 539 U.S. at 521.

This claim does not form a basis for federal habeas relief because Davis is not claiming that his *conviction* was unconstitutionally obtained. *See* 28 U.S.C. § 2254(a) (habeas relief may only be granted on the ground that the petitioner is "in custody in violation of the Constitution or laws or treaties of the United States");

*Estelle*, 502 U.S. at 67–68 ("In conducting habeas review, a federal court is limited to deciding whether *a conviction* violated the Constitution, laws, or treaties of the United States.") (emphasis added).  Defects in procedure in collateral civil proceedings do not provide a basis for federal habeas relief, even if couched as constitutional violations.  *See Carroll v. Sec'y, DOC*, 574 F.3d 1354, 1365 (11th Cir. 2009) (holding that a failure to hold an evidentiary hearing in a state postconviction proceeding, even when challenged as a due process violation, was not a basis for federal habeas relief); *In re Rutherford*, 437 F.3d 1125, 1127 (11th Cir. 2006) (finding insufficient for habeas relief the petitioner's claim that the state postconviction court denied him due process by failing to provide mental health records of a person the petitioner alleged had actually committed the crime).  "The reasoning behind this well-established principle is straightforward: a challenge to a state collateral proceeding does not undermine the legality of the detention for imprisonment—*i.e.*, the conviction itself—and thus habeas relief is not an appropriate remedy." *Carroll*, 574 F.3d at 1365 (citing *Quince v. Crosby*, 360 F.3d 1259, 1262 (11th Cir. 2004) (holding that a defect in a collateral proceeding does not state a basis for habeas relief)).

The Eleventh Circuit has also rejected the arguments made by other habeas petitioners that federal courts owe no deference under 28 U.S.C. § 2254(d) and (e) to a state postconviction court's order if the order is adopted from the state's

proposed order. *See Jones v. GDCP Warden*, 753 F.3d 1171, 1182 (11th Cir. 2014) (noting that the AEDPA "does not impose any specific requirements on how a state court should announce its decision" and concluding that "we can discern no basis for saying that a state court's fuller explanation of its reasons—albeit reasons drafted for the court by the State—would not be entitled to AEDPA deference"); *Rhode v. Hall*, 582 F.3d 1273, 1281 (11th Cir. 2009) (noting that "the record clearly reflects that both Rhode and the State had the opportunity to present the state habeas court with their version of the facts" and concluding that "[d]espite the fact that the state habeas court adopted the State's facts verbatim, these findings of fact are still entitled to deference from this court"). Similarly, the Eleventh Circuit has rejected a federal habeas petitioner's claim that he should have been afforded an evidentiary hearing in the district court because, even though he received a Rule 32 evidentiary hearing, the hearing resulted in inadequate findings of fact because the Rule 32 court merely adopted the State's proposed order verbatim. *See Brownlee v. Haley*, 306 F.3d 1043, 1067 n.19 (11th Cir. 2002). In *Brownlee*, the court stated: "Even though Brownlee is correct that we have criticized the verbatim adoption of proposed orders, the Supreme Court and this Court have consistently upheld the use of such orders as long as they were adopted after adequate evidentiary proceedings and are fully supported by the evidence." *Id.*

In any event, if this Court was able to review this claim it would find it to be without merit. The circumstances here establish that Davis received a full and fair hearing on the constitutional claims that he raised in his Rule 32 proceedings. Davis was represented by counsel during those proceedings, and the Rule 32 Court conducted an evidentiary hearing at which Davis was permitted to call 18 witnesses, including two experts, and submit five depositions and numerous exhibits. "The extensive record from the Rule 32 proceedings in this case 'eliminates any doubt about the [trial] judge's involvement in the matter and careful analysis of . . . [the] evidence.'" *Brownlee*, 306 F.3d at 1067 n.19 (quoting *Ammons v. Dade City*, 783 F.2d 982, 984 n.4 (11th Cir. 1986)) (alterations in original). Regardless, this claim is due to be denied as not cognizable on federal habeas review.

**E.    Davis's Claim that the Denial of His Motions for a Continuance Deprived Him of His Rights to Due Process, a Fair Trial, and Effective Assistance of Counsel (Doc. 1 at ¶¶ 134–38)**

Davis has withdrawn this argument (*see* doc. 47 at 7 n.1 (Davis's supplemental merits brief)), so it will not be considered.

**F.    Davis's Claim that Prosecutorial Misconduct Deprived Him of His Rights to Due Process, a Fair Trial, and a Reliable Sentence (Doc. 1 at ¶¶ 139–56)**

Davis alleges that the prosecution engaged in misconduct during his trial, amounting to violations of his constitutional rights to due process, a fair trial, and a

reliable sentence.  Within this claim, Davis lists numerous separate instances of alleged prosecutorial misconduct.  Davis alleges that the prosecution failed to disclose material exculpatory evidence in violation of *Brady*.  (Doc. 1 at ¶ 140).[12] He alleges that the prosecution used preemptory strikes to remove prospective jurors on the basis of race and gender, in violation of *Batson*.  (*Id.* at ¶ 141).[13]  He alleges that the prosecutor misstated the law, which shifted the burden to Davis to prove his innocence.  (*Id.* at ¶ 142).[14]  He alleges that the prosecutor appealed to the jury's prejudices and emotions to obtain a conviction.  (*Id.* at ¶ 143).  For example, Davis points out that in closing argument, the prosecutor described Davis and his actions with the words "cowardly," "meanness," and "depravity" and stated that Davis "tried

---

[12]    The Court has considered Davis's claim that the State violated *Brady* in section VI.C., *supra*, but here, Davis describes the same claim as one of prosecutorial misconduct.

[13]    Davis also raises a claim that the State violated *Batson*, which the Court will address in section IV.P., *infra*.

[14]    Although Davis does not specify in his habeas petition how the prosecutor misstated the law, reference to this claim in Davis's Rule 32 petition reveals that Davis is challenging the following statement made by the prosecutor in closing argument:

> To acquit this defendant you would have to believe that it was just the most astronomical of coincidences that this defendant happens to be with Antonio Jointer and Derrick Singleton on the night and morning in which Eugene Smith is shot, Timothy Ray is shot seven times, and John Bradley is shot three times.  It has just got to be an unbelievable bad coincidence that these people are shot in the house of the father of the confidential informant who is scheduled to testify against you. It has got to be an astronomical coincidence.

(Doc. 15-7 at 111–12).

to cheat justice and in doing so cheated three lives . . ." (*Id.* (citing doc. 15-7 at 114)).

Davis also alleges that the prosecutor made other errors during closing argument by referring to facts that were not in evidence and manipulating other facts to prejudice him. (*Id.* at ¶ 144). Davis points to three examples of this. Davis points out that the prosecutor stated that Boswell, Jr. could not be located to testify against Davis at his scheduled drug distribution trial because Boswell, Jr. was "scared." (*Id.* at ¶ 145 (citing doc. 15-7 at 203–04)). Davis contends that this statement was improper because the only evidence that Boswell, Jr. was afraid to testify was from Cpl. Drummond's testimony, which the court had ruled to be inadmissible hearsay. (*Id.*). Davis also points out that the prosecutor told the jury that it was unreasonable to believe Davis's defense that Henderson actually committed the murders to silence Boswell, Jr. because Henderson was never given the identity of Boswell, Jr. as the CI from whom he bought drugs, like Davis was. (*Id.* at ¶ 146 (citing doc. 15-7 at 104–05)). Davis contends that this argument was improper because no evidence had actually been presented to the jury that Henderson did not know that Boswell, Jr. was a CI. (*Id.*). Davis also points to the fact that the prosecutor reminded the jury that Smith had testified that Davis and Singleton came into his bedroom and attempted to kill him. (*Id.* at ¶ 147 (citing doc. 15-7 at 71)). Davis argues that this

statement was improper because Smith never actually identified Singleton by name in his testimony. (*Id.*).

Additionally, Davis alleges that the prosecutor improperly vouched for the credibility of the State's witnesses and for the strength of the State's case by telling the jury in his rebuttal closing argument that all the people who "may want to kill Charlie [Boswell], Jr., . . . were investigated, and they were all cleared, because there wasn't enough evidence." (*Id.* at ¶¶ 148–49 (citing doc. 15-7 at 103)). Davis argues that, by stating that all other suspects had been cleared, the prosecutor improperly informed the jury that he had personal knowledge of Davis's guilt. (*Id.*).

Davis also alleges that the prosecution knew or should have known that their key witnesses, Dunn and Jointer, testified falsely. (*Id.* at ¶ 150). Davis alleges that Dunn and Jointer lied when they testified that they had received no deals in exchange for their testimony and that the prosecution knew this. (*Id.* at ¶¶ 151–52). Davis also alleges that Jointer lied when he testified that Davis was the ringleader in the murders and that Jointer was pressured into accompanying Davis and Singleton to the location where the crimes occurred. (*Id.* at ¶¶ 153–54).

Davis also contends that the prosecutor committed misconduct during his penalty phase closing argument. Davis alleges that the prosecutor improperly told the jury that the jury had already found the existence of two aggravating factors: that the murder was committed during a burglary and that the murder was committed to

disrupt or hinder the lawful exercise of a governmental function or the enforcement

of laws.  (*Id.* at ¶ 155 (citing 15-8 at 14)).[15]  Davis also alleges that the prosecutor

offered argument that was irrelevant to all the proffered aggravating circumstances,

such as characterizing the crime as "depraved," "cruel," "pitiless," and "merciless."

(*Id.* at ¶ 156 (citing doc. 15-8 at 15–16)).

Finally, Davis embeds two ineffective assistance of trial counsel claims within

this prosecutorial misconduct claim.  He argues that his trial counsel were ineffective

for failing to properly investigate his case, which prevented them from knowing that

the statements that the prosecutor made during his closing arguments improperly

vouching for the State's witnesses were false.  (*Id.* at ¶ 148).  Davis also argues that

his trial counsel were ineffective for failing to object to all of these instances of

prosecutorial misconduct.  (*Id.* at ¶ 149).

The embedded ineffective assistance of counsel claims are procedurally

defaulted and thus barred from this Court's review because Davis did not exhaust

---

[15]    The full comment by the prosecutor was as follows:

> What we have offered is three aggravating circumstances.  One that you have already found murder was committed during the course of a burglary.  We have also offered a[n aggravating] circumstance, which in a sense, as Ms. Redmond pointed out, you have already found, that the capital offense was committed to disrupt governmental operation and operation of laws. You found that, because finding him guilty of conspiracy, y'all know what he went in that house to do, to kill a witness, to permanently silence a witness.

(Doc. 15-8 at 14).

them in the state courts.  Although Davis raised them in his Rule 32 petition (doc.

15-11 at ¶ 86), he did not argue them on appeal to the ACCA from the Rule 32

Court's denial of the claim or in a petition for certiorari to the Alabama Supreme

Court.  As a result, Davis has not met the exhaustion requirement of 28 U.S.C. §

2254(b)(1), and he is procedurally barred from raising these claims in a federal

habeas petition. *See O'Sullivan*, 526 U.S. at 845; *Pope*, 680 F.3d at 1286; *Ward*, 592

F.3d at 1156.  Dismissal of this habeas petition to allow Davis to present these claims

as federal claims in state court would be futile; he would be barred from raising them

under Ala. R. Crim. P. 32.2(c) because they would be barred by the applicable statute

of limitations and under Ala. R. Crim. P. 32.2(b) as a successive petition.  Thus,

because any state remedy with respect to these claims is procedurally barred by state

procedural rules, these two claims are procedurally defaulted from federal habeas

review.

The substantive claims of prosecutorial misconduct within this section are

procedurally barred from this Court's review because the state courts dismissed them

based upon adequate and independent state procedural rules and Davis did not

exhaust them in the state courts.  Specifically, Davis did not raise these allegations

of prosecutorial misconduct at trial or on direct appeal.  Thus, when Davis raised

these allegations for the first time in his Rule 32 petition (*see* doc. 15-11 at ¶¶ 43–

49), the Rule 32 Court dismissed them as procedurally barred because Davis could

have, but did not, raise them during trial or on direct appeal, pursuant to Rules 32.2(a)(3) and (5) of the Alabama Rules of Criminal Procedure. (Doc. 15-71 at 177–80).[16]  And when Davis appealed the Rule 32 Court's order, he did not include these claims.  Thus, because the last state court to render a reasoned decision dismissed these claims based upon adequate and independent state procedural rules, this Court may not consider these claims on federal habeas review. *See Ward*, 592 F.3d at 1156–57.

Davis argues that this Court may still address the merits of these claims because he can show cause for the default and actual prejudice resulting from the prosecutorial misconduct.  Specifically, Davis contends that his trial attorneys' failure to object to these instances of prosecutorial misconduct during the trial, and his appellate attorney's failure to raise these issues on direct appeal, constitute ineffective assistance of counsel that serves as cause to excuse the procedural default of these claims.  In support, Davis cites *Ward*, in which the Eleventh Circuit held

---

[16]    The one exception is Davis's allegation that the prosecution knowingly presented false testimony by Dunn and Jointer.  The Rule 32 Court dismissed it under Rules 32.2(a)(2) and (5) because it was addressed at trial but Davis did not raise it on appeal.  (*See* doc. 15-71 at 179–80).  Presumably, the Rule 32 Court was referring to the fact that Davis's counsel argued in his oral motion for a judgment of acquittal that the State had not proven its case in part because Dunn's and Jointer's testimonies were not credible.  Davis's counsel argued that it was not credible in part because he suspected that both Dunn and Jointer were testifying in exchange for deals with the State for lesser sentences, even though both witnesses denied that.  The trial court denied the motion for a judgment of acquittal.

that an ineffective assistance of counsel claim may constitute cause for the procedural default of another claim. 592 F.3d at 1157.

However, as will be discussed again in section VI.Y, *infra*, Davis's ineffective assistance of appellate counsel claims are themselves procedurally defaulted from this Court's review because, although he raised them in his Rule 32 petition, he failed to raise them on collateral appeal. For this reason, the *Ward* case does not help Davis, because in *Ward*, the Eleventh Circuit held that an ineffective assistance of counsel claim may only constitute cause for procedural default if it is not procedurally defaulted itself. *See Ward*, 592 F.3d at 1157 ("We have [] determined that an ineffective-assistance-of-counsel claim, if both exhausted and not procedurally defaulted, may constitute cause.") (citing *Hill v. Jones*, 81 F.3d 1015, 1031 (11th Cir. 1996) (holding that a petitioner could not rely on a procedurally defaulted ineffective assistance of counsel claim to show cause for a defaulted substantive claim)). Thus, Davis cannot rely on his appellate counsel's performance as cause when he did not exhaust his ineffective assistance of appellate counsel claims in state court by raising the claims through one full round of the state courts' collateral appeal process. To be able to bypass that review and have this Court rule on the merits of his ineffective assistance of appellate counsel claims under the guise of determining whether they constitute cause for a default would undermine the

principles underlying the exhaustion rules.  As the Eleventh Circuit explained in

*Hill*:

> The procedural default rule has its foundations in the principles of comity and judicial efficiency. *See* [*Wainwright v.*] *Sykes*, 433 U.S. [72,] 87-88, 97 S. Ct. at 2506. To allow a federal court to review a defaulted claim of ineffective assistance under the guise of a cause analysis would ignore the fact that under the procedural rules of Alabama and other states, the petitioner has forfeited his right to have that claim reviewed by a state court.  This hardly amounts to respect for a state's right to enforce its procedural rules.  This is especially troubling given that almost any procedural default of a constitutional claim can be characterized as an attorney's error. Using a procedurally-defaulted ineffective assistance claim to open the door to review of underlying, defaulted, "substantive" claims would render state procedural bars meaningless in many cases.

81 F.3d at 1030 (alternations in original).

The same analysis applies to Davis's claim that his *trial* counsel's ineffectiveness in raising these instances of prosecutorial misconduct at trial constitutes cause to excuse the default of these claims.  As discussed earlier in this section, Davis did not exhaust his ineffective assistance of trial counsel claim (based on failure to object to prosecutorial misconduct) because he did not appeal the Rule 32 Court's denial of that claim, and thus, he "forfeited his right to have that claim reviewed by a state court." *Hill*, 81 F.3d at 1030.  Davis's ineffective assistance of trial counsel claim cannot constitute cause to excuse the procedural of this claim because it is procedurally defaulted itself. *Ward*, 592 F.3d at 1157.

Accordingly, Davis procedurally defaulted these prosecutorial misconduct claims in the state courts. He is unable to demonstrate cause and prejudice to excuse the default, so these claims are due to be dismissed.

**G.    Davis's Claim that His Absence During Part of his Trial Frustrated the Fairness of the Proceedings and Violated His Rights Under the Fifth, Sixth, Eighth, and Fourteenth Amendments (Doc. 1 at ¶¶ 157–58)**

Davis alleges that his absence from part of his trial violated his right to be present at all stages of his trial, his right to counsel, his right to confrontation, his right to due process, and his right to a fair trial guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments. In support, Davis cites *Faretta v. California*, in which the Supreme Court held that the accused "has a [constitutional] right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings." 422 U.S. 806, 819 n.15 (1975). Davis bases this claim on the fact that he was not present during the in-chambers hearing that occurred during the testimony of the prosecution's first witness, Cpl. Drummond, in which Davis's counsel moved for a mistrial. (*See* doc. 15-4 at 159–67). As noted previously, Davis's counsel requested an in-chambers hearing and moved for a mistrial because they had just learned during Cpl. Drummond's testimony that Boswell, Jr. had been threatened by McClenney, who went by the nickname "Johnny Red," and they did not have time to pursue the information as it might pertain to their defense that someone else had a motive to kill Boswell, Jr., especially considering the similarities

between "Johnny Red" and Davis's nickname of "Red." During the in-chambers hearing, the trial court heard argument from the attorneys and testimony from Cpl. Drummond, and the trial court ultimately denied the motion for a mistrial. At one point during the hearing, Davis's counsel commented that he had just realized that Davis was not present. (*Id*. at 164). In any event, the parties waived any claim of error by later engaging in a colloquy with the trial court in which Davis expressly waived his presence at the earlier hearing. (Doc. 15-5 at 15–16).

This claim is procedurally barred from this Court's review because the state courts dismissed it due to an adequate and independent state procedural rule and Davis did not exhaust it in the state courts. Davis did not raise this claim on direct appeal, but he did raise it in his Rule 32 petition. (Doc. 15-11 at ¶¶ 49–50). The Rule 32 Court found that it was procedurally defaulted because it was addressed at trial and Davis could have but did not raise it on direct appeal, pursuant to Rules 32.2(a)(2) and (5) of the Alabama Rules of Criminal Procedure. (Doc. 15-71 at 180–81).[17] Davis did not appeal that ruling. Thus, because the last state court to render a reasoned decision dismissed this claim based upon an adequate and independent state procedural rule, this Court does not consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

---

[17] In finding that this issue was addressed at trial, presumably the Rule 32 Court was referring to the fact that Davis waived his right to be present at that hearing.

Davis again argues that his appellate attorney's ineffectiveness in failing to raise the issue on direct appeal constitutes cause to excuse the procedural default of the claim and that he was actually prejudiced by his absence during the in-chambers hearing, citing *Ward*, 592 F.3d at 1157. For the reasons explained above, however, *Ward* is inapplicable here because Davis did not exhaust his ineffective assistance of appellate counsel claim in his Rule 32 proceedings, thus procedurally defaulting it as well, and *Ward* holds that attorney ineffectiveness cannot excuse the procedural default of a claim if the petitioner also procedurally defaulted the attorney ineffectiveness claim. *See Ward*, 592 F.3d at 1157.

Accordingly, this claim is procedurally defaulted and due to be dismissed.

## H.    Davis's Claim that the Trial Court's Admission of Certain Evidence and Testimony Violated His Rights to Due Process, Confrontation, and a Fair Trial (Doc. 1 at ¶¶ 159–61)

Davis alleges that the trial court erred when it admitted certain evidence and testimony in violation of Davis's rights to confrontation, due process, and to a fair trial guaranteed by the Fifth, Sixth, Eighth and Fourteenth Amendments. (Doc. 1 at ¶ 159). Davis again raises numerous separate allegations within this claim. First, Davis alleges that the trial court erred in admitting the court documents from his earlier drug distribution case that was *nolle prossed* because the documents were more prejudicial than probative to any issue in the case. (*Id*. at ¶ 160 (citing doc. 15-4 at 138–40)). Second, Davis alleges that the trial court erred in admitting Cpl.

183

Drummond's testimony that Davis's brother Princeton was convicted on drug distribution charges. (*Id*. at ¶ 161) (citing doc. 15-4 at 135)). Davis argues that Princeton's convictions were irrelevant, prejudicial, and insinuated Davis's guilt by association. (*Id*.). Third, Davis alleges that the trial court should have instructed the jury that it could not consider the evidence about Princeton's convictions as substantive evidence of Davis's guilt. (*Id*.). Davis cites *Dawson v. Delaware*, 503 U.S. 159, 167 (1992), for the proposition that the admission of evidence of the defendant's association with a suspect group, when such an association is not relevant to the issues being decided in the trial or sentencing, constitutes reversible error. (*Id*.). Fourth, Davis alleges that he was denied effective assistance of counsel when his trial counsel failed to successfully object to the admission of this evidence. (*Id*. at ¶ 159).

Davis's first allegation that the trial court erred in admitting the court documents from his *nolle prossed* drug distribution case is procedurally barred from this Court's review because the state court dismissed it based upon an adequate and independent state procedural rule and Davis did not exhaust it in the state courts. More specifically, Davis did not raise the issue on direct appeal. When he raised it in his Rule 32 petition (doc. 15-11 at ¶ 50), the Rule 32 Court found that it was procedurally defaulted because it was addressed at trial, and Davis could have but did not raise it on direct appeal, pursuant to Rules 32.2(a)(2) and (5) of the Alabama

Rules of Criminal Procedure. (Doc. 15-71 at 181).[18]  Davis did not appeal that ruling. Thus, because the last state court to render a reasoned decision dismissed this claim based upon an adequate and independent state procedural rule, this Court cannot consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

Davis's second allegation that the trial court erred in admitting Cpl. Drummond's testimony about Princeton's conviction is also procedurally barred from this Court's review because the state court dismissed it based upon an adequate and independent state procedural rule and Davis did not exhaust it in the state courts. More specifically, Davis did not object on this ground at trial or raise this issue on direct appeal. Davis raised this claim for the first time in his Rule 32 petition. (Doc. 15-11 at ¶ 50). The Rule 32 Court found that it was procedurally defaulted from review because Davis could have but did not raise it at trial or on direct appeal, pursuant to Rules 32.2(a)(3) and (5) of the Alabama Rules of Criminal Procedure. (Doc. 15-71 at 181). Davis did not appeal that ruling. Thus, because the last state court to render a reasoned decision dismissed this claim based upon an adequate and

---

[18]    In finding that this issue was addressed at trial, presumably the Rule 32 Court was referring to the fact that Davis's counsel objected to the introduction of these court documents at trial. (Doc. 15-4 at 138–40). Davis's counsel argued that they were more prejudicial to Davis than probative because they suggested that he had some sort of longstanding relationship with the court system. The State argued that they were relevant to show that Davis committed the murders shortly after receiving notice that his trial, at which Boswell, Jr. would testify, would be set for a certain date. The trial court overruled Davis's objection.

independent state procedural rule, this Court cannot consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

Although Respondent does not address Davis's third allegation that the trial court erred in failing to instruct the jury that it could not consider evidence of Princeton's drug conviction as substantive evidence of Davis's guilt, that claim is also procedurally barred from this Court's review because the state court dismissed it based upon an adequate and independent procedural rule. Davis raised this allegation for the first time in his Rule 32 petition. (Doc. 15-11 at ¶ 50). The Rule 32 Court's order can be read to have dismissed this allegation for the same reasons that it dismissed Davis's allegation that the trial court erred in admitting Cpl. Drummond's testimony about Princeton's drug conviction. (*See* Doc. 15-71 at 182). Thus, because the last state court to render a reasoned decision dismissed this claim based upon an adequate and independent state procedural rule, this Court cannot consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

With regard to these three claims, Davis again argues that his appellate attorney's ineffectiveness in failing to raise these issues on direct appeal constitutes cause to excuse the procedural default of the claims, citing *Ward*, 592 F.3d at 1157. For the reasons explained above, however, *Ward* is inapplicable here because Davis did not exhaust his appellate-attorney ineffective assistance of counsel claim in his

Rule 32 proceedings, thus procedurally defaulting it as well. *See Ward*, 592 F.3d at 1157.

Finally, Davis's fourth allegation that his trial counsel were ineffective for failing to object to the trial court's admission of the court documents on constitutional grounds and the testimony about Princeton's drug conviction is procedurally defaulted because Davis did not exhaust that claim in the state courts. This is the first time that Davis has raised an ineffective assistance of counsel claim based on these specific alleged failures. As a result, Davis has not met the exhaustion requirement of 28 U.S.C. § 2254(b)(1), and he is procedurally barred from raising this claim in a federal habeas petition. *See O'Sullivan*, 526 U.S. at 845; *Pope*, 680 F.3d at 1286, *Ward*, 592 F.3d at 1156. Dismissal of his habeas petition to allow Davis to present this claim in state court now would be futile because he would be barred from raising it in state court under Ala. R. Crim. P. 32.2(c) (statute of limitations bar) and Ala. R. Crim. P. 32.2(b) (successive petition bar). Thus, because any state remedy with respect to this claim is procedurally barred by these state procedural rules, this claim is procedurally defaulted from habeas review. And, because this ineffective assistance of trial counsel claim is procedurally defaulted itself, it also cannot constitute cause to excuse the procedural default of the substantive claims in this section. *Ward*, 592 F.3d at 1157.

As he has done with other claims, Davis argues that this ineffective assistance of trial counsel claim (based upon counsel's failure to object to the admission of the court documents on constitutional grounds and the testimony about Princeton's drug conviction) is merely "additional factual support" to the ineffective assistance of trial counsel claims that he *did* raise in his Rule 32 proceedings, citing *Willis*, 771 F.2d at 1449 n.5. However, for the reasons stated in section VI.A.3., *supra*, neither *Willis*, nor the Fifth Circuit case on which it relies, *Vela*, 708 F.2d at 959–60, aids Davis in his efforts to avoid the procedural bar because they are distinguishable from this case. This claim—that counsel was ineffective for failing to object to the admission of court documents and testimony about Princeton's drug conviction—is separate and distinct from the other guilt-phase ineffective assistance of trial counsel claims that Davis raised in his postconviction proceedings, and habeas petitioners may not present particular factual instances of ineffective assistance of counsel in their federal petitions that were not first raised in the state courts. *Ward*, 592 F.3d at 1156.

The four allegations within this claim are procedurally defaulted and due to be dismissed.

I.    **Davis's Claim that the Trial Court Prevented Him from Presenting a Defense in Violation of His Rights to Confrontation, Due Process, and a Fair Trial (Doc. 1 at ¶¶ 162–63)**

Davis alleges that the trial court prevented his counsel from eliciting certain testimony from Dunn and Jointer and in so doing, violated his rights to present a

defense, to confront witnesses, to due process, and to a fair trial as guaranteed by the Fifth, Sixth, Eighth, and Fourteenth Amendments.  (Doc. 1 at ¶ 162).  Davis describes three instances where the trial court sustained the prosecution's objections to questions that his counsel asked Dunn or Jointer during their cross-examinations.

First, Davis alleges that the trial court erred when it refused to allow his counsel to ask Dunn whether he had been charged with criminal conspiracy and the circumstances surrounding that charge.  The charge stemmed from Dunn's presence during the conversation several weeks prior to the murders among him, Davis, Singleton, and Jointer where Davis expressed his desire to prevent Boswell, Jr. from testifying against Princeton.  (*Id*. at ¶ 163 (citing doc. 15-6 at 68)).  The prosecutor objected to that question on the ground that it put the jury under a false impression.  (Doc. 15-6 at 68).  The trial court sustained the objection.  (*Id*.).  Davis argues that whether Dunn was charged with criminal conspiracy would have been relevant to the jury's determination of whether Dunn was biased against Davis.

Second, Davis alleges that the trial court erred when it sustained the prosecution's objection to his defense counsel's question to Jointer as to whether Jointer planned to plead guilty to capital murder.   (Doc. 1 at ¶ 163 (citing doc. 15-6 at 112)).  Jointer had just testified that he was not guilty of capital murder, and Davis's counsel's next question was: "Are you going to plead to it?"  (Doc. 15-6 at 112).  The prosecutor objected that the question was argumentative, and the trial

court agreed.  (*Id.*).  Davis argues that Jointer's answer to that question would have aided Davis in proving his defense that someone else committed the murders.

The third instance occurred after Jointer had testified that he was pressured into accompanying Davis and Singleton to Boswell, Jr.'s house because they held a gun to his back, and he was afraid that Davis would kill him if he didn't go with them.  (Doc. 15-6 at 129).  Davis's counsel then asked Jointer: "Your two good friends were going to take you out and take you over to this house and just sort of put all the dead bodies in one place, kill you along with the informant, right?"  (*Id.*).  The prosecutor objected that the question was argumentative, and the trial court sustained the objection.  (*Id.*).  Davis argues that the trial court erred in sustaining the objection because Davis was attempting to present a defense that someone else committed the crime by casting doubt on Jointer's credibility.  (Doc. 1 at ¶ 163).[19] Davis cites *Washington v. Texas*, 388 U.S. 14, 19 (1967), in which the Supreme Court held, "The right to offer the testimony of witnesses . . . is in plain terms the right to present a defense," which includes "the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies."  (*Id*. at ¶ 162).

These claims are procedurally barred from this Court's review because the state court dismissed them based upon an adequate and independent state procedural

---

[19]    This argument itself borders on fanciful.

rule and Davis did not exhaust them in the state courts. More specifically, Davis did not object on these grounds during either of these witnesses' testimony at trial. Nor did he raise these issues on direct appeal. Davis raised these claims for the first time in his Rule 32 petition. (Doc. 15-11 at ¶ 51). The Rule 32 Court found that they were procedurally defaulted from review because Davis could have but did not raise them at trial or on direct appeal, pursuant to Rules 32.2(a)(3) and (5) of the Alabama Rules of Criminal Procedure. (Doc. 15-71 at 182). Davis did not appeal that ruling. Thus, because the last state court to render a reasoned decision dismissed this claim based upon an adequate and independent state procedural rule, this Court cannot consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

Relying upon *Ward*, 592 F.3d at 1157, Davis again argues that his trial counsel's failure to raise these claims at trial and his appellate counsel's failure to raise these claims on direct appeal constitute cause to excuse the procedural default of these claims. For the reasons explained above, however, *Ward* is inapplicable here because Davis's ineffective assistance claims are themselves procedurally defaulted. Davis never raised a trial counsel ineffectiveness claim premised on these alleged failures in his Rule 32 proceedings, and although Davis presented an appellate counsel ineffectiveness claim in his Rule 32 petition, he failed to raise it on collateral appeal.

In sum, the three allegations within this claim are procedurally defaulted and due to be dismissed.

**J.    Davis's Claim that the Trial Court's Failure to Excuse Seven Potential Jurors for Cause Deprived Him of His Rights to Due Process, a Fair Trial, and a Reliable Sentence (Doc. 1 at ¶¶ 164–66)**

Davis alleges that the trial court erred and violated his constitutional rights in denying his counsel's motion to excuse for cause seven potential jurors (jurors numbered 283, 228, 151, 229, 252, 262, and 278) because they were either biased against him or biased in favor of the death penalty. Davis alleges that he was thus forced to use his peremptory strikes to remove potential jurors who were biased against him. Davis cites *Ross v. Oklahoma*, 487 U.S. 81, 85 (1988), and *United States v. Martinez-Salazar*, 528 U.S. 304, 313 (2000), which hold that a defendant has a right to a fair and impartial jury.

This claim is procedurally barred from this Court's review because the state court dismissed it based upon an adequate and independent state procedural rule and Davis did not exhaust it in the state courts. More specifically, Davis did not raise this claim at trial or on direct appeal, and when he raised it in his Rule 32 petition (doc. 15-11 at ¶ 52), the Rule 32 Court found that it was procedurally defaulted because Davis could have but did not raise it at trial or on direct appeal, pursuant to Rules 32.2(a)(3) and (5) of the Alabama Rules of Criminal Procedure. (Doc. 15-71 at 183). Davis did not appeal that ruling. Thus, because the last state court to render

a reasoned decision dismissed this claim based upon an adequate and independent state procedural rule, this Court cannot consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

Relying upon *Ward*, 592 F.3d at 1157, Davis again argues that his trial counsel's failure to raise this claim at trial and his appellate counsel's failure to raise this claim on direct appeal constitute cause to excuse the procedural default of this claim. For the reasons explained above, however, *Ward* is inapplicable here because Davis's ineffective assistance claims are themselves procedurally defaulted. Davis never raised a trial counsel ineffectiveness claim premised on this alleged failure in his Rule 32 proceedings. Although he presented an appellate counsel ineffectiveness claim in his Rule 32 petition, he failed to raise it on collateral appeal.

In sum, this claim is procedurally defaulted and due to be dismissed.

## K. Davis's Claim that the Trial Court's Removal of One Potential Juror for Cause Deprived Him of His Rights to Due Process, a Fair Trial, and a Reliable Sentence (Doc. 1 at ¶¶ 167–68)

Davis alleges that the trial court also erred when it removed for cause one potential juror who Davis claims "was completely confused by the Judge's leading questions because of her religious beliefs." (Doc. 1 at ¶ 168).[20] In support, Davis

---

[20] Davis does not identify this potential juror by name or juror number, but he cites the portion of the trial transcript where the trial court granted the State's motion to have two potential jurors removed for cause: Juror #242, Margaret Taylor, and Juror #244, Marice Taylor. (*Id.* (citing doc. 15-3 at 200–02)).

cites *Lockhart v. McCree*, 476 U.S. 162, 165 (1986), in which the Supreme Court held that potential jurors may be struck for cause only if their views on capital punishment "would prevent or substantially impair the performance of their duties as jurors at the sentencing phase of the trial."

This claim is also procedurally barred from this Court's review because the state court dismissed it based upon an adequate and independent state procedural rule and Davis did not exhaust it in the state courts. More specifically, Davis did not raise this claim at trial or on direct appeal. He raised it for the first time in his Rule 32 petition. (Doc. 15-11 at ¶ 53). The Rule 32 Court found that it was procedurally

---

During individual *voir dire*, Juror #242, Margaret Taylor, stated that she did not understand the trial court's question as to whether she had a personal opinion one way or the other about the death penalty. (*See* doc. 15-3 at 195–96). After additional questioning, the trial court asked her, "Do you think your personal opinion is against the death penalty is what I am hearing you say?", to which she answered "Yes, I guess." (*Id.* at 198). The trial court then asked her if she could set aside her personal beliefs and vote for the death penalty, to which she responded: "I don't have any idea." (*Id.* at 199). The trial court then stated, "What I am hearing you telling me is that basically your personal opinion you think is so great that you couldn't set that aside to consider the death penalty." (*Id.*). She responded: "No." (*Id.*). The trial court then dismissed her and granted the State's motion to have her removed for cause.

Juror #244, Marice Taylor, was questioned individually next, and he stated that based upon his religious beliefs, he could not vote to take another person's life. (*Id.* at 200–01). When asked whether he could set aside his personal religious beliefs and determine the evidence in the case and follow the law, he said that he could not. (*Id.* at 201). The trial court also dismissed him and granted the State's motion to have him removed for cause.

Thus, although Davis's habeas petition refers to "one veniremember" who was removed for cause "because of her religious beliefs," Davis might have conflated Juror #242 and Juror #244. Indeed, Davis's Rule 32 petition raised this claim as to both of those jurors. (*See* Doc. 15-13 at 63 (challenging the removal of two veniremembers: "one veniremember for cause because of her religious beliefs and another veniremember for cause who was completely confused by the judge's leading questions")).

defaulted from review because Davis could have but did not raise it at trial and on direct appeal, pursuant to Rules 32.2(a)(3) and (5) of the Alabama Rules of Criminal Procedure. (Doc. 15-71 at 183). Davis did not appeal that ruling. Thus, because the last state court to render a reasoned decision dismissed this claim based upon an adequate and independent state procedural rule, this Court cannot consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

Relying upon *Ward*, 592 F.3d at 1157, Davis again argues that his trial counsel's failure to raise this claim at trial and his appellate counsel's failure to raise this claim on direct appeal constitute cause to excuse the procedural default of this claim. For the reasons explained above, however, *Ward* is inapplicable here because Davis's ineffective assistance claims are themselves procedurally defaulted. Davis never raised a trial counsel ineffectiveness claim premised on this alleged failure in his Rule 32 proceedings, and although he presented an appellate counsel ineffectiveness claim in his Rule 32 petition, he failed to raise it on collateral appeal.

This claim is procedurally defaulted and due to be dismissed.

## L.    Davis's Claim that Alabama's Capital Sentencing Scheme Violated His Right to a Trial by Jury (Doc. 1 at ¶¶ 169–70)

Davis alleges that his death sentence, which was based upon a non-unanimous jury recommendation, violates his Sixth Amendment right to a trial by jury, citing *Apprendi v. New Jersey*, 530 U.S. 466 (2000), in which the Supreme Court held that

any fact that increases a sentence beyond the statutory maximum must be proven to a jury beyond a reasonable doubt, and *Ring v. Arizona*, 536 U.S. 584 (2002), in which the Supreme Court addressed the implications of *Apprendi* regarding the use of mandatory minimum sentences, struck down a statute that conditioned the imposition of the death penalty on a judge's factual determinations about aggravating factors, and emphasized that such determinations must be made by a jury.

This claim is also procedurally barred from this Court's review because the state court dismissed it based upon an adequate and independent state procedural rule and Davis did not exhaust it in the state courts. More specifically, Davis did not raise this claim at trial or on direct appeal, even though *Apprendi* was handed down before the ACCA issued its opinion in Davis's direct appeal. Davis raised it for the first time in his Rule 32 petition. (Doc. 15-11 at ¶ 53). The Rule 32 Court found that it was procedurally defaulted from review because Davis could have but did not raise it at trial and on direct appeal, pursuant to Rules 32.2(a)(3) and (5) of the Alabama Rules of Criminal Procedure. (Doc. 15-71 at 183). The Rule 32 Court also noted that the Supreme Court had recently held that its holding in *Ring* was not to be applied retroactively to cases, like Davis's, that were already final, citing *Schriro v. Summerlin*, 542 U.S. 348 (2004). (Doc. 15-71 at 183). Davis did not raise this claim in any further appeals. Thus, because the last state court to render a reasoned

decision dismissed this claim based upon an adequate and independent state procedural rule, this Court cannot consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

Davis again argues that his appellate attorney's ineffectiveness in failing to raise this issue on direct appeal constitutes cause, which excuses the procedural default of the claim, citing *Ward*, 592 F.3d at 1157. For the reasons explained above, however, *Ward* is inapplicable here because Davis did not exhaust his appellate-attorney ineffective assistance of counsel claim in his Rule 32 proceedings, thus procedurally defaulting it as well. *See Ward*, 592 F.3d at 1157.

This claim is procedurally defaulted and due to be dismissed.

## M. Davis's Claim that the Trial Court's Failure to Disqualify the Prosecutor or Take Other Remedial Action to Cure the Taint of Prosecutorial Misconduct Violated Davis's Right to a Fair Trial (Doc. 1 at ¶¶ 171–73)

In Claim F, *supra*, Davis alleged that the prosecution engaged in misconduct that prejudiced him. In this claim, Davis alleges that the trial court's failure to disqualify the prosecutor or take measures to neutralize the prosecutor's misconduct violated his constitutional right to a fair trial. Davis asserts that attorney misconduct and violations of discovery rules that result in prejudice to the opposing party may warrant sanctions, including dismissing the indictment, granting a new trial, or disqualifying the prosecutor. In support, he cites *United States v. Morrison*, 449 U.S. 361, 362, 365 (1981), in which the Supreme Court explained that the proper

197

approach to a Sixth Amendment violation is to "identify and then neutralize the taint by tailoring relief appropriate in the circumstances to assure the defendant the effective assistance of counsel and a fair trial."

This claim is also procedurally barred from this Court's review because the state court dismissed it based upon an adequate and independent state procedural rule and Davis did not exhaust it in the state courts. Davis did not raise this claim at trial or on direct appeal. He raised it for the first time in his Rule 32 petition. (Doc. 15-11 at ¶¶ 57–58). The Rule 32 Court found that it was procedurally defaulted from review because Davis could have but did not raise it at trial and on direct appeal, pursuant to Rules 32.2(a)(3) and (5) of the Alabama Rules of Criminal Procedure. (Doc. 15-71 at 184). Davis did not appeal that ruling. Thus, because the last state court to render a reasoned decision dismissed this claim based upon an adequate and independent state procedural rule, this Court cannot consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

Davis again argues that his appellate attorney's ineffectiveness in failing to raise this claim on direct appeal constitutes cause to excuse the procedural default of this claim, citing *Ward*, 592 F.3d at 1157. For the reasons explained above, however, *Ward* is inapplicable here because Davis did not exhaust his appellate-attorney ineffective assistance of counsel claim in his Rule 32 proceedings, thus procedurally defaulting it as well. *See Ward*, 592 F.3d at 1157. The same rationale applies to

Davis's argument that the ineffective assistance of his trial counsel in failing to object to instances of prosecutorial misconduct during his trial demonstrates cause for his procedural default of this claim. As discussed in section VI.F., *supra*, Davis raised an ineffective assistance of trial counsel claim premised on counsel's failure to object to prosecutorial misconduct for the first time in this petition, and therefore, the claim is itself procedurally defaulted.

Accordingly, the cause and prejudice doctrine does not excuse the procedural default of this claim, and it is due to be dismissed.

## N. Davis's Claim that Misconduct by Jurors Deprived Him of His Rights to be Tried by an Impartial Jury, to Due Process, and to a Reliable Sentence (Doc. 1 at ¶¶ 174–78)

Davis alleges four separate instances of juror misconduct during his trial that he says prejudiced him and violated his constitutional rights.

First, he alleges that the jury's deliberations were tainted because a folder was discovered in the jury room that was labeled "1105-A" and contained a Narcotics and Intelligence Bureau report on Davis and his brother Princeton. (*Id*. at 175 (citing doc. 15-7 at 150–56)). As noted earlier in this opinion, upon discovery of the file by court staff, Davis's counsel immediately moved for a mistrial, but the trial court denied the motion after a hearing with the jury and upon learning that no one had opened or read the file. (*See* doc. 15-7 at 15–56). Davis argues that the trial court's failure to grant a mistrial on this issue violated his due process rights because, since

the file pertained to his past drug-related charges, it could have biased the jury during their deliberations.  In support, Davis cites *Lawson v. Borg*, 60 F.3d 608, 612 (9th Cir. 1995) ("Jury exposure to facts not in evidence deprives a defendant of the rights to confrontation, cross-examination, and assistance of counsel embodied in the Sixth Amendment.").

Davis's second allegation is that jurors discussed the case prior to commencement of their deliberations in violation of the trial court's instructions. Davis does not identify which jurors he says discussed the case prematurely before it was submitted to them, otherwise elaborate on this claim, or cite the record.  Third, Davis alleges that some jurors were not overly concerned about the penalty phase verdict because they were improperly informed that the trial court was authorized to override it.  Davis does not identify the jurors to whom he refers or cite the record. Fourth, Davis alleges that during *voir dire*, some jurors failed to accurately answer questions; some jurors failed to disclose their views on capital punishment; and some jurors failed to disclose that they had been victims of crimes.  Davis does not identify the jurors to whom he refers, but he argues that he was denied the right to have questions answered truthfully by prospective jurors in order to enable his counsel to exercise peremptory strikes.  In support, he cites *United States v. Perkins*, 748 F.2d 1519, 1529 (11th Cir. 1984).  Davis's failure to identify specific jurors or elaborate on specific facts relating to each such juror dooms these claims at the starting gate.

It's a race among horses with neither names nor riders.  And it wastes the court's time and resources.

Davis's first allegation about the narcotics file is procedurally barred from this Court's review because the state court dismissed it based upon an adequate and independent state procedural rule, and Davis did not exhaust it in the state courts. More specifically, Davis did not raise this issue on direct appeal.  When he raised it in his Rule 32 petition (*see* doc. 15-11 at ¶¶ 58–59), the Rule 32 Court found that it was procedurally defaulted from review because Davis could have but did not raise it on direct appeal, pursuant to Rules 32.2(a)(2) and (5) of the Alabama Rules of Criminal Procedure (doc. 15-71 at 185).  Davis did not appeal that ruling.  Thus, because the last state court to render a reasoned decision dismissed this claim based upon an adequate and independent state procedural rule, this Court cannot consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

The remaining three allegations are not only devoid of any factual basis, but also procedurally barred from review because the state court dismissed them based upon an adequate and independent state procedural rule and Davis did not exhaust them.  Davis did not raise these claims at trial or on direct appeal.  He raised them for the first time in his Rule 32 petition.  (Doc. 15-11 at ¶ 59).  The Rule 32 Court found that they were procedurally defaulted from review because Davis could have but did not raise them at trial or on direct appeal, pursuant to Rules 32.2(a)(3) and

(5) of the Alabama Rules of Criminal Procedure. (Doc. 15-71 at 185–86). Davis did not appeal that ruling. Thus, because the last state court to render a reasoned decision dismissed these claims based upon an adequate and independent state procedural rule, this Court cannot consider these claims on federal habeas review. *Ward*, 592 F.3d at 1156–57. Upon thorough review, it appears these horses have been deceased all along.

Relying upon *Ward*, 592 F.3d at 1157, Davis again argues that his trial counsel's failure to raise these dead claims at trial and his appellate counsel's failure to raise these claims on direct appeal constitute cause to excuse the procedural default of these claims. For the reasons explained above, however, *Ward* is inapplicable here because Davis's ineffective assistance claims are themselves procedurally defaulted. They are procedurally defaulted because Davis never raised a trial counsel ineffectiveness claim premised on this alleged failure in his Rule 32 proceedings, and although he presented an appellate counsel ineffectiveness claim in his Rule 32 petition, he failed to raise it on collateral appeal.

These claims are procedurally defaulted and due to be dismissed.

**O.    Davis's Claim that the Trial Court's Failure to Instruct the Jury on the Lesser Included Offense of Intentional Murder Rendered His Conviction and Sentence Unreliable in Violation of his Eighth and Fourteenth Amendment Rights (Doc. 1 at ¶¶ 179–83)**

Davis alleges that the trial court violated his constitutional rights by failing to instruct the jury that they could convict him of the lesser included offense of intentional murder rather than capital murder. Davis argues that the failure to instruct the jury on this lesser included offense violated *Beck v. Alabama*, in which the Supreme Court held that in capital cases, when the evidence supports a conviction on a lesser included offense, the jury must be instructed to consider that alternative. 447 U.S. 625, 627 (1980).[21]

---

[21]    As the following colloquy demonstrates, Davis's counsel actually told the trial court that he would not request a lesser included offense because it was not applicable, considering that Davis's defense was that he did not commit the murders:

| The Court: | Let me generally ask this question. Are you requesting any lesser included offenses on any of these charges? Quite frankly, it is hard for me to see how any would be applicable. You are contending he didn't do it. |
|---|---|
| Mr. Copeland: | Well, number one. Number two, if I request murder, it doesn't make sense because there are two murders. They happened sort of at the same time. I don't have anything to contest. So I don't know how I can request a lesser included, but I would like to reserve the right to keep thinking on it. |
| Mr. McNeill: | Judge, I can say Paul and I have talked about jury charges and lesser offenses for quite a while, and I am with him. I have told him I can't think of a single one either. I have tried a number of capital cases in front of you, and if it is there even remotely, I agree to go ahead and give it, but I can't think of a single one because the defendant says he wasn't there. |
| Mr. Copeland: | I would like to reserve the right with the Court if between now and the time you charge the jury I can come up with one that makes sense, that I would be allowed to present it on the Record at that time. Right now I don't see it. |

(Doc. 15-7 at 27–28).

This claim is procedurally barred from this Court's review because the state court dismissed it based upon an adequate and independent state procedural rule and Davis did not exhaust it. More specifically, Davis did not raise this claim at trial or on direct appeal. He raised it for the first time in his Rule 32 petition. (Doc. 15-11 at ¶¶ 59–60). The Rule 32 Court found that it was procedurally defaulted from review because Davis could have but did not raise it at trial or on direct appeal, pursuant to Rules 32.2(a)(2) and (5) of the Alabama Rules of Criminal Procedure. (Doc. 15-71 at 186–87). Davis did not appeal that ruling. Thus, because the last state court to render a reasoned decision dismissed this claim based upon an adequate and independent state procedural rule, this Court cannot consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

Relying upon *Ward*, 592 F.3d at 1157, Davis again argues that his trial counsel's failure to raise this claim at trial and his appellate counsel's failure to raise this claim on direct appeal constitute cause to excuse the procedural default of this claim. For the reasons explained above, however, *Ward* is inapplicable here because Davis's ineffective assistance claims are themselves procedurally defaulted. They are procedurally defaulted because Davis never raised a trial counsel ineffectiveness claim premised on this alleged failure in his Rule 32 proceedings, and although he presented an appellate counsel ineffectiveness claim in his Rule 32 petition, he failed

to raise it on collateral appeal.  In sum, this claim is procedurally defaulted and due to be dismissed.

**P.    Davis's Claim that the Prosecution Violated *Batson* (Doc. 1 at ¶¶ 184–85)**

Davis alleges that the prosecution used its preemptory strikes in a discriminatory manner to remove Black and female potential jurors, in violation of *Swain v. Alabama*, 380 U.S. 202 (1965); *Batson v. Kentucky,* 476 U.S. 79 (1986); *Powers v. Ohio,* 499 U.S. 400 (1991); *J.E.B. v. Alabama,* 511 U.S. 127 (1994); and the Sixth, Eighth, and Fourteenth Amendments.  Davis does not identify by name or juror number any potential jurors who were removed or otherwise elaborate on this claim.

This claim is procedurally barred from this Court's review because the state court dismissed it based upon an adequate and independent state procedural rule.  More specifically, Davis did not raise this claim at trial or on direct appeal.  He raised it for the first time in his Rule 32 petition.  (Doc. 15-11 at ¶¶ 61–62).  The Rule 32 Court found that it was procedurally defaulted from review because Davis could have but did not raise it at trial or on direct appeal, pursuant to Rules 32.2(a)(2) and (5) of the Alabama Rules of Criminal Procedure.  (Doc. 15-71 at 187).  Davis did not appeal that ruling.  Thus, because the last state court to render a reasoned decision dismissed this claim based upon an adequate and independent state procedural rule,

this Court cannot consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

Relying upon *Ward*, 592 F.3d at 1157, Davis again argues that his trial counsel's failure to raise this claim at trial and his appellate counsel's failure to raise this claim on direct appeal constitute cause to excuse the procedural default of this claim. For the reasons explained above, however, *Ward* is inapplicable here because Davis's ineffective assistance claims are themselves procedurally defaulted. They are procedurally defaulted because Davis never raised a trial counsel ineffectiveness claim premised on this alleged failure in his Rule 32 proceedings, and although he presented an appellate counsel ineffectiveness claim in his Rule 32 petition, he failed to raise it on collateral appeal.

This claim is procedurally defaulted and due to be dismissed.

**Q.    Davis's Claim that the Trial Court Misapplied an Aggravating Factor at Sentencing and as a Result His Sentence Violates His Rights Under the Sixth, Eighth, and Fourteenth Amendments (Doc. 1 at ¶¶ 186–88)**

Davis alleges that the trial court violated his constitutional rights by sentencing him to death based in part on the aggravating factor that he was under a sentence of imprisonment when he committed the murders pursuant to Ala. Code § 13A-5-49(1). Davis argues that he was not in fact under a sentence of imprisonment at the time of the murders. As noted previously in this opinion, the trial court found that the aggravator applied because Davis's probationary sentence on an earlier

conviction had not been completed at the time that he committed the murders.  More specifically, Davis's probation officer testified, and the trial court found, that Davis was sentenced to six months' probation on October 18, 1995; but that before he had completed his probationary term, he was arrested for drug distribution on April 5, 1996; and so when he committed the murders on November 29, 1996, he was still technically a probationer.  With no citation to the record, Davis now claims that he was *convicted* of Second Degree Criminal Mischief on September 26, 1995, placed on six months' probation until March 26, 1996, and that his probation was thus over before he was arrested on drug distribution charges on April 5, 1996.  He argues that the court was therefore without jurisdiction to declare him delinquent on April 16, 1996.

This claim is procedurally barred from this Court's review because the state court dismissed it based upon an adequate and independent state procedural rule and Davis did not exhaust it.  More specifically, Davis did not raise this claim at trial or on direct appeal.[22]  Davis raised this claim for the first time in his Rule 32 petition.  (Doc. 15-11 at ¶¶ 62–63).  The Rule 32 Court found that it was procedurally defaulted from review because Davis could have but did not raise it at trial or on

---

[22]    Davis's counsel argued at the penalty phase of his trial that the Alabama Legislature, in drafting the death penalty code, could not have intended that a "probation extended beyond term for administrative reasons on a misdemeanor" should be an aggravating circumstance warranting the death penalty.  (Doc. 15-7 at 161).  But his counsel did not argue that Davis was not a probationer at the time of the murders.  Rather, his counsel admitted that he was.  (*See* id. at 197 ("But I understand that it was tolled.")).

direct appeal, pursuant to Rules 32.2(a)(3) and (5) of the Alabama Rules of Criminal Procedure. (Doc. 15-71 at 187). Davis did not appeal that ruling. Thus, because the last state court to render a reasoned decision dismissed this claim based upon an adequate and independent state procedural rule, this Court cannot consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

Relying upon *Ward*, 592 F.3d at 1157, Davis again argues that his trial counsel's failure to raise this claim at trial and his appellate counsel's failure to raise this claim on direct appeal constitute cause to excuse the procedural default of this claim. For the reasons explained above, however, *Ward* is inapplicable here because Davis's ineffective assistance claims are themselves procedurally defaulted. They are procedurally defaulted because Davis never raised a trial counsel ineffectiveness claim premised on this alleged failure in his Rule 32 proceedings, and although he presented an appellate counsel ineffectiveness claim in his Rule 32 petition, he failed to raise it on collateral appeal.

This claim is procedurally defaulted and due to be dismissed.

**R.    Davis's Claim that the Trial Court Considered Improper Evidence in Determining Aggravating Factors and Disregarded a Valid Mitigating Factor and as a Result His Sentence Violates His Rights Under the Sixth, Eighth, and Fourteenth Amendments (Doc. 1 at ¶¶ 189–93)**

Davis makes two separate allegations in this claim. First, he alleges that when the trial court sentenced him to death, it impermissibly considered factors outside

208

the aggravating circumstances enumerated in Ala. Code § 13A-5-49 that may be considered in imposing a death sentence. (Doc. 1 at ¶ 189). In support, Davis cites the following statements in the "Conclusion" section of the trial court's Sentencing Order: "This Court cannot erase from its mind the callousness and the utter disregard for life Davis exhibited in committing this crime. . . . A colder more callous crime is hard to imagine. Davis took pleasure in taking another person's life." (*Id.* (citing doc. 15-1 at 174)). Davis contends that these statements indicate that the trial court gave weight to its subjective impressions of the crimes and sentenced him to death for reasons not contained in the statute. (*Id.* at ¶ 190). Davis further asserts that the trial court's subjective impressions had no basis in the record and that no evidence was ever presented that Davis took pleasure in taking another's life or that the crime was particularly cold or callous. (*Id.*).

This claim is procedurally barred from this Court's review because the state court dismissed it based upon an adequate and independent state procedural rule. More specifically, Davis did not raise this claim at trial or on direct appeal. He raised it for the first time in his Rule 32 petition. (Doc. 15-11 at ¶¶ 63–64). The Rule 32 Court found that it was procedurally defaulted from review because Davis could have but did not raise it at trial, pursuant to Ala. R. Crim. P. 32.2(a)(3), and because it was addressed on direct appeal, pursuant to Ala. R. Crim. P. 32.2(a)(5), citing

*Davis*, 804 So. 2d at 1164.  (Doc. 15-71 at 188).[23]  Davis did not appeal that ruling. Thus, because the last state court to render a reasoned decision dismissed this claim based upon an adequate and independent state procedural rule, this Court cannot consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

Davis's second allegation within this section is that the trial court declined to find the existence of the statutory mitigating circumstance that Davis had no significant criminal history.  (Doc. 1 at ¶ 191).  In its Sentencing Order, the trial court found that this circumstance did not exist because "Davis was involved in the distribution of marijuana and was on probation at the time he committed the offense." (Doc. 15-1 at 173).  The trial court's order also referred to Davis's "drug operation." (*Id.*).  Davis contends that only *convictions* may be considered in negating the application of this statutory mitigating circumstance.  (Doc. 1 at ¶ 192). Davis argues that since his involvement in the distribution of marijuana and his purported status as a probationer were not convictions, they were insufficient to disprove this mitigating factor under Alabama law.  (*Id.*).

---

[23]    In finding that the issue was addressed on appeal, the Rule 32 Court likely referred to the fact that, although Davis did not raise this issue on direct appeal, the ACCA noted in its opinion on direct appeal that it was required to review the propriety of Davis's death sentence and examine the record for plain error. *See Davis*, 804 So. 2d at 1163.  After quoting the portion of the trial court's Sentencing Order wherein the trial court weighed the aggravating and mitigating circumstances and sentenced Davis to death, the ACCA concluded that the trial court's findings were supported by the record. *Id*. at 1164.

This claim is also procedurally barred from this Court's review because the state court dismissed it based upon an adequate and independent state procedural rule. More specifically, Davis did not raise this claim at trial or on direct appeal. He raised it for the first time in his Rule 32 petition. (Doc. 15-11 at ¶¶ 62–63). The Rule 32 Court found that it was procedurally defaulted from review because Davis could have but did not raise it at trial or on direct appeal, pursuant to Rules 32.2(a)(3) and (5) of the Alabama Rules of Criminal Procedure. (Doc. 15-71 at 187). Davis did not appeal that ruling. Thus, because the last state court to render a reasoned decision dismissed this claim based upon an adequate and independent state procedural rule, this Court cannot consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

Relying upon *Ward*, 592 F.3d at 1157, Davis again argues that his trial counsel's failure to raise this claim at trial and his appellate counsel's failure to raise this claim on direct appeal constitute cause to excuse the procedural default of this claim. For the reasons explained above, however, *Ward* is inapplicable here because Davis's ineffective assistance claims are themselves procedurally defaulted. They are procedurally defaulted because Davis never raised a trial counsel ineffectiveness claim premised on this alleged failure in his Rule 32 proceedings, and although he presented an appellate counsel ineffectiveness claim in his Rule 32 petition, he failed to raise it on collateral appeal.

211

This claim is procedurally defaulted and due to be dismissed.

**S.    Davis's Claim that the Trial Court Deprived Him of His Fifth, Sixth, Eighth, and Fourteenth Amendment Rights by Allowing the State to Present Hearsay Testimony (Doc. 1 at ¶ 194)**

Davis alleges that the trial court erroneously allowed the prosecution to present hearsay testimony from Jointer, Smith, Boswell, Sr., Det. Cunningham, and Det. Naquin.  Davis argues that the hearsay testimony violated his Fifth, Sixth, Eighth, and Fourteenth Amendment rights, citing *Crawford v. Washington*, 541 U. S. 36, 68 (2004) ("Where testimonial evidence is at issue [] the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.").

This claim is procedurally barred from this Court's review because the state court dismissed it based upon an adequate and independent state procedural rule. More specifically, Davis did not raise this claim at trial or on direct appeal.  He raised it for the first time in his Rule 32 petition.  (Doc. 15-11 at ¶ 64).  The Rule 32 Court found that it was procedurally defaulted from review because Davis could have but did not raise it at trial or on direct appeal, pursuant to Rules 32.2(a)(3) and (5) of the Alabama Rules of Criminal Procedure.  (Doc. 15-71 at 188–89).  Davis did not appeal that ruling.  Thus, because the last state court to render a reasoned decision dismissed this claim based upon an adequate and independent state procedural rule,

this Court cannot consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

Relying upon *Ward*, 592 F.3d at 1157, Davis again argues that his trial counsel's failure to raise this claim at trial and his appellate counsel's failure to raise this claim on direct appeal constitute cause to excuse the procedural default of this claim. For the reasons explained above, however, *Ward* is inapplicable here because Davis's ineffective assistance claims are themselves procedurally defaulted. They are procedurally defaulted because Davis never raised a trial counsel ineffectiveness claim premised on this alleged failure in his Rule 32 proceedings, and although he presented an appellate counsel ineffectiveness claim in his Rule 32 petition, he failed to raise it on collateral appeal.

This claim is procedurally defaulted and due to be dismissed.

**T.    Davis's Claim that the Trial Court's Jury Instructions Deprived Him of his Fifth, Sixth, Eighth and Fourteenth Amendment Rights (Doc. 1 at ¶¶ 195–200)**

Davis alleges that the trial court misstated the law in its jury instructions in several instances. He argues that these errors violated his constitutional rights to due process and a fair trial.

First, Davis alleges that the trial court incorrectly defined reasonable doubt by instructing the jury that reasonable doubt must not be "possible" but "actual"; that it must not be "vague" but "reasonable"; and that it does not include "all doubt" but

only "doubt for which a reason can be given." (Doc. 1 at ¶ 196 (quoting doc. 15-7 at 117–18)).[24] Davis argues that the trial court's reasonable doubt definition lessened the State's burden of proving each element of the crimes charged beyond a reasonable doubt, in violation of his constitutional rights to due process and a fair trial. In support, he cites *Cage v. Louisiana*, 498 U.S. 39 (1990), in which the Supreme Court held that the trial court's definition of reasonable doubt violated the defendant's due process rights because it "equated a reasonable doubt with a 'grave uncertainty' and an 'actual substantial doubt,' and stated that what was required was

---

[24]    The trial court's full instruction on reasonable doubt was as follows:

Before a conviction can be had, the State must satisfy you of the defendant's guilt beyond a reasonable doubt.

What is a doubt which would justify an acquittal? A doubt which would justify an acquittal must be an actual doubt, not just a mere possible doubt. A reasonable doubt is not a mere guess or surmise, and it is not a capricious doubt.

If after considering all of the evidence in this case you have an abiding conviction for the truth of the charge, then you are convinced beyond a reasonable doubt, and it would be your duty to find the defendant guilty. On the other hand, evidence which merely gives rise to a surmise, conjecture or suspicion of guilt is not sufficient in order to base a conviction upon it. The reasonable doubt which entitles an accused to an acquittal is not a mere fanciful, vague, conjectural, or speculative doubt, but a reasonable doubt arising from the evidence, the lack of evidence, or a conflict in the evidence and remaining after a careful consideration of the testimony such as reasonable, fair-minded, conscientious men and women would entertain under all the circumstances.

The State is not required to convince you of the defendant's guilt beyond all doubt, but simply beyond a reasonable doubt, and beyond a reasonable doubt means a doubt for which a reason can be given.

(Doc. 15-7 at 117–18).

a 'moral certainty' that the defendant was guilty." 498 U.S. at 40. The Supreme Court reasoned that such an instruction was unconstitutional because it suggested that a higher degree of doubt was required to acquit. *Id*.

Second, Davis alleges that the trial court incorrectly instructed the jury that the intent to kill could be inferred from the use of a deadly weapon. (Doc. 1 at ¶ 197 (quoting doc. 15-7 at 137)).[25] Davis argues that the trial court's intent instruction shifted the burden of proving intent from the State to him and deprived him of the right to have the jury make the finding of his intent beyond a reasonable doubt. In support, he cites *Sandstrom v. Montana*, 442 U.S. 510 (1979), in which the Supreme Court considered the constitutionality of a guilt-phase jury instruction which stated: "the law presumes that a person intends the ordinary consequences of his voluntary

---

[25]    The trial court's full instruction on intent was as follows:

Every killing is unlawful unless excused or justified by the law.

A person acts intentionally when his purpose is to cause a specific result.

You may infer that a person intends the natural consequences of what he does if the act is done intentionally.

Intent to kill can be inferred from the use of a deadly weapon.

A pistol is a deadly weapon.

Intent may be shown from all of the evidentiary circumstances which tend to shed light on the intent of the defendant. You may consider the defendant's conduct and demeanor immediately after the crime and his statements to aid you in characterizing the defendant's conduct.

(Doc. 15-7 at 137).

acts." *Id.* at 515.    The Supreme Court held that the instruction violated the defendant's due process rights because the jury was not told that the presumption could be rebutted. *Id.* at 517.

Third, Davis alleges that the trial court incorrectly told the jury that the only difference among the Indictment's three charges of capital murder was that they were "stated in different ways."  (Doc. 1 at ¶ 198 (quoting doc. 15-7 at 122)).  Davis argues that this description prejudiced him because each charge was different.[26]

Fourth, Davis alleges that during the penalty phase, the trial court misstated the law concerning aggravating and mitigating circumstances.  (Doc. 1 at ¶¶ 199–200) (quoting doc. 15-8 at 35–36)).  Davis quotes the following portion of the trial court's instruction at the conclusion of the penalty phase:

> If after full and fair consideration of all the evidence in this case, you are convinced beyond a reasonable doubt that at least one aggravating circumstance does exist and you are convinced that the aggravating circumstance outweighs the mitigating circumstance, then in that event your verdict would read as follows: We, the jury, recommend that the defendant, Melvin Davis, be punished by death. . .
>
> However, if after a full and fair consideration of all of the evidence in this case you determine that the mitigating circumstances

---

[26]    The trial court's full instruction regarding the charges in the Indictment was thorough and detailed.  The trial court explained to the jury the differences among each of the five counts of the Indictment and the elements that the State was required to prove for each count.  The trial court explained that Count I charged capital murder because two or more persons were murdered pursuant to one scheme or course of conduct and that Counts II and III charged capital murders because they were committed during the course of a Burglary in the First Degree.  The trial court further explained that Count II concerned the victim, John Bradley, and that Count III concerned the victim, Timothy Ray, and that is why there were separate counts.  (Doc. 15-7 at 122–32).

outweigh any aggravating circumstance that exists or that the State has failed to prove that an aggravating circumstance exists beyond a reasonable doubt, then in that event your verdict would be, We, the jury, recommend that the defendant, Melvin Davis, be punished by imprisonment for life without parole.

(Doc. 15-8 at 35–36). Davis argues that these instructions shifted the burden to Davis to prove that the mitigating circumstances outweighed the aggravating circumstances, and that such an instruction is unconstitutional because it "create[s] the risk that the death penalty will be imposed in spite of factors which would call for a less severe penalty," quoting *Sumner v. Shuman*, 483 U.S. 66, 70 (1987). (*Id.* at ¶ 200).

These claims are procedurally barred from this Court's review because the state court dismissed them based upon an adequate and independent state procedural rule and Davis did not exhaust them. More specifically, Davis did not raise these claims at trial or on direct appeal. He raised them for the first time in his Rule 32 petition. (Doc. 15-11 at ¶¶ 65–67). The Rule 32 Court found that they were procedurally defaulted from review because Davis could have but did not raise them at trial or on direct appeal, pursuant to Rules 32.2(a)(3) and (5) of the Alabama Rules of Criminal Procedure. (Doc. 15-71 at 188–89). Davis did not appeal that ruling. Thus, because the last state court to render a reasoned decision dismissed these claims based upon an adequate and independent state procedural rule, this Court cannot consider these claims on federal habeas review. *Ward*, 592 F.3d at 1156–57.

217

Relying upon *Ward*, 592 F.3d at 1157, Davis again argues that his trial counsel's failure to raise this claim at trial and his appellate counsel's failure to raise this claim on direct appeal constitute cause to excuse the procedural default of this claim. For the reasons explained above, however, *Ward* is inapplicable here because Davis's ineffective assistance claims are themselves procedurally defaulted. They are procedurally defaulted because Davis never raised a trial counsel ineffectiveness claim premised on this alleged failure in his Rule 32 proceedings, and although he presented an appellate counsel ineffectiveness claim in his Rule 32 petition, he failed to raise it on collateral appeal.

This claim is procedurally defaulted and due to be dismissed.

## U. Davis's Claim that His Sentences for Conspiracy to Commit Murder and Attempted Murder Violated *Apprendi* (Doc. 1 at ¶¶ 201–03)

Davis alleges that the trial court's enhancement of his sentences for conspiracy to commit murder and attempted murder from 20 years to 99 years based on his use of a gun pursuant to Ala. Code § 13A-5-6(a)(6) was unconstitutional because it violated *Apprendi*, 530 U.S. at 490. (Doc. 1 at 202 (citing doc. 15-8 at 73)). Davis argues that the jury never found beyond a reasonable doubt that a gun was used in those crimes. Therefore, he contends that the enhancement of those two sentences violated his constitutional right to have "any fact that increases the penalty

for a crime beyond the prescribed statutory maximum . . . submitted to a jury, and proved beyond a reasonable doubt." *Apprendi*, 530 U.S. at 490.

This claim is procedurally barred from this Court's review because the state court dismissed it based upon an adequate and independent state procedural rule. More specifically, Davis did not raise this claim at trial or on direct appeal. He raised it for the first time in his Rule 32 petition. (Doc. 15-11 at ¶¶ 67–68). The Rule 32 Court found that it was procedurally defaulted from review because Davis could have but did not raise it at trial or on direct appeal, pursuant to Rules 32.2(a)(3) and (5) of the Alabama Rules of Criminal Procedure. (Doc. 15-71 at 189). Davis did not appeal that ruling. Thus, because the last state court to render a reasoned decision dismissed this claim based upon an adequate and independent state procedural rule, this Court cannot consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

Relying upon *Ward*, 592 F.3d at 1157, Davis again argues that his trial counsel's failure to raise this claim at trial and his appellate counsel's failure to raise this claim on direct appeal constitute cause to excuse the procedural default of this claim. For the reasons explained above, however, *Ward* is inapplicable here because Davis's ineffective assistance claims are themselves procedurally defaulted. They are procedurally defaulted because Davis never raised a trial counsel ineffectiveness claim premised on this alleged failure in his Rule 32 proceedings, and although he

presented an appellate counsel ineffectiveness claim in his Rule 32 petition, he failed to raise it on collateral appeal.

This claim is procedurally defaulted and due to be dismissed.

## V.    Davis's Claim that the State's Introduction of Crime Scene and Autopsy Photographs Denied Him the Right to a Fair Trial (Doc. 1 at ¶¶ 204–08)

Davis alleges that he was denied a fair trial because the trial court admitted, over his repeated objections, crime scene and autopsy photographs of the victims' gunshot wounds. Davis points out that his counsel offered to stipulate to the identity of the victims and to the nature of their injuries to preclude the State from introducing the photographs but that the State did not agree to his proposed stipulation. (Doc. 1 at ¶ 206 (citing doc. 15-4 at 113–14; doc. 15-5 at 25–27, 109–12, 126, 135–37; doc. 15-6 at 189)). Davis argues that the only value of the photographs was to illustrate the type and place of each wound, which was information to which he offered to stipulate, and that the graphic images prejudiced his defense. Davis contends that a defendant's offer to stipulate should be a consideration when a trial court is determining the probative value of evidence, citing *Old Chief v. United States*, 519 U.S. 172, 174, 180–92 (1997), and *Estelle*, 502 U.S. at 70. He also relies upon *Gregg v. Georgia*, 428 U.S. 153, 195 (1976), and *Furman v. Georgia*, 408 U.S. 238 (1972), for the proposition that the constitutionality of the death penalty depends on the exclusion of arbitrariness in the process.

Although Respondent contends that Davis exhausted this allegation on direct appeal and states that the ACCA's decision is thus subject to a reasonableness review by this Court under 28 U.S.C. § 2254(d), the Court does not agree. A careful review of the record reveals that this allegation is procedurally defaulted from this Court's review because Davis did not fully exhaust it on direct appeal and because the Rule 32 Court dismissed it based upon an adequate and independent state procedural rule.

More specifically, Davis argued on direct appeal that the trial court abused its discretion in admitting the photographs because they were prejudicial, but he based his argument entirely on state law and did not argue that this error amounted to a violation of his constitutional due process rights. (*See* doc. 15-9 at 15–17). The ACCA held on direct appeal that the trial court did not err in admitting the photographs under Alabama's evidentiary rules, reasoning:

> The appellant argues that the trial court erred in admitting into evidence crime-scene photographs and autopsy photographs of the victims because, he says, the prejudicial effect of the photographs outweighed their probative value. In support of his argument, he contends that the photographs were unnecessary because, at trial, he, through defense counsel, offered to stipulate to the following facts: the number of people killed, the names of the victims, the causes of death, and the location of the shootings.

> The record indicates that during the trial, when the State attempted to admit into evidence the photographs of the two deceased victims, defense counsel made the following objection:

> "[Defense Counsel]: Judge, as the record will indicate, earlier I made a general objection to the production of such things as autopsy photos. And Your Honor invited me to renew those

objections at the time they were offered. I am doing so now. My objection is based on two grounds. Number one, the pictures which presumably are being offered for identification are pictures that are unnecessarily gruesome by their very nature and really are not being offered for identification. I specifically refer to picture number 10. This hardly would be, in my opinion and upon my argument, that hardly would be the picture I would show someone to see if they knew what they looked like. Moreover, Your Honor, we would be perfectly willing to stipulate that these two men are the victims, that they were shot, that they were shot however many times the evidence says they were shot, that they were shot with whatever bullet was pulled from their body, [and that] the cause of the death was the shooting. We are not contesting a single question about the crime scene. So their relevance, Your Honor, which relevance requires admissibility on the grounds that the offered information tends to prove a material fact. There is no material fact that's proved that we are not willing to stipulate to. So, therefore, their effect, in addition to being more prejudicial than probative, is cumulative. And, moreover, on the second argument of relevance, unless it tends to connect in this case this defendant to this crime, it is irrelevant. They may as well be showing the first 20 minutes of [Saving] Private Ryan, because we are not saying this didn't happen, and it didn't happen the way [the prosecutor] described it."

The record indicates that the trial court overruled defense counsel's objection and allowed the State to present 20 photographs of the deceased victims. The photographs consisted of identification photographs of the victims and photographs displaying some, but not all, of the gunshot wounds they suffered. Some photographs displayed only shell casings lying on the floor of the house.

The ultimate question in determining the admissibility of photographs of victims, as with all demonstrative evidence, is:

"Whether it has a reasonable tendency to prove or disprove some material fact in issue. This decision is left largely to the sound discretion of the trial judge. Of course, the decision of the trial

judge is not necessarily final since his decision is reviewable to determine if there has been an abuse of discretion."

C. Gamble, *McElroy's Alabama Evidence*, § 207.01(2) (5th. ed. 1996) (footnotes omitted).

> "In *Johnson v. State*, 620 So. 2d 679, 692 (Ala. Cr. App. 1992), rev'd on other grounds, 620 So. 2d 709 (Ala. 1993), cert. denied, 510 U.S. 905, 114 S. Ct. 285, 126 L.Ed.2d 235 (1993), the appellant argued that grossly inflammatory photographs should not have been allowed into evidence at the guilt and penalty stages of the trial. In holding that the photographs were admissible at both stages, this court stated:

>> "'We have reviewed the challenged photographs and, although they are not pleasant to look at, we conclude that the trial court did not err in admitting them at either stage of the proceedings.

>> "'"[P]hotographs that show the external wounds of a deceased victim are admissible even though the evidence is gruesome and cumulative and relates to undisputed matters." *Ex parte Siebert*, 555 So. 2d 780, 783 (Ala. 1989), cert. denied, 497 U.S. 1032, 110 S. Ct. 3297, 111 L.Ed.2d 806 (1990). *See also Ex parte Bankhead*, 585 So. 2d 112 (Ala. 1991). "[P]hotographic evidence, if relevant, is admissible even if it has a tendency to inflame the minds of the jurors." *Ex parte Siebert* at 784. *See also Ex parte Bankhead*. We find no error in the trial court's admission of the photographs at the guilt phase of the trial. *See, e.g., Smith v. State*, 581 So. 2d 497 (Ala. Crim. App. 1990), rev'd on other grounds, 581 So. 2d 531 (Ala. 1991) (photographs of victim's decomposed and bloated body properly admitted); *Dabbs v. State*, 518 So. 2d 825 (Ala. Crim. App. 1987) (photographs of victim's head injuries taken during autopsy were gruesome but necessary to demonstrate extent of injuries); *Hamilton v. State*, 492 So. 2d 331 (Ala. Crim. App. 1986) (photograph of deceased's exposed scalp properly admitted into evidence.)'"

*Boyd v. State*, 715 So. 2d 825, 833 (Ala. Crim. App. 1997). . . .

>        Here, although the appellant argues that he "would have"
> stipulated to the facts underlying the photographs, and that so
> stipulating, he argues, would have eliminated any necessity for the
> introducing the photographs, there is no indication from the record that
> such a stipulation between the State and defense counsel occurred.
> Additionally, because the photographs were relevant to show not only
> the location and details of the offense, but also the extent of the victims'
> injuries as well as the heinous manner in which those injuries were
> inflicted, they were properly admitted into evidence. Moreover, the
> photographs were illustrative of the testimony of a number of witnesses.
> Thus, the trial court did not abuse its discretion in admitting the
> photographs into evidence.

*Davis*, 804 So. 2d at 1156–58 (footnote and some citations omitted). As the

foregoing demonstrates, the ACCA's analysis was based entirely upon state law.

Davis pursued the argument that the photographs were prejudicial in his petition for

a writ of certiorari in the Alabama Supreme Court (*see* doc. 15-10 at 3–4), but the

court denied the petition without an opinion, *see Davis*, No. 1001023.

Davis's petition for a writ of certiorari in the United States Supreme Court is

the first time that he incorporated a constitutional due process violation into this

claim. In that petition, he stated the issue as follows: "When does the admission of

inflammatory photographic evidence—rendered entirely cumulative by a capital

defendant's offer to stipulate to the undisputed and straightforward underlying facts

conveyed by the evidence—constitute a due process violation?" (Doc. 15-10 at

101). In response, the State argued that the United States Supreme Court should

deny the petition for certiorari because Davis had not raised this constitutional due

process claim thus far in the Alabama courts. (*See id.* at 154–55). On November 13, 2001, the United States Supreme Court denied Davis's petition for a writ of certiorari without an opinion. *Davis*, 534 U.S. 1024.

Davis raised the due process claim again in his Rule 32 Petition. (Doc. 15-11 at ¶¶ 68–69). The Rule 32 Court dismissed the claim as procedurally barred on the grounds that it had already been raised and addressed at trial and on direct appeal pursuant to Rules 32.2(a)(2) and 32.2(a)(4) of the Alabama Rules of Criminal Procedure. (Doc. 15-71 at 189–90). The Rule 32 Court so held even though Davis relied solely on Alabama law at trial and on direct appeal (at least until his petition for certiorari in the United States Supreme Court). In any event, when Davis appealed the Rule 32 Court's order to the ACCA, he did not reassert this claim.

As a result, Davis has not met the exhaustion requirement of 28 U.S.C. § 2254(b)(1) because Davis did not fully exhaust the *constitutional* claim by giving the state courts the opportunity to consider it through "one complete round of the State's established appellate review process." *O'Sullivan*, 526 U.S. at 845. Specifically, Davis did not raise the constitutional claim during the direct appeal process until his petition for a writ of certiorari in the United States Supreme Court. He raised it again in his Rule 32 petition, but he failed to raise the claim on collateral appeal. And although Davis argued at trial, on direct appeal, and in his petition to the Alabama Supreme Court that the photos were more prejudicial than probative,

that argument was based upon Alabama evidentiary rules and was not the same constitutional claim that he presents here. *See Pope*, 680 F.3d at 1286 ("[A]n issue is exhausted if 'the reasonable reader would understand [the] [federal] claim's particular legal basis and specific factual foundation' to be the same as it was presented in state court."); *see also O'Sullivan*, 526 U.S. at 848 (where a petitioner has not "properly presented his claims to the state courts," the petitioner will have "procedurally defaulted his claims" in federal court). He is thus procedurally barred from raising this constitutional claim in a federal habeas petition. *See O'Sullivan*, 526 U.S. at 845; *Pope*, 680 F.3d at 1286, *Ward*, 592 F.3d at 1156.

Dismissal of his habeas petition to allow Davis to present this claim as a federal claim in state court now would be futile because he would be barred from raising it in state court under Ala. R. Crim. P. 32.2(c) (statute of limitations bar) and Ala. R. Crim. P. 32.2(b) (successive petition bar). Thus, because any state remedy with respect to this claim is procedurally barred by these state procedural rules, Davis's claim is procedurally defaulted from habeas review.

Although Respondent has not identified this claim as procedurally defaulted in his briefs to this Court, Respondent has also not made an express waiver of the exhaustion requirement. *See* 28 U.S.C. § 2254(b)(3) (requiring the waiver to be expressly stated); *Dill*, 371 F.3d at 1302 n.1 (stating that the AEDPA requires a court to address exhaustion when it is not expressly waived by the State). Thus, because

Davis has failed to properly exhaust this claim, Respondent has not expressly waived that failure to exhaust, and this claim could no longer be brought in state court if this Court dismissed Davis's petition to return to state court, this claim is procedurally barred. *See McNair*, 416 F.3d at 1304–05 (holding the same in a case where the respondent did not expressly waive exhaustion).

**W.   Davis's Claim that the State Failed to Meet Its Burden of Proving All Elements of the Capital Murder Offenses in Violation of His Rights to Due Process and a Fair Trial (Doc. 1 at ¶¶ 209–10)**

Davis raises two distinct claims here: that the State failed to prove that a burglary occurred, which was required for two of the capital murder charges, and that the State failed to prove that Davis was under a sentence of imprisonment when the murders occurred, which was required for one of the death penalty aggravating circumstances to apply.  Davis argues that the State's failure to meet its burden of proof deprived him of his rights to due process and a fair trial.  In support, Davis cites *In re Winship*, 397 U.S. 358, 364 (1970) ("Lest there remain any doubt about the constitutional stature of the reasonable-doubt standard, we explicitly hold that the Due Process Clause protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged.").

First, taking Davis's claim that the State failed to prove that a burglary occurred, although Respondent contends that Davis exhausted this allegation on

direct appeal and states that the ACCA's decision is thus subject to a reasonableness review by this Court under 28 U.S.C. § 2254(d), the Court does not agree. A careful review of the record reveals that this allegation is procedurally defaulted from this Court's review because the Rule 32 Court dismissed it based upon an adequate and independent state procedural rule. More specifically, Davis did not raise a constitutional argument with respect to this claim at trial or on direct appeal. Rather, he based this claim purely on state law. Specifically, at the close of the State's case-in-chief during the guilt phase, Davis moved to dismiss the two counts charging murder committed during a burglary on the ground that the State had failed to prove a "breaking and entering." (Doc. 15-7 at 23–24).

After hearing the arguments of counsel, the trial court denied the motion. (*Id.* at 27). On direct appeal, Davis argued to the ACCA that he should not have been found guilty of murder committed during a burglary because the State failed to prove that he either unlawfully entered the residence or remained unlawfully in the residence after being allowed inside initially. (Doc. 15-9 at 18–20). At oral argument, Davis argued for the first time that the trial court failed to instruct the jury as to how one unlawfully enters or unlawfully remains pursuant to the burglary statute. The ACCA allowed Davis to file a supplemental brief on this issue. The ACCA ultimately rejected these claims on direct appeal, holding that the State had sufficiently proved that there was a burglary because, even though Davis was

allowed entry into the dwelling, he remained unlawfully with the intent to commit a crime therein, pursuant to Ala. Code § 13A-7-1(4). *Davis*, 804 So. 2d at 1159–60. The ACCA's analysis was based entirely upon Alabama law, and it did not discuss a constitutional violation. *See id.*

For the first time in his Rule 32 petition, Davis argued that the State's failure to prove the element of the capital murder charge that a burglary occurred deprived him of his rights to due process and a fair trial. (Doc. 15-11 at ¶¶ 69–70). The Rule 32 Court dismissed the claim as procedurally barred on the grounds that it was raised and addressed at trial and raised and addressed on direct appeal pursuant to Rules 32.2(a)(2) and 32.2(a)(4) of the Alabama Rules of Criminal Procedure. (Doc. 15-71 at 190). The Rule 32 Court so held even though Davis relied solely on Alabama law at trial and direct appeal and neither the trial court nor the ACCA considered the merits of an alleged constitutional violation. In any event, when Davis appealed the Rule 32 Court's order to the ACCA, he did not reassert this claim. Thus, because the last state court to render a reasoned decision on the *constitutional* claim dismissed this claim based upon an adequate and independent state procedural rule, this Court cannot consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

Although Respondent has not identified this claim as procedurally defaulted in his briefs to this Court, Respondent has also not made an express waiver of the

exhaustion requirement. *See* 28 U.S.C. § 2254(b)(3) (requiring the waiver to be expressly stated); *Dill*, 371 F.3d at 1302 n.1 (stating that the AEDPA requires a court to address exhaustion when it is not expressly waived by the State).  Thus, the Court will not consider the claim because the state court dismissed the *constitutional* claim based upon an adequate and independent state procedural rule, it is procedurally barred from this Court's review, and Respondent has not expressly waived the procedural default. *See McNair*, 416 F.3d at 1304–05 (holding the same in a case where the respondent did not expressly waive exhaustion).

Turning to Davis's claim that the State did not prove that he was under a sentence of imprisonment when the murders occurred, the claim is also procedurally barred from this Court's review because the state courts dismissed it based upon an adequate and independent state procedural rule.  Davis did not raise this constitutional claim at trial or on direct appeal.[27]  He raised it for the first time in his Rule 32 petition.  (Doc. 15-11 at ¶¶ 69–70).  The Rule 32 Court found that it was procedurally defaulted from review because Davis could have but did not raise it at trial or on direct appeal, pursuant to Rules 32.2(a)(3) and (5) of the Alabama Rules of Criminal Procedure.  (Doc. 15-71 at 190–91).  Davis did not appeal that ruling.

---

[27]    Davis did not raise this specific issue—concerning whether his probationary term had already concluded at the time that he was arrested on drug distribution charges—at trial or on appeal.  At the penalty phase of his trial, Davis argued that probation should not constitute imprisonment for the aggravating circumstance to apply.  But Davis's counsel admitted that Davis was on probation and that it was tolled.  (Doc. 15-7 at 161, 197).

Thus, because the last state court to render a reasoned decision dismissed this claim based upon an adequate and independent state procedural rule, this Court cannot consider this claim on federal habeas review. *Ward*, 592 F.3d at 1156–57.

Davis again argues that his appellate attorney's ineffectiveness in failing to raise these issues on direct appeal constitutes cause, which excuses the procedural default of the claims, and that he was actually prejudiced by the introduction of the evidence, citing *Ward*, 592 F.3d at 1157. For the reasons explained above, however, *Ward* is inapplicable here because Davis did not exhaust his appellate-attorney ineffective assistance of counsel claim in his Rule 32 proceedings, thus procedurally defaulting it as well. *See Ward*, 592 F.3d at 1157. Nor does Davis's claim that the ineffective assistance of his trial counsel in failing to raise the issue during his trial demonstrate cause for his procedural default of this claim. Davis has not cited any relevant ineffective assistance of counsel claim that he raised in either the state courts or in this habeas petition.

These claims are procedurally defaulted and due to be dismissed.

## Y.    Davis's Claims of Ineffective Assistance of Appellate Counsel (Doc. 1 at ¶¶ 211–15)

The right to the effective assistance of counsel applies to both trial and appellate counsel. *Evitts v. Lucey*, 469 U.S. 387, 396–97 (1985). The *Strickland* test for ineffective assistance of trial counsel also applies to appellate counsel. *See Smith*

*v. Robbins*, 528 U.S. 259, 289 (2000); *Johnson v. Alabama*, 256 F.3d 1156, 1187 (11th Cir. 2001).

Davis's final claim is that he was denied effective assistance of counsel on direct appeal, and he sets forth 20 separate and distinct instances in which he claims that his appellate counsel was constitutionally ineffective. Davis alleges first that his appellate counsel did not consult or communicate with Davis in preparing his appeal and complains that his fee declaration shows that he spent only eight hours working on his appeal. (Doc. 1 at ¶ 211). Davis specifically alleges that his appellate counsel: (1) failed to move to supplement the record to show the race and gender composition of the jury venire and the race and gender of each venireperson that the prosecution struck; (2) ineffectively litigated the issue of the trial court's admission of the crime scene and autopsy photographs; (3) ineffectively litigated the issue of whether the State proved that Davis committed a burglary; 4) failed to appeal the trial court's admission of evidence concerning his *nolle prossed* drug distribution case; 5) failed to appeal the trial court's denial of his motion to strike potential jurors for cause; 6) failed to appeal the trial court's grant of the State's motion to strike potential jurors for cause; 7) failed to appeal the trial court's admission of testimony concerning his brother Princeton Davis's drug activity; 8) failed to appeal the trial court's admission of Cpl. Drummond's testimony concerning a drug action that he did not actually witness; 9) failed to appeal the trial court's admission of Dunn's

testimony; 10) failed to appeal the trial court's refusal to allow Davis to present certain exculpatory and impeachment evidence; 11) failed to appeal the trial court's refusal to instruct the jury on lesser included offenses to capital murder; 12) failed to appeal the trial court's denial of his motions for a continuance of the trial; 13) failed to raise a *Brady* claim; 14) failed to raise the claim that Davis's absence during the hearing on his motion for a mistrial violated his constitutional rights; 15) failed to raise claims of prosecutorial misconduct; 16) failed to raise a *Batson* claim; 17) failed to challenge the aggravating circumstances; 18) failed to raise the claim that the trial court improperly determined the existence of aggravating and mitigating circumstances in sentencing Davis to death; 19) failed to raise a claim that hearsay evidence was improperly admitted; 20) failed to raise a claim that the jury instructions were improper; and 21) failed to raise a claim that the State did not meet its burden of proving all elements of the offenses. (*Id.* at ¶¶ 211–14).

As noted previously in this opinion, all of these claims are procedurally defaulted because Davis did not exhaust them during his state postconviction proceedings. More specifically, Davis raised these claims in his Rule 32 petition. (Doc. 15-11 at ¶¶ 38–43). After conducting an evidentiary hearing during which Davis's appellate counsel testified, the Rule 32 Court denied these claims on their merits in a thorough discussion, finding either that Davis's appellate counsel's decisions about which claims to raise on direct appeal were strategic or that Davis

had not shown that he was prejudiced by the failure to raise the claims because they were not meritorious. (Doc. 15-71 at 40, 140–76). Davis did not appeal that ruling. The ACCA, in its opinion on collateral appeal, noted as much, finding that Davis had abandoned any ineffective assistance of appellate counsel claims pursuant to Ala. R. App. P. 28(a)(1). *See Davis*, 44 So. 3d at 1126 n.5 ("Davis raises no claims of ineffective assistance of appellate counsel in his brief. *See* Rule 28(a)(1), Ala. R. App. P."). The exhaustion requirement "applies to a petitioner's state collateral review process." *Pruitt v. Jones*, 348 F.3d 1355, 1359 (11th Cir. 2003). Because Davis did not present these claims to the ACCA or to the Alabama Supreme Court in a petition for writ of certiorari on collateral review, Davis failed to avail himself of all available state remedies that are a part of normal appellate procedure in Alabama. *See Dill*, 371 F.3d at 1303. As a result, Davis has not met the exhaustion requirement of 28 U.S.C. § 2254(b)(1), and he is procedurally barred from raising these claims in a federal habeas petition.

Dismissal of his habeas petition to allow Davis to present these claims fairly as federal claims in state court now would be futile because he would be barred from raising them in state court under Rule 32.2(c) of the Alabama Rules of Criminal Procedure (statute of limitations bar) and Rule 32.2(b) of the Alabama Rules of Criminal Procedure (successive petition bar). Thus, because any state remedy with

respect to these claims is procedurally barred by the state procedural rules noted above, Davis's claims are procedurally defaulted from habeas review.

Davis contends that he *did* raise these claims to the ACCA on collateral appeal by pointing to the "Statement of Facts" section of his collateral appeal brief.  (Doc. 25 at 94 (citing doc. 15-68 at 46–47)).  However, while the Statement of Facts section of Davis's collateral appeal brief contains a brief description of the actions taken by his appellate counsel, it does not raise any ineffective assistance of appellate counsel claim.  It does not even contain the word "ineffective."  Habeas petitioners may not present particular factual instances of ineffective assistance of counsel in their federal petitions that were not first presented to the state courts. *Ward*, 592 F.3d at 1156.  Additionally, Davis has not offered any argument in support of why the procedural default should be excused.

These claims are procedurally defaulted from review and are due to be dismissed.

## VII.  CERTIFICATE OF APPEALABILITY

Under the AEDPA, before a petitioner may appeal the denial of a § 2254 habeas corpus petition, the petitioner must obtain a Certificate of Appealability ("COA"). *Miller-El*, 537 U.S. at 335–36; 28 U.S.C. §2253(c)(2).  Thus, this Court is required to issue or deny a COA when entering a final order, such as this one, that

is adverse to a federal habeas petitioner. *See Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts*.

A COA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke*, 542 U.S. 274, 282 (2004); *Miller-El*, 537 U.S. at 336; *Slack v. McDaniel*, 529 U.S. 473, 483 (2000). To make such a showing, the petitioner must demonstrate that reasonable jurists could debate whether the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard*, 542 U.S. at 282; *Miller-El*, 537 U.S. at 336. This Court finds that Davis's claims do not satisfy either standard. Thus, Davis is not entitled to a COA.

## VIII.  CONCLUSION

For the foregoing reasons, it is ORDERED that Davis's petition for a writ of habeas corpus is DENIED and DISMISSED with prejudice, without an evidentiary hearing.

An appropriate final judgment will follow.

DONE this 28th day of January, 2026.

/s/ W. Keith Watkins
UNITED STATES DISTRICT JUDGE